G. Scott Sobel, Esq., SBN 124818
Law Office of G. Scott Sobel
1180 S. Beverly Drive, Suite 610
Los Angeles, CA 90035-1158
Tel: (310) 422-7067; Fax: (888) 863-5630
GScottSobel@gmail.com
Attorney for Plaintiffs and proposed Classes

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Alexander C. Baker; | **Case No. 4:21-cv-00022-RM** |
| All other similarly situated Songwriters; | **CLASS ACTION** |
| Adam Bravery LLC; | **VERIFIED FIRST AMENDED COMPLAINT (Class Claims 1-6):** |
| All other similarly situated Royalty Assignees; | |

Plaintiffs,

v.

American Society of Composers, Authors And Publishers, aka ASCAP;

Broadcast Music, Inc., aka BMI;

Mike O'Neil;

Erika Stallings;

and

Does 1-10,

Defendants.

1. **DECLARATORY JUDGMENT** ASCAP & BMI Mandatory Arbitration Clause is Void and Unenforceable for Economic Duress

2. **DECLARATORY JUDGMENT** ASCAP & BMI and Their Officials are State Actors

3. **DECLARATORY JUDGMENT** ASCAP & BMI Arbitration Clause Violates First and Seventh Amendment without Due Process

4. **DECLARATORY JUDGMENT** Performance Royalties are a Federally Protected Right `

5. **DECLARATORY JUDGMENT** ASCAP & BMI Owe Songwriters a Fiduciary Duty

6. **BREACH OF FIDUCIARY DUTY** For Underpayment - Failing To Obey the Royalty Calculation Formula

7-15. **NON-CLASS TORT CLAIMS**

**DEMAND FOR JURY TRIAL**

1
2
3
4
5

Plaintiff Alexander C. Baker, by and through his attorney, brings this action on behalf of himself and all other similarly-situated Songwriters ("Songwriter Class Members" or simply "Songwriters"). Plaintiff Adam Bravery LLC, by and through its attorney, brings this action on behalf of itself and all other similarly-situated Royalty Assignees of Songwriters.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

**I.  SHORT PLAIN STATEMENT OF THE CLASS ACTION CASE** ........**1**

   A.  ASCAP & BMI Owe a Fiduciary Duty to Songwriters And Must Be Held Accountable ....................................................................................1

   B.  Songwriters' Constitutional Rights Must Be Restored .............................1

   C.  ASCAP & BMI Should Be Declared State Actors ...................................2

   D.  Collecting Performance Royalties Should Be Declared A Federally-Protected Right ......................................................................................2

   E.  BMI's Mandatory Arbitration Agreement Is Unconstitutional and Is Void For Economic Duress.........................................................................2

   F.  Alexander C. Baker and his Assignee Adam Bravery, LLC are Viable Class Representatives ...........................................................................3

   G.  The Court Should Bifurcate the Declaratory Judgments and Try Them Purely As A Matter of Law....................................................................4

   H.  Class Injury Can *Only* Be Remedied By Class-Wide Relief ...................4

**II.  SHORT PLAIN STATEMENT OF THE UNDERLYING CASE**...........**5**

**III. SUBJECT MATTER JURISDICTION** ........................................**5**

   A.  Federal Question Jurisdiction ...................................................................5

   B.  Alexander Baker and Adam Bravery LLC Assert Diversity Jurisdiction ..6

   C.  Supplemental Jurisdiction .........................................................................6

**IV. PERSONAL JURISDICTION** .....................................................**6**

**V.  VENUE** .....................................................................................**8**

**VI. PARTIES** ..................................................................................**8**

   A.  Plaintiffs ...................................................................................................8

   B.  Defendants ................................................................................................9

   C.  Doe Defendants ........................................................................................9

**VII.  STANDING**.............................................................................**9**

A. Individual Standing for Plaintiff Alexander C. Baker ...............................9

B. Organizational Standing for Adam Bravery LLC....................................10

**VIII.   FACTS RELEVANT TO CLASS ACTION CLAIMS ....................12**

A. Background on ASCAP & BMI ...............................................12

B. Facts Regarding Copyrights In Recorded Music .....................................12

C. Facts Regarding Songwriters' Assignment of Public Performance Rights To ASCAP & BMI ..................................................13

D. Facts Regarding ASCAP & BMI Granting "Blanket" Licenses .............13

E. Facts Distinguishing Performance Royalties from Artist Royalties .........13

F. Facts Distinguishing Performance Royalties From Royalties Paid On Third Party License Deals..............................................14

G. Facts Regarding The Co-Mingling of All Performance Royalty Money .15

H. Facts Regarding The Mysterious Nature of the Performance Royalty Formula ..........................................................15

I. Facts Regarding The Consent Decrees .......................................16

J. ASCAP & BMI Standard Writer "Agreement" .................................17

K. Background on Class Representative Alexander Baker ..........................20

**IX. CAUSES OF ACTION IN CLASS ACTION CASE ...............................21**

FIRST CAUSE OF ACTION ..................................................21

SECOND CAUSE OF ACTION ...............................................23

THIRD CAUSE OF ACTION .................................................25

FOURTH CAUSE OF ACTION ...............................................28

FIFTH CAUSE OF ACTION .................................................31

SIXTH CAUSE OF ACTION .................................................33

**X.   PRAYER FOR RELIEF ON CLASS ACTION CLAIMS ....................33**

A. Declaratory Relief .......................................................33

B. Accounting ............................................................34

C. Damages...............................................................34

D.  Injunctive Relief ..................................................................34

E.  Costs and Fees ...................................................................34

**XI. DEMAND FOR COURT TRIAL AND JURY TRIAL ON CLASS ACTION CLAIMS ........................................................35**

**XII.   FACTS RELEVANT TO THE UNDERLYING CASE AGAINST BMI ....................................................................35**

A.  The Baker-Marlo Divorce, Stipulation and Royalty Order .....................35

B.  Baker's Assignment of BMI Royalties to the LLC .................................36

C.  BMI and Erika Stallings Fabricate a False "Dispute" and Repeatedly Threaten to Stop Paying Royalties.........................................37

D.  Marlo Files Meritless Contempt Action Which is Dismissed .................41

E.  BMI Officially Imposes Dispute Hold, But Then Pays Again Anyway...42

F.  BMI Stops Paying Royalties ..............................................43

**XIII.   CAUSES OF ACTION IN UNDERLYING CASE............................43**

SEVENTH CAUSE OF ACTION ...................................... 43

EIGHTH CAUSE OF ACTION ............................................ 45

NINTH CAUSE OF ACTION................................................ 46

TENTH CAUSE OF ACTION ............................................... 48

ELEVENTH CAUSE OF ACTION ....................................... 51

TWELVTH CAUSE OF ACTION ........................................ 55

THIRTEENTH CAUSE OF ACTION ................................... 58

FOURTEENTH CAUSE OF ACTION .................................. 59

FIFTEENTH CAUSE OF ACTION ...................................... 60

**XIV.   PRAYER FOR RELIEF ON UNDERLYING CLAIMS .................60**

A.  Damages...............................................................................60

B.  Injunction ...........................................................................61

C.  Costs and Fees ...................................................................61

**XV.   DEMAND FOR JURY TRIAL .................................................61**

# I.    SHORT PLAIN STATEMENT OF THE CLASS ACTION CASE

(Songwriter Class and Assignee Class v. ASCAP & BMI)

## A.    ASCAP & BMI Owe a Fiduciary Duty to Songwriters And Must Be Held Accountable

1.      It is time that ASCAP & BMI are finally held accountable for the $2 billion they collect annually as fees for music performance licenses. ASCAP & BMI are "not-for-profit" organizations and so-called Performance Royalty Organizations ("PRO"), who act as an agent on behalf of Songwriters to collect, hold, and then appropriately distribute the Performance Royalty money to which each Songwriter is entitled. After operating expenses, half of the money collected is supposed to be paid to Songwriters, the other half is supposed to go to Publishers.

2.      However, Songwriters are presently unable to conduct any type of audit of ASCAP & BMI, under the theory that ASCAP & BMI do not owe Songwriters a fiduciary duty. Songwriters come to this Honorable United States District Court, and do hereby challenge ASCAP & BMI, seeking Declaratory Judgment that yes, ASCAP & BMI do *so* owe Songwriters a fiduciary duty, and Songwriters do *so* have a right to audit ASCAP & BMI.

## B.    Songwriters' Constitutional Rights Must Be Restored

3.      Furthermore, BMI Songwriters have discovered that their constitutional right to a civil jury trial under the First and Seventh Amendments was destroyed by the terms of a decades-old Consent Decree, which mandates that BMI force all BMI Songwriters to submit to a Mandatory Arbitration Agreement as a pre-condition of receiving any Performance Royalties at all. Under their respective Consent Decrees, the United States commands both ASCAP & BMI to admit as members any Songwriter with at least one published song. Thus, Songwriters seek a Declaratory Judgment that receiving Performance Royalties is a federally-protected right (not a contractually-created right), and that a Songwriter need not relinquish the right to petition (or any other constitutional right) as a precondition of receiving Performance Royalties.

### C.    ASCAP & BMI Should Be Declared State Actors

4.      Currently boasting an estimated 1.5 million writer members between them, ASCAP & BMI are "not-for-profit" organizations. Having long ago been prosecuted in federal antitrust litigation under the Sherman Act, ASCAP & BMI are bound by federal Consent Decrees, which operate as federal law upon them. The Consent Decrees compel ASCAP & BMI to act in certain ways as a pre-condition of conducting operations. For this reason, under the State Compulsion Test, Songwriters seek a Declaratory Judgment that ASCAP & BMI and their Officials are State Actors for civil rights purposes.

### D.    Collecting Performance Royalties Should Be Declared A Federally-Protected Right

5.      Among other Consent Decree mandates, both ASCAP & BMI are compelled to collect Performance Royalty money for any Songwriter with at least one published work. Songwriters thus seek a Declaratory Judgment that collecting Performance Royalties is a federally-protected statutory right, not a contractually-created right.

### E.    BMI's Mandatory Arbitration Agreement Is Unconstitutional and Is Void For Economic Duress

6.      For all intents and purposes, any Songwriter who seeks to earn Performance Royalty money must sign with either ASCAP or BMI. Besides ASCAP & BMI, the only other significant PRO is SESAC (formerly the foreign Society of European Authors and Composers), a private, "invitation-only" society catering exclusively to highly successful, established writers, and which Songwriters have no right to join.

7.      Unlike ASCAP, BMI's Consent Decree compels BMI to include a Mandatory Arbitration Clause in its standard Writer "Agreement." While this may superficially appear to represent a meaningful choice for the Songwriter, it really doesn't.

8.      First, for any given time period, Songwriter must sign with either ASCAP or BMI, but not both. Thus, each of Songwriter's songs is registered with ASCAP or BMI, but not both. Second, to collect Performance Royalties for any song, the Songwriter and the Publisher must sign up with *the same* PRO, either ASCAP or BMI. Thus, if the Publisher

is already a publishing member of BMI, the beginning songwriter must also sign up with BMI.

9.     Since both ASCAP & BMI are bound to accept any writer with at least one published song, and since both ASCAP & BMI disclaim owing a fiduciary to Songwriters, ASCAP & BMI are identical in the most fundamental respects. Clearly, a Songwriter must sign with either ASCAP or BMI to collect any Performance Royalties at all. And, there are many situations in which the Songwriter does not have a meaningful choice to join ASCAP, and must sign with BMI, or else not collect Performance Royalties.

10.    The inability to collect any Performance Royalties can lead to economic ruin. For this reason, Songwriter's seek a Declaratory Judgment that BMI's Mandatory Arbitration Clause is void for economic duress.

11.    Moreover, BMI's Mandatory Arbitration Clause is mandated by a decades-old Consent Decree to which Songwriters were not party. For this reason, Songwriters seek a Declaratory Judgment that BMI's Mandatory Arbitration Clause infringes Songwriter's First and Seventh Amendment rights to petition and jury trial, without affording the Due Process promised by the Fifth/Fourteenth Amendments.

## F.    Alexander C. Baker and his Assignee Adam Bravery, LLC are Viable Class Representatives

12.    Songwriter Class Members are ASCAP & BMI writers with at least one published song that generates Performance Royalties. Songwriter Class Representative Alexander C. Baker is a composer, songwriter and music producer who has earned upwards of $1 million in Performance Royalties for the use of his music on TV shows over the last two decades. Baker originally signed with ASCAP in 1990, then moved to BMI in 1999. Baker has earned royalties from both ASCAP & BMI in every distribution quarter since. Assignee Class Representative Adam Bravery LLC is a Limited Liability Company to which Baker assigned the right to receive royalty payments.

13.    Baker's interests are aligned perfectly with the interests of Songwriters in finding that ASCAP & BMI owe Songwriters a fiduciary duty, and that such fiduciary duty was

breached by systematically cheating Songwriters from money owed. Baker's interests are further aligned with Songwriters in voiding the Mandatory Arbitration Clause, in obtaining a declaration that receiving Performance Royalties are a federal-protected right, and in holding ASCAP & BMI and their agents to be State Actors for civil rights purposes.

### G.    The Court Should Bifurcate the Declaratory Judgments and Try Them Purely As A Matter of Law

14.    In the interest of judicial economy, Class Action Plaintiffs will request that the Court bifurcate the first five Declaratory Judgment class action claims, pleaded here as the First, Second, Third, Fourth and Fifth Causes of Action (collectively, the "Declaratory Judgment Claims").

15.    Class Action Plaintiffs believe and on that basis allege that there are no material facts in dispute relevant to the Declaratory Judgment Claims. Based on the undisputed facts regarding the standard operating procedure of ASCAP & BMI, a dispute has now arisen as to the enforceability and/or constitutionality of various elements of that procedure. Regarding the Declaratory Judgment Claims, there is no need for any discovery by the Parties, nor any fact-finding by the Court.

16.    For the above reasons, Songwriters believe the Declaratory Judgment Claims can and should be bifurcated and brought to a Court Trial in short order.

### H.    Class Injury Can *Only* Be Remedied By Class-Wide Relief

17.    As will be set forth fully in Plaintiffs' Motion to Certify Class, despite more than 1 million Class Plaintiffs, per Fed. R. Civ. Pro. § 23(b)(2) there will not arise a duty to notify Plaintiffs and provide an opportunity to opt out, because Plaintiffs injury can *only* be remedied by class-wide relief. (See *Tinsley v. McKay*, 156 F. Supp. 3d 1024 (9th Cir. filed Apr. 30, 2018) (No. 17-17501), Appellants' Joint Opening Brief at 53.)

## II.    SHORT PLAIN STATEMENT OF THE UNDERLYING CASE

18.    BMI is legally obligated to pay Performance Royalties to Adam Bravery, LLC, the rightful Assignee of Alexander C. Baker, a BMI writer member from 1999-present. After paying royalties faithfully for over 20 years, in March 2020 BMI stopped doing so without legal justification, but upon a false and fabricated pretext.

19.    Likewise, ASCAP is legally obligated to pay Performance Royalties to Baker, an ASCAP writer member from 1990-1999. ASCAP has failed to obey a July 2016 Court Order and Letter of Direction requiring it to equalize royalties between Baker and his former co-writer.

## III.    SUBJECT MATTER JURISDICTION

### A.    Federal Question Jurisdiction

20.    Class Plaintiffs assert original federal jurisdiction under 28 U.S.C. § 2201 et. seq., the Declaratory Judgment Act, as Songwriters seek Declaratory Judgments that the Mandatory Arbitration Clause is void for coercion; the Mandatory Arbitration Clause unconstitutionally violates Songwriters' federal rights to petition and to a jury trial; receiving Performance Royalties is a federally-protected right; ASCAP & BMI and its officials are State Actors for civil rights purposes; and that ASCAP & BMI owes a fiduciary duty to its writer members, who thereby have a right to audit.

21.    Federal jurisdiction is also asserted under 42 U.S.C. § 1983, the Civil Rights Act, as Plaintiffs seek to hold Defendants liable for civil rights violations.

22.    Furthermore, federal jurisdiction was expressly retained in the Consent Decrees. See *United States v. ASCAP,* 2001 WL 1589999 (S.D.N.Y); *United States v. BMI*, 64 Civ. 3787 (S.D.N.Y.).

**B.    Alexander Baker and Adam Bravery LLC Assert Diversity Jurisdiction**

23.    In addition to federal question jurisdiction, Plaintiffs to the underlying action against assert diversity jurisdiction.

24.    Plaintiff Adam Bravery LLC is a Limited Liability Company registered and headquartered in Arizona.

25.    Plaintiff Alexander C. Baker resides in California.

26.    Defendant ASCAP is a Delaware corporation, with headquarters in New York. Likewise, Defendant BMI is a Delaware corporation, with headquarters in New York. On information and belief, Defendants Mike O'Neill and Erika Stallings each reside in New York.

27.    The value of Alexander Baker's BMI royalty stream in the underlying case was at least $100,000, rendered worthless by BMI's unjustified royalty stoppage.

28.    Additionally, Plaintiffs to the underlying case against BMI seeks general damages of not less than $1,000,000, and special damages of not less than $200,000.

29.    Therefore federal diversity jurisdiction is proper over all underlying claims by Plaintiffs Alexander C. Baker and Adam Bravery LLC.

**C.    Supplemental Jurisdiction**

30.    The District Court should exercise supplemental jurisdiction over the State law claims because all of the claims arise from a common nucleus of operative facts that are so inextricably intertwined that they cannot reasonably be separated.

## IV.    PERSONAL JURISDICTION

31.    State long-arm statutes frequently authorize specific personal jurisdiction over defendants for intentional torts that cause effects in the forum state. See *Calder v. Jones*, 465 U.S. 783, 790 (1984).

32.    Under Ariz. R. Civ. P. 4.2(a), an Arizona court may exercise personal jurisdiction over a non-resident defendant to the maximum extent permitted by the U.S. Constitution.

1   Arizona's long-arm statute has a broad remedial purpose and is liberally construed to

2   confer upon Arizona residents the maximum privileges permitted by the federal

3   constitution. *Meyers v. Hamilton Corp.*, 143 Ariz. 249, 252, 693 P.2d 904, 907 (1984).

4   33.    For an Arizona court to exercise personal jurisdiction over a non-resident defendant,

5   the plaintiff must show that the defendant had minimum contacts with Arizona such that

6   maintaining the suit in Arizona does not offend traditional notions of fair play and

7   substantial justice. *Id.* at 252, 693 P.2d at 907.

8   34.    "The notion of 'fair play and substantial justice' is a flexible one, requiring courts to

9   look at the fact situation of each case to determine whether there are sufficient, purposeful

10  'minimum contacts' with the forum." *O'Connor, Cavanagh, Anderson, Westover,*

11  *Killingsworth & Beshears, P.A. v. Bonus Utah, Inc.*, 156 Ariz. 171, 173, 750 P.2d 1374,

12  1376 (Ct. App. 1988) (emphasis added). *See also Williams v. Lakeview Co.,* 199 Ariz. 1,

13  3-4, 13 P.3d 280, 282-83 (2000) ("We cannot decide the issue of personal jurisdiction by

14  applying any mechanical test or 'talismanic jurisdictional formulas'; the facts of each case

15  must always be weighed in determining whether personal jurisdiction would comport with

16  'fair play and substantial justice.'") (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S.

17  462, 485-86 (1985).

18  35.    In deciding if minimum contacts exist, "it is not the number of contacts involved but

19  the importance of the particular contacts. Quality, not the quantity of defendant's

20  activities, is what is persuasive." *Meyers*, 143 Ariz. at 253, 693 P.2d at 908. Therefore, **a**

21  **single act is sufficient to establish a basis for personal jurisdiction**. *O'Connor*, 156

22  Ariz. at 173, 750 P.2d at 1376. *See, e.g., Id. ,* 156 Ariz. at 173, 750 P.2d at 1376

23  (defendant's hiring of Arizona law firm to file answer on its behalf in pending lawsuit

24  created minimum contact necessary to establish personal jurisdiction over him); *Holmes*

25  *Tuttle Broadway Ford, Inc. v. Concrete Pumping, Inc.*, 131 Ariz. 232, 235, 639 P.2d 1057,

26  1060 (Ct. App. 1981) (**defendant's single act of ordering a new engine from plaintiff**

27  **without intending to pay for it was sufficient to satisfy minimum contacts test**).

28

36.     Here, BMI's single act of promising to pay royalties to an Arizona citizen, then stopping royalties without legal justification is sufficient to satisfy minimum contacts test.

## V.    VENUE

37.     Venue is proper in Arizona because that is the State in which Plaintiff Adam Bravery LLC is registered to do business. On information and belief regarding operative case law, Plaintiff Adam Bravery LLC is precluded from seeking relief in a Federal Court in any other State besides Arizona.

## VI.   PARTIES

### A.    Plaintiffs

38.     Plaintiff and proposed Songwriter Class Representative Alexander C. Baker ("Baker") is an individual. Baker is a songwriter and music producer, and the aspiring producer of a music-driven animated entertainment franchise titled "Adam Bravery."

39.     The proposed Songwriter Class is all ASCAP & BMI writer members who signed the Writer "Agreement" of ASCAP and/or BMI, who wish to collect Performance Royalties, but also wish to no longer be bound by the unenforceable, unconscionable and/or unconstitutional terms and conditions imposed upon them by ASCAP & BMI as a pre-condition, and about which Class Action Plaintiffs complain herein throughout. Beyond all else, Songwriters seek to establish, once and for all, that ASCAP & BMI owe them a fiduciary duty.

40.     Plaintiff and proposed Assignee Class Representative Adam Bravery, LLC, is an Arizona Limited Liability Company formed by Baker and two other equal members in 2018, is the assignee and legal claimant to benefit from Alexander C. Baker's Performance Royalty money. The purpose of Adam Bravery LLC is to produce and commercially exploit a music-driven, animated motion picture authored by Baker, and to commercially exploit its associated music and merchandise.

41.     The proposed Assignee Class is all persons and entities to whom rights to receive Performance Royalties have been validly assigned, who wish to collect Performance

Royalties, but also wish to no longer be bound by the unenforceable, unconscionable and/or unconstitutional terms and conditions imposed upon them by ASCAP & BMI as a pre-condition, and about which Class Action Plaintiffs complain herein throughout.

### B.   Defendants

42.     Defendant American Society of Composers, Authors and Publishers, commonly known as "ASCAP," is a Delaware not-for-profit corporation with its principal office in New York.

43.     Defendant Broadcast Music Inc., commonly known as "BMI," is a Delaware not-for-profit corporation with its principal office in New York.

44.     ASCAP & BMI are Performing Rights Organizations ("PRO") as set forth in the Copyright Act and whose purpose is to collect and distribute music Performance Royalty money to its affiliated writer and publisher members.

45.     Defendant Mike O'Neill is the CEO of BMI, and sued in his individual capacity for involvement in the false pretext to withhold royalties (Claims 7-12).

46.     Defendant Erika Stallings is presently Assistant General Counsel at Facebook, but was in-house counsel for BMI at all relevant times, and is believed to be personally responsible for issuing a false pretext on which to stop paying royalties to Adam Bravery LLC. Stallings is sued in her individual capacity for her involvement in the false pretext to withhold royalties (Claims 7-12).

### C.   Doe Defendants

Doe Defendants are unknown BMI officials involved in authorizing, planning and executing the false pretext for withholding royalties (Claims 7-12).

## VII.   STANDING

### A.   Individual Standing for Plaintiff Alexander C. Baker

47.     Plaintiff Alexander C. Baker has standing to sue ASCAP & BMI for the Declaratory Judgments sought in the First – Sixth Causes of Action because he has suffered injury in fact – both constitutional and monetary injuries.

48.     As a direct and proximate consequence of Defendants' actions, Baker has suffered injuries in fact, which injuries are the loss of value of his share of ownership in Adam Bravery LLC, which loss in value was actually and proximately caused by the destruction of the federally protected right to receive BMI Performance Royalty money, which right is presently held by Plaintiff Adam Bravery LLC. Baker has also been injured by the unjustified withhold of ASCAP royalties.

49.     Baker seeks to vindicate his First Amendment right to petition and Seventh Amendment right to a jury trial, which rights are vigorously asserted here, but which rights BMI contends was "waived" by virtue of the BMI Writer "Agreement" and its Mandatory Arbitration Clause.

50.     Baker seeks a Declaratory Judgment that ASCAP & BMI owe him a fiduciary duty, and that such fiduciary duty was breached, not only by the unwarranted royalty stoppages, but also by ASCAP & BMI's failure to abide their own royalty calculation formulas.

51.     Baker alleges that both ASCAP & BMI breached their fiduciary duty to him, and to all Songwriters, by cheating them out of Performance Royalties owed, as the demanded audit will show.

52.     Moreover, Baker seeks a declaration that BMI's Mandatory Arbitration Clause is void and/or unconstitutional, or finding performance royalties to be a federally protected right, or finding ASCAP & BMI and its officials to be State Actors would allow Adam Bravery LLC to recover damages, and recover the withheld royalty money, which would restore the lost value of the company.

53.     Baker's injuries – both constitutional and monetary - are remediable by the relief sought.

### B.    Organizational Standing for Adam Bravery LLC

54.     Plaintiff Adam Bravery LLC has standing to pursue the Declaratory Judgments sought in the First – Fifth Causes of Action because it has suffered injury in fact. As Assignee, Adam Bravery LLC has the right to receive royalty money. Under the U.S. Constitution, Adam Bravery LLC has a right to petition the government for grievances,

1    and a right to a jury trial, the loss of which rights constitutes injury. Moreover, the

2    unjustified withholding Performance Royalty money is clear financial injury.

3    55.    Moreover, an association has standing to bring suit on behalf of its members when

4    its members would otherwise have standing to sue in their own right, the interests it seeks

5    to protect are germane to the organization's purpose, and neither the claim asserted nor the

6    relief requested requires the participation of individual members in the lawsuit. *Hunt v.*

7    *Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 335, 97 S. Ct. 2434, 2437 (1977)

8    56.    Here, for the reasons set forth above, Alexander Baker has standing to sue in his

9    own right for Declaratory Judgments and for civil rights violations. Though he assigned

10    his federally-protected right to receive performance royalties to the LLC, he has a vested

11    financial interest in the LLC as a 1/3 owner.

12    57.    Adam Bravery LLC seeks to protect its right to collect Performance Royalties,

13    which is germane to its overall purpose for two reasons. First, it exists to create and

14    commercially exploit copyrighted content, which commercial exploitation should in the

15    future encompass receiving performance royalties. Second, and most pressingly, Adam

16    Bravery LLC depends crucially on the quarterly income from ASCAP & BMI royalties in

17    order to operate. While one member of Adam Bravery LLC – Baker – is party to this

18    lawsuit, neither the Declaratory Judgment nor Civil Rights claims asserted nor the relief

19    requested require the participation of the other members.

20    58.    Therefore, Adam Bravery LLC has standing to pursue Declaratory Judgment and

21    Civil Rights claims because Defendants acted under color of law to deprive Adam Bravery

22    LLC of its federally protected right to receive Performance Royalty money. Defendants

23    also acted to deprive Adam Bravery LLC of its First Amendment Right to Petition, and

24    Seventh Amendment right to a jury trial, which right is vigorously asserted here.

25

26

27

28

## VIII.  FACTS RELEVANT TO CLASS ACTION CLAIMS

### A.    Background on ASCAP & BMI

59.    Since well before World War II, ASCAP & BMI have operated as not-for-profit organizations in the role of Performance Rights Society, or Performing Rights Organization ("PRO") as set forth in the "Definitions" section of Copyright Act at 17 U.S.C. § 101.

60.    ASCAP & BMI enter into purported "contracts" with music writers ("writer members," and herein "Songwriters") for the purpose of collecting and distributing Performance Royalty money owed to Songwriters. Performance Royalties are often the only way a Songwriter can monetize.

### B.    Facts Regarding Copyrights In Recorded Music

61.    "Copyright" is a right of ownership. It applies to authored works, such as a song, and refers to the exclusive legal rights of (1) reproduction, (2) adaptation, (3) publication, (4) public performance, and (5) public display. See 17 U.S.C. § 106.

62.    There are *two* separate copyrights for a piece of recorded music – one copyright in the musical Composition (held by the Publisher, and often referred to as the "publishing rights"), and one copyright in the Master Recording (held by the Master Owner, and often referred to as the "master rights").

63.    Under the Copyright Act of 1976 (17 U.S.C. § 101 et. seq.), copyright owners have the exclusive right to license a recorded song for use [1] on a TV show. Thus, use of *one* recorded song on a TV show requires the TV show producer to obtain, at arms length, *two* licenses – a "synchronization" license issued by the Publisher for use of the Composition, and a "master" license issued by the Master Owner for use of the Master.

64.    Songwriter is neither the Publisher nor the Master Owner. Songwriter does *not* own *either* of the copyrights. Songwriter has no right to license the use of the recorded song on

---

[1] "Use" of recorded music on a TV show involves the rights of reproduction,

a TV show. Songwriter has no right to license the use of the recorded song to *anyone for any purpose*.

### C.    Facts Regarding Songwriters' Assignment of Public Performance Rights To ASCAP & BMI

65.    Having contractually assigned all copyright ownership to Publisher, Songwriter retains only the right to collect the so-called "writer's share" of public Performance Royalties.

66.    By virtue of the license described in the standard Writer "Agreement," Songwriters assign to ASCAP & BMI the right to license the public performances of their songs. ASCAP & BMI each have a vast repertoire of songs written by Songwriters.

### D.    Facts Regarding ASCAP & BMI Granting "Blanket" Licenses

67.    Acting as a global agent on behalf of Songwriters, ASCAP & BMI enter into blanket license agreements with end-users of recorded music such as TV networks. ASCAP & BMI charge a license fee in exchange for granting – on behalf of all Songwriters -  the public performance rights to the *entire repertory* of music written by all ASCAP & BMI Songwriters. Note that as PROs, ASCAP & BMI license *only* the performance rights, *not* any of the other fundamental rights.

68.    Together, ASCAP & BMI collect roughly $2 billion in license fees on an annual basis. ASCAP & BMI retain that license fee money for a period of time, typically for about nine months, taking an unknown amount of the money for operating expenses. Then, on a quarterly basis, in January, March, June and September of each year, ASCAP & BMI distribute the remainder money as Performance Royalties, purportedly according to a formula based on the results of performance surveys, and a weighting factor based on the type of musical use.

### E.    Facts Distinguishing Performance Royalties from Artist Royalties

69.    Performance Royalties - central to this case – are distinguishable from Artist Royalties. Artist Royalties are paid by a Record Company to a musical Artist according to

the terms of a contract between the Artist and the Record Company. A typical such "artist deal" obligates the for-profit Record Company to pay the Artist royalties based on a ***negotiated*** percentage of the revenue from sales of the Artist's musical product, after a ***negotiated*** recoupment of the Record Company's initial investment into the project.

70.     Note that there is a direct relationship between the money received by the Record Company in revenue vs. the money it owes in royalties. At no time is the money co-mingled with other moneys owed to other artists, who have their own, different negotiated contracts. For these reasons, prior court cases have found that no fiduciary duty exists between the Artist and the Record Company, as an artist deal contract is negotiated "at arms length." See e.g. *Faulkner v. Arista Records LLC*, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009)

## F.     Facts Distinguishing Performance Royalties From Royalties Paid On Third Party License Deals

71.     Performance Royalties are also distinguishable from royalties paid on third-party license deals. In some cases a copyright owner of a song will grant a license to a Licensee, with the understanding that Licensee then has the right to turn around and grant a license for use of the song to a third party. Under such a contract, the Licensee will pay a royalty to Licensor as a ***negotiated*** percentage of the license fees received from the third party.

72.     Note that there is a direct relationship between the money received by the Licensee and the royalty owed to the Licensor. At no time is the money co-mingled with other monies owed to other licensors, who have their own, different negotiated contracts. For these reasons, prior court cases have found that no fiduciary duty exists between the Licensor and Licensee in such third-party license agreements, as such agreements are negotiated "at arms length." See e.g. *Surge Licensing v. Copyright Promo. LTD*, 258 A.D.2d 257

**G.    Facts Regarding The Co-Mingling of All Performance Royalty Money**

73.    Performance Royalties are fundamentally different from the other types of royalties for several reasons. First, ASCAP & BMI are not-for-profit entities, whereas Record Companies and Third Parity Licensees are for-profit entities.

74.    Second, the "agreement" between Songwriter and ASCAP & BMI to collect Performance Royalties is not negotiated at arms length. In fact, the "agreement" is not negotiated at all. There is a standard, one-size-fits-all writer "agreement" that Songwriter signs, or else does not receive Performance Royalties. Unlike the other types of music royalties, Songwriters are bound by identical "agreements."

75.    Third, there is no relationship at all between the money collected by ASCAP & BMI and the Performance Royalty paid to Songwriter for use of the song. This is because ASCAP & BMI do not collect money for use of the song, and have no involvement in licensing the song for use on a TV show. [2] Rather, ASCAP & BMI charge TV Networks annual blanket fees, which fee covers their entire repertory, unrelated to any particular song or songs. All of the money collected by ASCAP is co-mingled together in a giant ASCAP pool. Likewise, all of the money collected by BMI is co-mingled together in a giant BMI pool.

76.    If, and only if, a Publisher / Master Owner licenses Songwriter's song for use on a TV show, does a Performance Royalty become due to Songwriter. Performance Royalties are paid to Songwriters in quarterly distributions, allegedly according to a set formula.

**H.    Facts Regarding The Mysterious Nature of the Performance Royalty Formula**

77.    In a publication called "ASCAP's Survey and Distribution System: Rules & Policies," ASCAP describes its formula, in part, as:

> Distribution to each writer member (hereinafter called "writer") from this fund shall be calculated on the basis of the number of performance credits

---

[2] Songs are licensed to a TV show by the Publisher and Master Owner.

> of such writer recorded during the most recent available fiscal survey quarter year multiplied by the performance credit value for that quarter year, multiplied by 20%.

See https://www.ascap.com/~/media/files/pdf/members/payment/drd.pdf

78.     BMI employs a similar formula. How exactly ASCAP & BMI tally the number of "performance credits," or how a number is assigned to "performance credit value," or how those numbers relate to the total amount of money collected, is unknown to Plaintiffs. More importantly, even if the specifics of the formula were known, Plaintiffs are unable to verify whether ASCAP & BMI are adhering to it.

### I.     Facts Regarding The Consent Decrees

79.     Long ago, ASCAP & BMI were each prosecuted by the United States of America for violations of the Sherman Anti-Trust Act. The net result of those prosecutions were Consent Decrees containing the terms and conditions under which ASCAP & BMI are allowed to operate.

80.     The Consent Decrees are periodically renegotiated, or updated. On information and belief, the most recent version of the Consent Decree controlling BMI is the 1994 version, a true and correct copy of which is attached to this complaint as EXHIBIT "A," pp. 2-10. The most recent Consent Decree controlling ASCAP is the 2001 version, a true and correct copy of which is attached to this complaint at EXHIBIT "R," pp. 92-100.

81.     Under the Consent Decree, ASCAP & BMI have no right to refuse membership to any Songwriter with at least one work published. At Article V (A) ("No Right to Refuse"), the BMI Consent Decree states, in relevant part:

> "[BMI] shall not refuse to enter into a contract providing for the licensing by [BMI] of performance rights with any writer who shall have had at least one copyrighted musical composition of his writing commercially published or recorded..."

See EXHIBIT "A," p. 3

82.     Likewise, at Article XI, A(1), the ASCAP Consent Decree States:

> ASCAP is hereby ordered and directed to admit to membership, non-participating or otherwise, [a]ny writer who shall have had at least one

work regularly published, whether or not performance of the work has been recorded in an ASCAP survey.

See EXHIBIT "R," p. 98

83. The BMI Consent Decree requires BMI to divest all songwriters of their enumerated right to a jury trial. At Article VII (C) ("Arbitration Mandate"), the BMI Consent Decree states:

Defendant [BMI] shall include in all contracts which it tenders to writers, publishers and music users relating to the licensing of performance rights a clause requiring the parties to submit to arbitration in the City, County and State of New York under the then prevailing rules of the American Arbitration Association, all disputes of any kind, nature or description in connection with the terms and conditions of such contracts or arising out of the performance thereof or based upon an alleged breach thereof, except that in all contracts tendered by defendant to music users, the clause requiring the parties to submit to arbitration will exclude disputes that are cognizable by the Court pursuant to Article XIV hereof.

See EXHIBIT "A," p. 5

84. The ASCAP Consent Decree does not include an Arbitration Mandate. See EXHIBIT "R," p. 92 et. seq.

## J.    ASCAP & BMI Standard Writer "Agreement"

85. Pursuant to their obligations under the Consent Decrees, ASCAP & BMI offer potential writer-members a standard Writer "Agreement." See current Writer "Agreements" for ASCAP (EXHIBIT "Q," p. 92 et. seq.) and BMI (EXHIBIT "C," p. 17 et. seq.)

86. The Writer "Agreements" granting performance rights to ASCAP & BMI are "non-exclusive" in one sense, meaning that the Publisher retains the right to license performance rights directly, without utilizing the services of the PRO. However, in a different sense, the Writer "Agreement" *is* exclusive, in that Songwriter may only belong to one PRO at a time. Any and all songs registered with one PRO forever remain with that PRO, regardless of whether Songwriter later changes his or her affiliation.

87. On June 4, 1999, Baker signed the BMI standard Writer "Agreement" (hereafter the "BMI-Baker Writer 'Agreement'"), attached to this Complaint at EXHIBIT "B," p. 12-15.

88.    At paragraph 13 ("Power of Attorney clause"), the BMI-Baker Writer "Agreement"
states that:

> You make, constitute and appoint us, or our nominee, your true and lawful
> attorney, irrevocably during the Period, in our name or that of our
> nominee, or in your name, or otherwise, in our sole judgment, to do all
> acts, take all proceedings, execute, acknowledge and deliver any and all
> instruments, papers, documents, process or pleadings that, in our sole
> judgment, may be necessary, proper or expedient to restrain infringement
> of and/or to enforce and protect the rights granted by you hereunder, and
> to recover damages in respect to or for the infringement or other violation
> of said rights, and in our sole judgment to join you and/or others in whose
> names the copyrights to any of the Works may stand.

EXHIBIT "B," p. 14

89.    The current ASCAP Writer "Agreement" has a similar Power of Attorney clause.
See EXHIBIT "Q," p. 90, Item 5.

90.    At paragraph 17 ("Right to Payment of Money") the BMI-Baker Writer
"Agreement" states:

> You acknowledge that the rights obtained by you pursuant to this
> agreement constitute rights to payment of money and that during the
> Period we shall hold title to the performing rights granted to us hereunder.

EXHIBIT "B," p. 15

91.    At paragraph 18 ("Promise to Pay") the BMI-Baker Writer "Agreement" states:

> We agree to distribute to you royalties and monies collected by us
> pursuant to the authorization granted in subparagraph 18(a), pursuant to
> our then prevailing practices, including deduction of our expenses
> therefor.

EXHIBIT "B," p. 15

92.    Likewise, the current ASCAP Writer "Agreement" promises:

> a fair, just and equitable distribution of royalties among the membership.

EXHIBIT "Q," p. 90, Item 8.

93.    At paragraph 19, ("Mandatory Arbitration Clause") the BMI-Baker Writer
"Agreement" states:

> All disputes of any kind, nature or description arising in connection with
> the terms and conditions of this agreement shall be submitted to the

American Arbitration Association in New York, New York, for arbitration under its then prevailing rules.

EXHIBIT "B," p. 15

94.     The ASCAP Writer "Agreement" does not contain a Mandatory Arbitration Clause.

95.     The standard BMI Writer "Agreement" appears to have changed since 1999 when Baker signed his. On February 4, 2020, Baker downloaded from the BMI website its "Writer Kit," which contains the current standard "agreement" ("New Writer 'Agreement'") plus instructions on how to fill out the forms. The New Writer "Agreement" is attached hereto as EXHIBIT "C," pp. 16-23.

96.     In many respects, the new Writer "Agreement" is identical to the 1999 version that Baker signed. For example, the "Power of Attorney" language in paragraph 13 of the BMI-Baker Writer "Agreement" is found at paragraph 15 of the New Writer "Agreement"; EXHIBIT "C," p. 21; the "Right to Payment" language in paragraph 17 of the BMI-Baker Writer "Agreement" is now present in paragraph 19 of the New Writer "Agreement," *Id*, p. 22; the "Promise to Pay" language in paragraph 18 of the BMI-Baker Writer "Agreement" is now found at paragraph 20 of the New Writer "Agreement," *Id*, p. 22; and the Mandatory Arbitration Clause at paragraph 19 of the BMI-Baker Writer "Agreement" is now found at paragraph 21 of the New Writer "Agreement," *Id*, p. 22.

97.     However, the New BMI Writer "Agreement" contains a significant difference as compared to the BMI Writer "Agreement" Baker signed, as paragraph 24 of the current version ("No Fiduciary Duty") states:

> You acknowledge that the relationship between you and us which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations hereunder.

EXHIBIT "C," p. 22

98.     The "No Fiduciary Duty" language is not present in the BMI-Baker Writer "Agreement." On information and belief, both ASCAP & BMI disclaim owing a fiduciary duty to Songwriters.

### K.     Background on Class Representative Alexander Baker

99.     Plaintiff Alexander C. Baker ("Baker") is a songwriter, lyricist and music composer. Primarily a pianist and keyboard player, Baker also sings, plays guitar and percussion instruments. Baker can improvise music and spontaneously compose music, to specifications, "at the drop of a hat." This ability allowed Baker to be a very prolific composer.

100.    In 1990, Baker signed a Writer "Agreement" with ASCAP.

101.    In 1993 Baker met Clair Marlo. Baker and Marlo formed a business partnership called "Invisible Hand Productions" for the purpose of writing, producing and commercially exploiting music.

102.    By 1994, along with his writing partner Marlo, Baker was earning ASCAP Performance Royalties for original music composed for the Muzak background music service. At that time, Baker was informed by Marlo (also an ASCAP writer) and informed by their then-publisher Dean Whitney (DeWhit Music Publishing Company, ASCAP) that BMI *did not collect* from Muzak.

103.    In 1995 Baker and Marlo were legally married.

104.    By 1996, Baker and Marlo began working on a "work-for-hire" basis for FirstCom Music, writing and producing collections of music for use on TV shows. FirstCom had both ASCAP & BMI publishing companies.

105.    Both Baker and Marlo began earning ASCAP Performance Royalties for music licensed by FirstCom to TV shows. However, in or about 1999, Baker and Marlo were informed that, as to Performance Royalties for music on TV shows, BMI paid significantly more than ASCAP.

106.    On June 4, 1999, Baker resigned from ASCAP and signed with BMI (hereafter the "BMI-Baker Writer 'Agreement'"), attached to this Complaint at EXHIBIT "B," p. 12-15.

107.    For a period of about 2 years, 1999 - 2001, Baker was a BMI writer while Marlo remained an ASCAP writer. Since there were numerous co-written songs earning Performance Royalties, Marlo (who handled the business) compared Performance

Royalties paid by ASCAP to those paid by BMI for the same performances. It was confirmed that – at least regarding such production music - BMI pays significantly more for TV show usage than does ASCAP.

108.    In or about 2001, Clair Marlo resigned ASCAP and also became a BMI writer.

109.    In the ensuing 2 decades, Baker had literally thousands of performances of his music on TV. Baker never failed to earn royalties in any quarterly distribution since. By the year 2010, Baker's annual BMI royalties were over $100,000 per year.

110.    Since 2010, Baker's royalties have gradually tapered off, and currently earn about $40,000 per year.

## IX.    CAUSES OF ACTION IN CLASS ACTION CASE

### FIRST CAUSE OF ACTION
### Declaratory Judgment – 28 U.S.C. § 2201
### BMI Mandatory Arbitration Clause is Void and Unenforceable
### Coercion / Economic Duress
### (Songwriter Class and Assignee Class v. BMI)

111.    Class Action Plaintiffs repeat, reallege, and incorporate by reference all facts stated above.

112.    Each BMI Songwriter undisputedly signed a document titled "Writer Agreement" with BMI, which document undisputedly contains a Mandatory Arbitration Clause, the language of which undisputedly purports to mandate arbitration for any dispute arising from the collection and distribution of performance royalties. Each member of the Assignee Class undisputedly assigned the rights to collect royalties under said Writer "Agreement."

113.    An actual controversy has arisen between Class Action Plaintiffs and BMI. Plaintiffs believe BMI's Mandatory Arbitration Clause is void and unenforceable because it was signed under coercion. BMI believe the Arbitration Clause is an enforceable agreement.

114.    Songwriters will be deemed to have been coerced into signing the BMI Writer "Agreement" if they can prove all of the following. (1) That BMI used a wrongful act or

wrongful threat to pressure Songwriters into consenting to the contract; (2) that a reasonable person in Songwriter's position would have believed that they had no reasonable alternative except to consent to the BMI Writer "Agreement"; and (3) that Songwriter would not have consented to the contract without the wrongful act or wrongful threat. (See CACI Jury Instructions, No. 333)

115.    At paragraph 19, ("Mandatory Arbitration Clause") the BMI Writer "Agreement" states:

> All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules.

116.    Applicable case law instructs us that economic duress has taken place when "a reasonably prudent person subject to [economic coercion] may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin." (*Rich & Whillock, Inc. v. Ashton Dev*., Inc., 157 Cal. App. 3d 1154, 1155, 204 Cal. Rptr. 86, 87 (1984), and see also *Frank Culver Elec., Inc. v. Jorgenson*, 136 Ariz. 76, 77-78, 664 P.2d 226, 227-28 (App. 1983))

117.    If Songwriter's Publisher is a BMI Publisher, then Songwriter does not have the option of joining ASCAP. Even if Songwriter is an ASCAP writer, if Songwriter seeks to obtain proper Performance Royalties for performances on TV shows, Songwriter must resign ASCAP and join BMI as Alexander Baker did in 1999, or else suffer very significant financial losses.

118.    BMI's conduct clearly meets the standard for economic duress, because a typical BMI Songwriter seeking Performance Royalties for music on TV shows, e.g. Alexander Baker, has no other method to obtain proper Performance Royalty money besides signing BMI's Mandatory Arbitration Clause.

119.    Such a loss of Performance Royalties is reasonably expected to lead to financial ruin for a typical Songwriter, because a typical Songwriter works on a "work-for-hire" basis, or otherwise surrenders copyright ownership. As set forth in the Copyright Act (17 U.S.C. §

101 et. seq.), under a "work-for-hire," the songwriter gives copyright ownership – and all associated royalty rights - to the Publisher. The only royalty right remaining to the songwriter under a work-for-hire is the right to collect Performance Royalties.

120.    Thus, to earn a living, a BMI Songwriter has no reasonable alternative to BMI. It is either sign BMI's Mandatory Arbitration Clause, or face economic ruin. This is more than theory or speculation. After collecting royalties upwards of $1 million over the years, Class Representatives Alexander Baker and Adam Bravery LLC are now faced with economic ruin, as a direct and proximate consequence of BMI's unjustified royalty stoppage. Had Baker never signed the Mandatory Arbitration Clause in the first place, he could not possibly have ever received the money he did and would have been economically ruined long ago.

121.    Therefore, the Court should find that Songwriter's signature on BMI's Mandatory Arbitration Clause was obtained by the coercion of economic duress, and on that basis declare the BMI Mandatory Arbitration Clause null, void and unenforceable.

## SECOND CAUSE OF ACTION
### Declaratory Judgment – 28 U.S.C. § 2201
### ASCAP & BMI and Their Officials are Government Actors for § 1983 Purposes
### (Songwriter Class and Assignee Class v. ASCAP & BMI)

122.    Plaintiffs repeat, reallege and incorporate by reference the facts alleged above.

123.    An actual controversy has arisen, as Songwriters and their Assignees believe that ASCAP & BMI and their Officials are State Actors for civil rights purposes, while ASCAP & BMI maintain that they are private not-for-profit organizations.

124.    ASCAP & BMI are each Delaware not-for-profit corporations. ASCAP & BMI and its officers are nominally private actors.

125.    However, ASCAP & BMI and their officers must be held to be government actors for Section 1983 purposes, under the State Compulsion Test.

126.    Under the State Compulsion Test, a private actor will be treated as a government official for Section 1983 purposes when a state exercises such coercive power that the "choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991,

1004 (1982) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 166 (1978); *Jackson,* 419

U.S. at 357*; Adickes v. S.H. Kress & Co*., 398 U.S. 144, 170 (1970); *Moose Lodge No. 107*

*v. Irvis*, 407 U.S. 163, 173(1965)).

127.    The State Compulsion Test is met when a state encourages or coerces a private

party to engage in the challenged conduct.  See Paul C. McCaffrey, Note, "Playing Fair:

Why the United States Anti-Doping Agency's Performance-Enhanced Adjudications

Should be Treated as State Action," 22 WASH. U. J.L. & POL'Y 645, 664 (2006).

128.    Here, the Consent Decrees coerce both ASCAP & BMI to collect royalties for "any

writer" with at least one published song, thus creating a federal entitlement and federal

right. The choice in law is that of the United States of America, not of ASCAP & BMI.

ASCAP & BMI have no choice in the matter.

129.    The Ninth Circuit has explained:

> The state compulsion test asks whether a private actor who violates
> someone's constitutional rights under the "compulsion" or framework of a
> state law or a state custom having force of law offends the Fourteenth
> Amendment. *Adickes v. S.H. Kress and Company*, 398 U.S. 144, 169-170,
> 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970); *North Georgia Finishing, Inc. v.*
> *Di-Chem, Inc*., 419 U.S. 601, 42 L. Ed. 2d 751, 95 S. Ct. 719 (1975).

*Gorenc v. Salt River Project Agric. Improv. & Power Dist*., 869 F.2d 503, 508 (9th Cir.

1989)

130.    In addition to mandating membership and the collection of Performance Royalties,

the BMI Consent Decree also coerces BMI to deprive its members of the Seventh

Amendment right to jury trial by mandating arbitration. Again, the choice in law is that of

the United States of America, not of BMI.

131.    Finding State compulsion is based on the degree of the state's influence over the

private actor and, therefore, its potential application is much broader than, for example, the

Public Function Test. As Justice Souter noted in *Brentwood Academy v. Tennessee*

*Secondary School Athletic Association*, coercion and encouragement refer to the "kinds of

facts that can justify characterizing an ostensibly private action as public instead.'

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288,303 (2001).

132.    In light of the "any writer" mandate, both Consent Decrees' degree of influence over ASCAP & BMI is *total,* as it states essentially *all* the significant terms under which ASCAP & BMI is and is not allowed to operate.

133.    Violations of the Consent Decree would subject ASCAP & BMI to punishment under the law. The Consent Decree compels ASCAP & BMI to act in certain ways, and to refrain from acting in other ways, and has all the force and power of federal statutory law.

134.    Thus, the mandates of the Consent Decrees satisfy the State Compulsion Test.

135.    Moreover, the Copyright Act (17 U.S.C. § 101 et. seq) mentions ASCAP & BMI *by name* in its definition section. Other than the Copyright Act, Plaintiffs are not aware of any other statutes, federal or state, that mention any private entities, whether for-profit or not-for-profit.

136.    Therefore, the Court should issue a Declaratory Judgment that, for Section 1983 purposes, ASCAP & BMI and its officials are State Actors.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983 Civil Rights, 28 U.S.C. § 2201 Declaratory Judgment**
**BMI Consent Decree Arbitration Mandate and BMI Arbitration Clause**
**Violate Right to Petition and Right to Jury Trial Without Due Process**
**(Songwriter Class and Assignee Class v. BMI)**

137.    Plaintiffs repeat, reallege and incorporate by reference the facts alleged above.

138.    An actual controversy has arisen between Class Action Plaintiffs and BMI. Acting under color of the Consent Decree, BMI has a policy and custom of Mandatory Arbitration. Plaintiffs believe BMI's Mandatory Arbitration Clause is unconstitutional because it deprives Plaintiffs of the rights to petition and to a jury trial without the due process promised in the Fifth Amendment. BMI believes its Mandatory Arbitration Clause is an enforceable agreement, and that Songwriters voluntarily waived their constitutional rights.

139.    The First Amendment to the U.S. Constitution states, in relevant part:

> Congress shall make no law … abridging … the right … to petition the Government for a redress of grievances.

140.    The Seventh Amendment to the U.S. Constitution states:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

The Fifth Amendment to the U.S. Constitution states, in relevant part:

> No person … shall be deprived of … property … without due process of law.

Procedural due process rules are meant to protect persons from the mistaken or unjustified deprivation of life, liberty, or property. (*Carey v. Piphus*, 435 U.S. 247, 259 (1978)). Thus, the required elements of due process are those that "minimize substantively unfair or mistaken deprivations" by enabling persons to contest the basis upon which a State Actor proposes to deprive them of protected interests. (*Fuentes v. Shevin*, 407 U.S. 67, 81 (1972)).

141.    In its Section VII (C), the Consent Decree states:

> "[BMI] shall include in all contracts which it tenders to writers, publishers and music users relating to the licensing of performance rights a clause requiring the parties to submit to arbitration in the City, County and State of New York under the then prevailing rules of the American Arbitration Association, all disputes of any kind, nature or description in connection with the terms and conditions of such contracts or arising out of the performance thereof or based upon an alleged breach thereof..."

142.    At paragraph 19, ("Mandatory Arbitration Clause") the BMI-Baker Writer "Agreement" states:

> All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules.

143.    Mandating arbitration is, by definition, a prior restraint of the right the petition and of the right to a jury trial. It has long been established that a prior restraint comes to the Court "with a heavy presumption against its constitutional validity." (*Bantam Books v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963)). *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir. 1996)).

144.    Thus, the Court should find that the burden of proof shifts to BMI to demonstrate the constitutional validity of its Mandatory Arbitration Clause, and that such is a heavy burden.

145.    Citing the U.S. Supreme Court's *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 752, 108 S. Ct. 2138, 2141 (1988) ("Lakewood"), the Eleventh Circuit recently explained the impermissible nature of unbridled discretion in issuing a prior restraint, which explains why BMI's Mandatory Arbitration Clause must be struck down:

> Perhaps the plainest example of an unconstitutional grant of unbridled discretion is a law that gives a government official power to [allow or disallow speech] but that provides no standards by which the official's decision must be guided.

(*Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1221 (11th Cir. 2017))

If we look to the plain language of the BMI Consent Decree, which has all the force of federal statutory law, there is no standard by which BMI has any discretion as to when the songwriter's First Amendment right to petition may or may not be restrained. Rather, the Songwriter's constitutional rights are simply done away with. Thus, BMI's Mandatory Arbitration Clause is worse than "unbridled discretion" to destroy rights, it is the ex ante wholesale destruction of rights, with no exercise of discretion required.

146.    The present deprivation of Class Action Plaintiffs' constitutional rights to petition and to a jury trial must be considered unfair and/or mistaken, because the Consent Decree and BMI's Mandatory Arbitration Clause purports to ex ante deny Songwriters the First Amendment right to petition the government for redress of grievances, and of the Seventh Amendment right to a jury trial, prior to the songwriter even contemplating such a thing as performance royalties. Indeed, the deprivation of rights occurred prior to most Songwriters alive today having even been born.

147.    "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them

1   an opportunity to present their objections. (*Mullane v. Central Hanover Bank & Trust Co.*,

2   339 U.S. 306, 314 (1950))

3   148.   No Songwriter here was party to the BMI Consent Decree, thus was not apprised of

4   the pendency of the action and not afforded any opportunity to present objections. There

5   was no notice to the Songwriters that their rights to petition and to a jury trial were at

6   stake, or that by executing the Consent Decree the right to petition and to a jury trial

7   would forever be lost. Defendants cannot even reasonably argue that Plaintiffs were

8   afforded due process, let alone could it be proven.

9   149.   Therefore, the Court should issue a Declaratory Judgment striking BMI's

10   Mandatory Arbitration Clause as unconstitutional. The Court should find that BMI's

11   Mandatory Arbitration Clause, and the Consent Decree arbitration mandate underlying it,

12   constitute an impermissible prior restraint of the First Amendment right to petition, and of

13   the Seventh Amendment right to a jury trial, and that such prior restraint was imposed

14   upon Plaintiffs without affording them the substantive and procedural due process

15   guaranteed by the Fifth and/or Fourteenth Amendment.

16   
17                      **FOURTH CAUSE OF ACTION**
                     **Declaratory Judgment – 28 U.S.C. § 2201**
18             **Collecting Performance Royalties is a Federal Right**
               **Regardless of Whether ASCAP & BMI Are State Actors**
19             **(Songwriter Class and Assignee Class v. ASCAP & BMI)**

20   150.   Class Action Plaintiffs repeat, reallege and incorporate by reference the facts alleged

21   above.

22   151.   And actual controversy has arisen, as Songwriters and their Assignees believe that

23   collecting Performance Royalties is a federally-protected statutory right, whereas ASCAP

24   & BMI believe the collecting Performance Royalties is a contractual right only.

25   152.   The Consent Decree has all the force and power of federal statutory law. At Article

26   V (A) ("No Right to Refuse"), the BMI Consent Decree states, in relevant part:

27            "[BMI] shall not refuse to enter into a contract providing for the licensing
             by [BMI] of performance rights with ***any writer*** who shall have had at
28

least one copyrighted musical composition of his writing commercially
published or recorded..."

See EXHIBIT "A," p. 2, emphasis added.

153.    Likewise, at Article XI, A(1), the ASCAP Consent Decree States:

ASCAP is hereby ordered and directed to admit to membership, non-
participating or otherwise, ***any writer*** who shall have had at least one work
regularly published, whether or not performance of the work has been
recorded in an ASCAP survey.

See EXHIBIT "R," p. 98, emphasis added.

154.    Clearly the United States intended the Consent Decrees to operate as federal law,
and to establish a federal entitlement to collect performance royalties. Otherwise, the
United States would not have mandated that ASCAP & BMI collect and distribute
royalties to "any writer."

155.    The Supreme Court has consistently held that a federal entitlement creates a federal
right. For example, a person's entitlement to welfare benefits under the federal Social
Security Act is a federal right that can be protected by section 1983. See *Maine v.
Thiboutot*, 448 U.S. 1, 100 S. Ct. 2502, 65 L. Ed. 2d 555 (1980) ("*Thiboutot*").

156.    In *Thiboutot*, *supra,* the Supreme Court contended with the issue of the scope of
coverage under Section 1983. The Court began by quoting the text from 42 U.S.C. § 1983:

Every person who, under color of any statute, ordinance, regulation,
custom, or usage, of any State or Territory, subjects, or causes to be
subjected, any citizen of the United States or other person within the
jurisdiction thereof to the deprivation of any rights, privileges, or
immunities secured by the Constitution *and laws*, shall be liable to the
party injured in an action at law, suit in equity, or other proper proceeding
for redress."

*Thiboutot*, *supra,* at 2504, emphasis in original.

157.    The Supreme Court then explained the large applicability of Section 1983:

Even were the language [of Section 1983] ambiguous, however, any doubt
as to its meaning has been resolved by our several cases suggesting,
explicitly or implicitly, the § 1983 remedy broadly encompasses violations
of federal statutory as well as constitutional law. *Rosado v. Wyman*, 397
U.S. 397 (1970), for example, "held that suits in federal court under §
1983 are proper to secure compliance with the provisions of the Social

Security Act on the part of participating States." *Edelman v. Jordan*, 415 U.S. 651, 675 (1974). *Monell v. New York* City Dept. of Social Services, 436 U.S. 658, 700-701 (1978), as support for its conclusion that municipalities are "persons" under § 1983, reasoned that "there can be no doubt that § 1 of the Civil Rights Act [of 1871] was intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights." Similarly, *Owen v. City of Independence*, 445 U.S. 622, 649 (1980), in holding that the common-law immunity for discretionary functions provided no basis for according municipalities a good-faith immunity under § 1983, noted that a court "looks only to whether the municipality has conformed to the requirements of the Federal Constitution and statutes." *Mitchum v. Foster*, 407 U.S. 225, 240, n. 30 (1972), and *Lynch v. Household Finance Corp.*, 405 U.S. 538, 543, n. 7 (1972), noted that § 1983's predecessor "was enlarged to provide protection for rights, privileges, or immunities secured by federal law." *Greenwood v. Peacock*, 384 U.S. 808, 829-830 (1966), observed that under § 1983 state "officers may be made to respond in damages not only for violations of rights conferred by federal equal civil rights laws, but for violations of other federal constitutional and statutory rights as well."

*Thiboutot*, *supra,* at 2504-05

158.    Thus, the Court must find that the Consent Decree mandate that ASCAP & BMI collect and pay performance royalties to "any writer" creates a federal right in the Songwriter.

159.    Because there is no language prohibiting assignment of rights to collect royalties, and indeed ASCAP & BMI have a standard form to facilitate assignment of royalties, the federal right to receive performance royalties must extend to Assignees.

160.    Therefore, the Court should issue a Declaratory Judgment that a songwriter with at least one published musical composition of his or her writing has a federally protected right to collect performance royalties, and that such federal right extends to assignees.

**FIFTH CAUSE OF ACTION**
**Declaratory Judgment – 28 U.S.C. § 2201**
**ASCAP & BMI Owe a Fiduciary Duty to Writers and Their Assignees**
**Regardless of Whether ASCAP & BMI Are State Actors**
**(Songwriter Class and Assignee Class v. ASCAP & BMI)**

161.    Plaintiffs repeat, reallege and incorporate by reference the facts alleged above.

162.    An actual controversy has arisen between Class Action Plaintiffs and ASCAP & BMI. Plaintiffs contend that ASCAP & BMI owes a fiduciary duty to all its Songwriter members, and to their Assignees. ASCAP & BMI contend they do not owe any fiduciary duty to its Songwriters or their Assignees.

The standard ASCAP & Writer "Agreement" explicitly makes the PRO Songwriter's "true and lawful attorney." See ASCAP, EXHIBIT "Q," p. 90, Item 5; BMI EXHIBIT "C," p. 21, Item 15.

163.    A true and lawful attorney is a fiduciary, by definition.

164.    As the Courts have explained:

> In determining whether one party owes a fiduciary duty to another, the courts focus on the substance of their relationship, not the labels they use.
>
> …
>
> If the "overall purpose" of the parties' agreement is to engage one party to act on the other's behalf, as agent, general contractual language purporting to "preclude [] the existence of an agency relationship" may be disregarded. *Samba Enterprises*, 2009 U.S. Dist. LEXIS 23393, 2009 WL 705537, at *7-8 (where purpose of agreement was "to engage Samba to act on iMesh's behalf" and where Samba held itself out as iMesh's "agent" to third parties, "Samba was iMesh's agent," and "owed iMesh fiduciary duties under New York law, notwithstanding clause in contract reciting that it was "not intended to create a 'partnership, franchise, joint venture, agency, or employment relationship.'"); see also *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 451-52 (S.D.N.Y. 2015) (where substance of parties' relationship was that of agent to principal, it was "of little consequence that the [contract] declares Morgan Stanley to be 'acting as an independent contractor'"). "It is the character and circumstances surrounding the relationship that determine the duty of the agent." *Impax Media, Inc. v. Ne. Advert. Corp.*, 2018 U.S. Dist. LEXIS 139972, 2018 WL 3962841, at *7 (S.D.N.Y. Aug. 17, 2018).

*Morgan Art Found. Ltd. v. Brannan*, No. 18-CV-8231 (AT) (BCM), 2020 U.S. Dist. LEXIS 14043, at *56-57 (S.D.N.Y. Jan. 28, 2020)

165.    Regardless of labels, the responsibility of ASCAP & BMI are those of a collection agent, and closely akin to those of an escrow officer: ASCAP & BMI are obligated to collect Performance Royalty monies due to all Songwriters (blanket license fees), to hold that money for some period of time, to deduct its own expenses, then calculate the amount due to each Songwriter, then to pay. Agents and escrow officers are fiduciaries, by definition.

166.    To determine if a fiduciary relationship exists, "New York law inquires whether one person has reposed trust or confidence in the integrity and fidelity of another who thereby gains a resulting superiority or influence over the first." (*Teachers Ins. & Annuity Assoc. of Am. v. Wometco Ent., Inc.*, 833 F. Supp. 344, 349-50 (S.D.N.Y. 1993)) Thus, a fiduciary duty exists where one assumes control and responsibility over another, or where one has a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking. (*Abercrombie v. College*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006))

167.    Songwriter has reposed trust and confidence in the integrity of ASCAP & BMI, as over $ 2 billion annually is collected, and is supposed to be distributed fairly and accurately among over 1 million Songwriters, according to a proscribed formula. Thus, ASCAP & BMI's responsibilities are very closely akin to those of a trustee obligated to make regular distributions to a number of similarly-situated beneficiaries. A trustee is a fiduciary, by definition.

168.   Because they are entrusted to collect, hold and fairly distribute Songwriters' money, the relationship between ASCAP & BMI and the Songwriter is the very *essence* of a fiduciary relationship.

169.   Therefore the Court should issue a Declaratory Judgment finding a fiduciary relationship between a Songwriter, on the one hand, and ASCAP & BMI on the other. This fiduciary relationship must extend to any subsequent assignees of rights to receive

royalty money. The Court should explicitly define that a fiduciary duty includes the right to conduct an audit of ASCAP & BMI, and to make public the *entirety* of the formula by which royalties are allocated amongst Songwriters.

### SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Songwriter Class and Assignee Class v. ASCAP & BMI)

170.    Plaintiffs repeat, reallege and incorporate by reference the facts alleged above.

171.    ASCAP & BMI owe Songwriters a fiduciary duty. *Supra.*

172.    ASCAP & BMI collect over $ 2 billion per year in blanket license fees.

173.    ASCAP & BMI promise to distribute Performance Royalties among Songwriters according to a formula that contains ambiguous and subjective terms such as "credit value." As far as Songwriters can tell, ASCAP & BMI are free to numerically manipulate such ambiguous terms to obtain essentially any result.

174.    Even to the extent that the royalty calculation formula is objective, Songwriters have no reason to believe that the Performance Royalty money is distributed according to the formula.

175.    Songwriters believe, and on that basis allege, that ASCAP & BMI manipulate the terms of the formula, or otherwise disobey the formula, on an ad hoc basis so as to cheat Songwriters from the full amount of Performance Royalties due to them, while improperly transferring undue amounts of money to society officers and others.

176.    Songwriters believe, and on that basis allege, that ASCAP & BMI significantly underpay Songwriters in such amount as proven at trial.

## X.    PRAYER FOR RELIEF ON CLASS ACTION CLAIMS

177.    Wherefore, Class Action Plaintiffs pray for relief as follows:

### A.    Declaratory Relief

For a Declaratory Judgment that the Mandatory Arbitration Clause within the Writer "Agreement" of ASCAP & BMI is void for economic duress;

For a Declaratory Judgment that, for purposes of Section 1983 litigation, ASCAP & BMI is a government entity and its officials are government actors;

For a Declaratory Judgment that the Arbitration Mandate in the Consent Decree and in the standard ASCAP & BMI Writer "Agreement" violates the First Amendment right to petition and the Seventh Amendment right to a jury trial;

For a Declaratory Judgment that any songwriter with at least one song published has a federally-protected right to collect Performance Royalties, and that such federal right is assignable; and

For Declaratory Judgment that ASCAP & BMI owes Songwriters and their Assignees a fiduciary duty, with rights to audit;

### B.   Accounting

For a full accounting of revenues received, application of royalty formula, and distribution of Performance Royalties, from the most recent year and as far back in time as the Court deems reasonable;

### C.   Damages

For monetary damages in an amount necessary to make Songwriters whole, according to proof;

### D.   Injunctive Relief

For a permanent injunction prohibiting ASCAP & BMI from disclaiming a fiduciary duty to its Songwriter members and their Assignees;

For a permanent injunction prohibiting BMI from compelling arbitration as a precondition of collecting Performance Royalties for Songwriters;

### E.   Costs and Fees

For the cost of the suit plus pre-judgment interest;

For attorney fees as allowed by statute and/or by contract; and

For any other such relief as the Court may deem appropriate.

1
2

# XI.   DEMAND FOR COURT TRIAL AND JURY TRIAL ON CLASS ACTION CLAIMS

3   178.   Class Action Plaintiffs hereby demand a Court trial on claims 1-5, and a Jury Trial
4   on Claim 6.

5   # XII.   FACTS RELEVANT TO THE UNDERLYING CASE AGAINST BMI

6
7   ## A.   The Baker-Marlo Divorce, Stipulation and Royalty Order

179.   In June 2014, Alexander Baker ("Baker") filed for divorce from his wife and
8   business partner Clair Marlo ("Marlo"). The divorce proceeding is Los Angeles Superior
9   Court, Case. No. LD068701 ("Baker Family Law Case").
10  180.   On July 7, 2016, Baker and Marlo stipulated and the Family Court ordered that
11  music royalties be equalized between them for all songs created after January 11, 1995
12  (the date of marriage) and before April 7 2015 (putative date of separation), (Royalty
13  Reallocation Order).  The Family Court Stipulation and Order is attached to the Complaint
14  as EXHIBIT "D," pp. 25-27.
15  181.   To effectuate the Royalty Reallocation Order, Baker and Marlo were instructed to
16  draft and submit to all royalty-paying entities a Letter of Direction, instructing each entity
17  to reallocate the royalties. Baker and Marlo quickly realized that determining the date of
18  creation for each of thousands of songs was impossible, and decided to instead use date of
19  registration, which is a record known to be kept by all royalty-paying entities. Reasoning
20  that it typically takes 4-6 weeks for a song to be registered after submitting that song to the
21  record company, Baker and Marlo agreed to use the date of June 1, 2015 as the cutoff date
22  for inclusion in the royalty reallocation.
23  182.   On July 18, 2016, Baker and Marlo jointly signed and mailed Letters of Direction to
24  royalty-paying entities, including ASCAP & BMI, instructing them to equalize the music
25  royalties on all music registered after January 11, 1995 and before June 1, 2015. See
26  EXHIBIT "E," p. 29.
27
28

FIRST AMENDED COMPLAINT

183.    BMI did comply with the Letter of Direction, and did reallocate the royalties as equal between Baker and Marlo. Beginning with the September 2016 distribution, and continuing unabated until March of 2020, BMI made equal payments to Baker and Marlo.

184.    ASCAP did **not** comply with the Letter of Direction.

### B.    Baker's Assignment of BMI Royalties to the LLC

185.    In or about September 2016, on the advice of his tax preparer, Baker formed Write Hear, LLC, a single-member Limited Liability Company. The purpose of Write Hear, LLC was to write, produce and commercially exploit music, and to obtain a more favorable tax treatment. Baker timely notified Marlo on the formation of Write Hear LLC within the Family Court disclosure process.

186.    On April 12, 2017, on advice of his tax preparer, Baker assigned his BMI royalty stream to Write Hear, LLC, which company paid Baker a salary. Baker used BMI's standard assignment form for the assignment. Baker timely notified Marlo about the assignment of royalties to Write Hear LLC within the Family Court disclosure process. See EXHIBIT "F" attached hereto.

187.    Beginning with the June 2017 distribution, BMI paid Performance Royalties to Write Hear LLC.

188.    During the summer of 2017, Baker decided to embark on the creation of an animated, music driven show called "Adam Bravery." Write Hear LLC hired numerous independent contractors toward the goal of producing the show, including illustrators, animators, writers and musicians.

189.    In or about April 2018, Baker persuaded two other individuals – Lisa Margulies and Chris Gebbia – to partner with him in the creation of the Adam Bravery show. Margulies had a financial background and also had connections in the animation world. Gebbia had a music background and was willing to put in long hours of creative work.

190.    In May of 2018, Baker and his two partners formed Adam Bravery, LLC, an Arizona Limited Liability Company. Prior to dissolving Write Hear LLC, all assets of

1    Write Hear LLC, including equipment and numerous work-for-hire contracts, were

2    assigned from Write Hear LLC to Adam Bravery LLC.

3    191.    On July 9, 2018, Baker's BMI royalties were assigned from Write Hear LLC to

4    Adam Bravery LLC. The same standard BMI royalty assignment form was used for the

5    assignment as before. Baker timely notified Marlo regarding the assignment of assets,

6    including the assignment of royalties, from Write Hear LLC to Adam Bravery LLC within

7    the Family Court disclosure process. See EXHIBIT "G."

8    192.    Beginning with the September 2018 distribution, BMI paid Adam Bravery, LLC.

9         **C.    BMI and Erika Stallings Fabricate a False "Dispute" and Repeatedly**

10            **Threaten to Stop Paying Royalties**

11   193.    In the week prior to July 16, 2019, Marlo's attorneys Mike DiNardo and Joe Yanny

12   contacted Erika Stallings and devised a plan to inflict emotional and financial distress

13   upon Baker, for the purpose of defeating him in court. Under the plan, BMI would

14   withhold paying Baker's share of royalties to Adam Bravery LLC, while continuing to pay

15   Marlo's share of the royalties to Marlo.

16   194.    Plaintiffs have no direct knowledge of any bribes or kickbacks paid to Erika

17   Stallings. However, insofar as BMI has certainly stopped paying royalties without legal

18   justification, and Erika Stallings has certainly concocted a false pretext on which to stop

19   paying, it is a reasonable inference that, in exchange for cooperation, Marlo or someone

20   pays Erika Stallings money as a bribe or kickback, in an amount and by methods to be

21   proven to the jury at trial.

22   195.    At all relevant times, Defendants knew that the BMI royalties are crucial to the

23   operation of Adam Bravery LLC, including the payment of Baker's salary, his source of

24   livelihood.

25   196.    On July 16, 2019, BMI counsel Erika Stallings emailed Baker stating:

26        I am writing with respect to the July 7, 2016 order from the Superior Court
          of California regarding the terms of your divorce with Clair Marlo.

27        Pursuant to that order, all works created between November 11, 1995 [sic]

28        through April 7, 2015 are to be split 50/50 and both parties agreed to not

to make any deals with any third parties regarding the aforementioned works. You assigned your share of the works [sic] to Adam Bravery LLC which is owned by you and three other individuals [sic] which is seemingly in violation of the terms of the order. Please advise as to your position. If you have legal counsel in this matter please forward me their contact information.

EXHIBIT "H," p. 39

197.    Besides getting the date wrong (begin date of royalty reallocation is January 11, 1995, not November 11, 1995), and the number of partners wrong (Baker has two other partners, not three), the July 16, 2019 BMI email was false in one very important, material respect: No "share of the works" was assigned.

198.    A musical "work" is defined in the Copyright act, and refers to the ownership of copyright of a musical composition. See 17 U.S.C. § 101 et. seq.

199.    ASCAP defines "work" in the text of its Writer "Agreement":

**"Musical Works" Defined**. The phrase "musical works" shall be construed to mean musical compositions and dramatico-musical compositions, the words and music there of, and the respective arrangements thereof, and the selections therefrom.

EXHIBIT "Q," p. 90, Item 10

200.    The Royalty Reallocation Order states that:

Neither party shall sell, transfer, assign, or make any deal whatsoever with any third party **for any work** created 1-11-95 through 4-7-15 without the written consent of the other party or court order.

EXHIBIT "D," pp. 25-26, bolding added.

201.    Under the copyright act, it is valid to assign works, i.e. to assign copyright ownership. Indeed, on the vast majority of royalty-earning musical compositions at issue between Baker and Marlo, the copyright is not owned by Baker or Marlo, rather it is owned by a third-party record company.

202.    At no time did Baker - whether acting as an individual or on behalf of any LLC - ever sell, transfer, assign or make any deal whatsoever with any third party for any work created 1-11-95 through 4-7-2015. The ownership of all works at issue is identical now as before.

203.    What Baker did do was assign his own share of the court-equalized Performance Royalty money to pay into a different bank account. Before, Baker's royalties paid into Baker's personal bank account. After the first assignment, the royalties paid into the Write Hear LLC bank account. After the July 2018 assignment, the royalties paid into the Adam Bravery LLC bank account. None of these assignments affected Marlo in any way, shape or form.

204.    A Performance Royalty is not a work.

205.    A work is not a Performance Royalty.

206.    In July 2019, and at all relevant times, BMI and Mike O'Neill and Erika Stallings and each of them understood and appreciated the distinction between "work" and "royalty." BMI and Mike O'Neill and Erika Stallings and each of them knew that the statement "You assigned your share of the works to Adam Bravery LLC…" was false.

207.    The assignments of royalties from Baker to Write Hear LLC, and from Write Hear LLC to Adam Bravery LLC did not affect Marlo in any way, nor did it affect the Family Court's ability to reallocate the royalties again, should it choose to do so. Regardless of who BMI is paying Baker's royalties to, any future reallocation would take place at BMI, just as it did in July 2016 when the royalties were reallocated the first time.

208.    On August 21, 2019, Baker and Marlo received a letter from BMI counsel Erika Stallings entitled "Broadcast Music Inc. Royalties," attached hereto as EXHIBIT "I," p. 41. This letter begins by falsely stating:

> BMI was recently made aware of a July 7, 2016 order issued by the Superior Court of California, County of Los Angeles (the "Order") relating to musical works written during your marriage.

EXHIBIT "I," p. 41.

209.    In fact, BMI was aware of the Order in July 2016, because the Letter of Direction, which BMI undisputedly complied with, begins with "Pursuant to July 7, 2016 Orders of the Court in Los Angeles Superior Court case LD068701…" See EXHIBIT E, p. 29.

210.    BMI's August 21, 2019 letter is also deceptive in that it does not refer to a royalty reallocation, but rather to an order "relating to musical works." EXHIBIT "I," p. 41. BMI

1 and Mike O'Neill and Erika Stallings and each of them were acting with malice in

2 willfully attempting to deceive, not only Baker, but also the Court, into falsely believing

3 that Baker assigned works, when Baker provably did no such thing.

4 211.    The only reasonable inference from these facts is that BMI and Mike O'Neill and

5 Erika Stallings and each of them conspired and colluded with Marlo and her attorneys to

6 intentionally injure Baker and Adam Bravery LLC.

7 212.    BMI's August 21, 2019 letter states:

8
9
10
> In 2018, Mr. Baker transferred his BMI royalties for the above referenced
> works to Adam Bravery, LLC, a multimember LLC. Ms. Baker has
> alleged that this transfer is in violation of the Order. Mr. Baker's position
> is that the transfer is merely a transfer of payment of royalties, not a
> transfer of the works and that no violation of the Order has occurred.

11
12
13
14
> As this is now a disputed matter between the parties, please be advised
> that unless the parties come to a resolution of this matter by September 5,
> 2019, BMI will be placing the disputed royalties on withhold and will
> proceed with filing a third party interpleader action to deposit the royalties
> with the court until the dispute is resolved.

15 EXHIBIT "I," p. 41.

16 213.    BMI has a standard dispute hold policy, which states in relevant part that:

17
18
> BMI will withhold royalties earned by any works that are the subject of
> litigation, upon receipt of a copy of the complaint as filed with the court
> and a written directive to BMI from the court requiring such withholding.

19 EXHIBIT "J," pp. 45-46

20 214.    If there was any "dispute" as to the proper payee of Baker's BMI royalty stream,

21 that dispute would be between Baker and Adam Bravery LLC. Nothing Baker did affected

22 Marlo's royalties in any fashion.

23 215.    As of September 2019, no complaint or any dispute had been filed by Marlo. Any

24 legitimate dispute hold would stop all royalties payable on the works, according to policy.

25 Here, BMI threatened to stop royalties paid to Baker, while continuing to pay Marlo. The

26 only reasonable inference from this fact is that BMI and Mike O'Neill and Erika Stallings

27 and each of them have the requisite state of mind to constitute actual malice toward

28 Plaintiffs.

216.   By September 5, 2019, per BMI's request, Baker and Marlo did not reach any agreement about the supposed "dispute." Baker and Marlo could not possibly have reached any agreement about the supposed "dispute," because there was no dispute regarding the proper allocation and payment of BMI royalties on which Baker and Marlo could either agree or disagree.

217.   The July 7, 2016 stipulation and order of the Family Court mandates that royalties are 50-50 between Baker and Marlo, and, as of this writing (March 2021), no order has superseded it.

218.    Despite BMI's threat to withhold royalties, on September 20, 2019 BMI royalty money was paid to Adam Bravery LLC.

219.   On September 26, 2019, BMI outside counsel AnnMarie Mori sent Baker an email asking him to stipulate that he and Marlo had a dispute, evidently in an effort to justify BMI withholding the money. Baker responded, in relevant part, as follows:

> I've never heard of stipulating to a dispute. That's agreeing to disagree, which is the same as no agreement. I don't understand why you are representing [Marlo]. I do know that neither she nor any of her attorneys has ever once contacted me on this issue, so that's strange. I do not know that [Marlo] disputes the propriety of the assignments, I only know that Erica[sic] Stallings and AnnMarie Mori represent that [Marlo] disputes the assignments. I have never been served with any court document that indicates that she disputes this, and, frankly Ms. Mori, I don't believe you. The reason I don't believe you is that you lied about being unaware of the Order. Do you have any evidence that [Marlo] disputes the assignment?

EXHIBIT "K," p. 49.

220.   BMI did not respond any further to the September 26, 2019 email thread.

### D.   Marlo Files Meritless Contempt Action Which is Dismissed

221.   On October 2, 2019, by and through attorney Joe Yanny, Marlo filed a Contempt action in Family Court, alleging that the assignment of royalties violated the court order. EXHIBIT "L," pp. 52-69. According to plan, Marlo's Contempt action mimicked BMI's false contention that Baker has assigned "copyright," or assigned "works," when in fact Baker assigned royalties. Marlo sought severe penalties against Baker, alleging that:

Each song is a separate violation of the Court Order. I ask the Court to impose fines of $1,000 for each of the 3,000 plus songs that were transferred, for Contempt of Court and to impose jail time to [Baker] of up to five days for each violation.

EXHIBIT "L," p. 69.

222.    On October 7, 2019, BMI wrote a letter to Both Marlo and Baker, stating that they had received notice of Marlo's Contempt action filed against Baker, and noting that said Contempt action:

...sets forth Ms. Marlo's contention that the that the 4/2017 assignment by Mr. Baker of his royalties to Write Hear, LLC, and the subsequent 7/2018 assignment of royalties by Mr. Baker on behalf of Write Hear, LLC to Adam Bravery LLC violated the July 2016 Court Order issued in the marital dissolution action.

EXHIBIT M, p. 71.

223.    BMI's October 7, 2019 letter also states:

Please be advised that BMI has placed a hold on the Assigned Royalties pending an order of the Court resolving the dispute or the written agreement of the parties as to the disposition of the Assigned Royalties.

EXHIBIT M, p. 71.

224.    Immediately thereafter, on or about October 10, 2019, the other members of Adam Bravery LLC fired Baker from his full time job.

225.    On November 7, 2019, the Family Court issued an order dismissing Marlo's Family Law Contempt action under Cal. Penal Code § 1385. EXHIBIT "N," p. 74.

226.    At the November 7, 2019 Contempt hearing, parties had been sworn in, thus jeopardy attaches and the Contempt action cannot be refilled. A dismissal of a Contempt action is non-appealable order under California law.

### E.    BMI Officially Imposes Dispute Hold, But Then Pays Again Anyway

227.    After the November 7, 2019 dismissal of Marlo's Contempt action, Baker contacted BMI and demanded that they lift the dispute hold. However, BMI indicated that they would maintain the dispute hold.

228.    Nevertheless, on January 20, 2020, BMI paid Adam Bravery LLC the royalties per the usual January distribution.

### F.    BMI Stops Paying Royalties

229.    On March 18, 2020, Adam Bravery LLC bank account received the BMI royalties as per the usual March distribution, in the amount of $9,243.31. However, within minutes, BMI reversed the deposit, and electronically removed $9,243.31 from the Adam Bravery LLC bank account.

230.    On June 11, 2020, BMI failed to pay $9,911.00 owed to Adam Bravery, LLC.

231.    On September 10, 2020, BMI failed to pay $9,342.68 owed to Adam Bravery, LLC.

232.    On January 14, 2021, BMI failed to pay $9,082.93 owed to Adam Bravery, LLC.

233.    On March 19, 2021, BMI failed to pay $9,731.55 owed to Adam Bravery, LLC.

234.    To date (March 2021), BMI has failed to pay a total of $47,311.37.

## XIII.  CAUSES OF ACTION IN UNDERLYING CASE

### SEVENTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Deprivation of Federal Right to Collect Performance Royalties
### (Alexander C. Baker and Adam Bravery LLC v. BMI)

235.    Plaintiff repeats, realleges and incorporates by reference the facts alleged above.

236.    Under the State Compulsion Test, BMI and Erika Stallings and Mike O'Neill are State Actors for civil rights purposes. *Supra*. Baker had a federally-protected right to collect performance royalties, *supra,* which right was validly assigned to Adam Bravery LLC.

237.    Acting under color of the Consent Decree, which is federal law, BMI and/or Erika Stallings and/or Mike O'Neill intentionally denied Adam Bravery LLC the Performance Royalty money that it has a federal right to collect. BMI and/or Erika Stallings and/or Mike O'Neill knew that there is no "dispute" between Marlo and Baker upon which to base any sort of "Dispute Hold," and he, she or they decided to withhold funds anyway.

238.    Plaintiffs believe, and on that basis allege, that BMI has a policy and custom allowing for the fabrication of a false pretext on which to impose a "dispute hold," and that Erika Stallings and/or Mike O'Neill and/or Does are responsible for implementing that policy on an ad hoc basis.

239.    Alternatively, Plaintiffs allege that Erika Stallings and/or Mike O'Neill and/or Does acted without authorization in fabricating the false pretext under which BMI royalties were stopped.

240.    BMI and/or Erika Stallings and/or Mike O'Neill knew that Baker depends on the royalties for his livelihood, because Baker told Erika Stallings so in a phone call on or about July 2019. Similarly, BMI and/or Erika Stallings and/or Mike O'Neill knew that Adam Bravery LLC depends on the royalties for its operation and continued existence. BMI and/or Erika Stallings and/or Mike O'Neill knew that withholding royalties would greatly diminish the market value of Adam Bravery LLC, and would injure Baker.

241.    On March 18, 2020, under direction of Erika Stallings, BMI failed to pay $9,243.31. To date, BMI failed to pay a total of $47,311.37.

242.    Adam Bravery LLC was harmed by BMI's failure to pay $47,311.37 so far, and will continue to be harmed for every subsequent payment missed.

243.    Baker has on several occasions had communications with an individual working for a company called "Royalty Exchange." Royalty Exchange is in the business of brokering the auction sales of royalty streams, such as Baker's. Royalty Exchange estimated that Baker's royalty stream might fetch $150,000 at auction, and suggested setting that as a reserve price.

244.    BMI official Erika Stallings and/or Mike O'Neil, each State Actors for Section 1983 purposes, intentionally deprived Plaintiffs of their federally-protected right to collect performance royalties. At minimum, Erika Stallings and/or Mike O'Neill acted with a reckless disregard Plaintiffs' federally protected rights.

245.    As a direct and proximate result of the deprivation of civil rights, Plaintiffs are injured in the amount of royalties withheld to date, and/or the loss of value of the business.

246.    Therefore, BMI, Erika Stallings and Mike O'Neill are jointly and severably liable to Plaintiffs for Civil Rights violations.

**EIGHTH CAUSE OF ACTION**
**Breach of Contract**
**(Adam Bravery, LLC v. BMI)**

247.    Plaintiff repeats, realleges and incorporates by reference the facts alleged above.

248.    If for whatever reason BMI and its officials are not held to be State Actor, or Plaintiffs right to receive royalties is not held to be a federally-protected right, then without waiving the right to present the legal claims set forth above and below, Plaintiffs *alternatively* present a Breach of Contract theory, i.e. an alternative to Deprivation of Civil Rights.

249.    In 1999, Baker and BMI entered into the BMI-Baker Writer "Agreement," a binding contract obligating BMI to pay performance royalties to Baker. At all relevant times prior to March 2020, Baker and BMI performed under the contract.

250.    In July 2016, Baker and co-writer Marlo instructed BMI to equalize royalties between them for all works registered after January 11, 1995 and before June 1, 2015. BMI complied with the reallocation. At all relevant times prior to March 2020, Baker and BMI performed under the modified contract.

251.    In April 2017, with BMI's consent, Baker validly assigned the right to receive royalties to Write Hear LLC. At all relevant times prior to March 2020, Write Hear LLC and BMI performed under the modified contract.

252.    In July 2018, with BMI's consent, Write Hear LLC validly assigned the right to receive royalties to Adam Bravery LLC. At all relevant times prior to March 2020, Adam Bravery LLC and BMI performed under the modified contract.

253.    The BMI-Baker Writer "Agreement" constitutes the "rights to payment of money," which right to be paid is validly held by Adam Bravery LLC.

254.    To date, BMI failed to pay a total of $47,311.37.

255.    Adam Bravery LLC was harmed by BMI's failure to pay $47,311.37 so far, and will continue to be harmed for every subsequent payment missed.

256.    Baker has on several occasions had communications with an individual working for a company called "Royalty Exchange." Royalty Exchange is in the business of brokering the auction sales of royalty streams, such as Baker's. Royalty Exchange estimated that Baker's royalty stream might fetch $150,000 at auction, and suggested setting that as a reserve price.

257.    As a direct and proximate result of BMI's having stopped paying royalties, the royalty stream is worthless on the market.

258.    Adam Bravery LLC depends crucially on the royalty money to operate, and has necessarily ceased all operations as a direct and proximate result of BMI's breach of contract.

259.    The net value of Adam Bravery LLC was diminished by at least $150,000 as a direct and proximate result of BMI's intentional and baseless failure to pay royalties.

260.    Therefore, BMI is liable to Adam Bravery LLC for Breach of Contract.

**NINTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(Adam Bravery LLC v. BMI)**

261.    Plaintiff repeats, realleges and incorporates by reference the facts alleged above.

262.    A fiduciary is a person in whom another has placed the utmost trust and confidence to manage and protect property or money. A fiduciary duty a duty to act for someone else's benefit, while subordinating one's own interests to that of the other.

263.    All attorneys are fiduciaries, which is to say they owe clients fiduciary duties. RESTATEMENT OF THE LAW GOVERNING LAWYERS, §16(3). An attorney owes the client a fiduciary duty of the very highest character. *Bird, Marella, Boxer & Wolpert v. Superior Court,* 106 Cal. App. 4th 419, 421, 130 Cal. Rptr. 2d 782, 784 (2003)

264.    A fiduciary relationship was formed between BMI (the agent-trustee) and Baker (the principal-beneficiary) upon signing the BMI-Baker Writer "Agreement" in 1999. The

BMI-Baker Writer "Agreement" explicitly makes BMI Baker's attorney-in-fact, providing that:

> "You [Baker] make, constitute and appoint us [BMI], or our nominee, your true and lawful attorney, irrevocably during the Period, in our name or that of our nominee, or in your name, or otherwise, in our sole judgment, to do all acts, take all proceedings, execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in our sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by you hereunder..."

EXHIBIT "B," p. 14.

265.   Under the BMI-Baker Writer "Agreement," the responsibilities of BMI are closely akin to those of an escrow officer: BMI promises to collect monies due to Baker, to hold them for some period of time, to deduct its own fees, then to distribute the remainder as a royalty payment. This is the very essence of a fiduciary relationship.

266.   Baker formed with BMI a relationship of trust and confidence whereby BMI is bound to exercise the utmost good faith and undivided loyalty toward Baker throughout the relationship, by paying Performance Royalties in strict accordance with the royalty calculation formula.

267.   By virtue of the assignment, to which BMI consented, BMI's fiduciary duty extends to Adam Bravery LLC. Nothing in the language of the assignment contracts restricts the assignability of any rights.

268.   BMI failed to pay the March 2020 royalty distribution, which is misconduct. To date, BMI has failed to pay a total of $47,311.37.

269.   Plaintiffs have no *direct* evidence of any bribes or kickbacks being paid. But insofar as BMI has stopped paying royalties without justification, and gone as far as concocting a false pretext on which to do so, it is a reasonable inference that, in  exchange for cooperation, Marlo pays BMI money as a bribe or kickback, in an amount and by methods to be proven to the jury at trial. Accepting such a kickback or a bribe in exchange for not paying royalties is not in Adam Bravery LLC's interest.

270.    Adam Bravery LLC depends crucially on the royalty money to operate, and has necessarily ceased all operations as a direct and proximate result of BMI's failure to pay royalties as it is legally obligated to do.

271.    Therefore BMI is liable to Adam Bravery LLC for Breach of Fiduciary Duty.

### TENTH CAUSE OF ACTION
### Constructive Fraud
### (Adam Bravery LLC and Alexander C. Baker v.
### BMI, Mike O'Neill and Erika Stallings in their individual capacities)

272.    Plaintiffs repeat, reallege and incorporate by reference the facts alleged above.

273.    Courts have given instructions on what constitutes constructive fraud:

> As a general principle constructive fraud comprises any act, omission or concealment involving a breach of legal or equitable duty, trust or confidence which results in damage to another even though the conduct is not otherwise fraudulent. Most acts by an agent in breach of his fiduciary duties constitute constructive fraud. The failure of the fiduciary to disclose a material fact to his principal which might affect the fiduciary's motives or the principal's decision, which is known (or should be known) to the fiduciary, may constitute constructive fraud. Also, a careless misstatement may constitute constructive fraud even though there is no fraudulent intent.

*Salahutdin v. Valley of Cal., Inc*., 24 Cal. App. 4th 555, 558, 29 Cal. Rptr. 2d 463, 464 (1994).

274.    Here, BMI and/or Mike O'Neill and/or Erika Stallings fabricated a false "dispute" between Marlo and Baker as a pretext to impose a royalty hold against Baker, while continuing to pay Marlo. Knowing that a Court order prohibited Baker from assigning works, BMI and/or Mike O'Neill and/or Erika Stallings falsely contended that Baker assigned works, knowing that Baker never did so. Baker assigned his own royalty stream to pay to a business entity, while ownership of the works has remained unchanged.

275.    BMI and/or Mike O'Neill and/or Erika Stallings further compounded the falsity by construing the fabricated "dispute" as being a dispute between Marlo and Baker, knowing that even if there was a dispute as to the proper payee of Baker's royalty stream, the dispute would be between Baker and Adam Bravery LLC. Marlo's royalties have

1  remained completely unaffected throughout, a fact known to BMI and/or Mike O'Neill
2  and/or Erika Stallings.

3  276.   BMI and/or Mike O'Neill and/or Erika Stallings compounded the falsity yet again
4  by withholding royalties only from Baker, while continuing to pay Marlo. This
5  demonstrates that BMI and/or Mike O'Neill and/or Erika Stallings do not believe there is a
6  dispute between Baker and Marlo. If there was a dispute between Baker and Marlo, BMI
7  would withhold royalties from both parties, according to their standard policy.

8  277.   Plaintiffs believe, and on that basis allege that BMI has never in its entire history
9  imposed a unilateral royalty dispute hold, such as BMI now claims to have imposed
10  unilaterally on Baker and Adam Bravery LLC. Plaintiffs believe, and upon that basis
11  allege that all other royalty dispute holds imposed by BMI in its entire history have
12  involved the withholding of royalties from both parties to the dispute.

13  278.   Knowing that there was no actual dispute between Baker and Marlo, BMI and/or
14  Mike O'Neill and/or Erika Stallings undertook a series of steps intended to entrap Baker
15  into admitting that there was a "dispute" upon which to withhold Baker's royalty stream
16  from Adam Bravery LLC. First BMI, in the person of Erika Stallings, emailed Baker and
17  simply asked him for his "position" on the "dispute." Next, BMI requested that Baker
18  "stipulate" that there was a dispute.

19  279.   When the above two attempts failed to succeed in tricking Baker into "admitting" or
20  "stipulating" that there was a "dispute," BMI and/or Mike O'Neill and/or Erika Stallings
21  then insisted that Marlo file a Family Law Contempt action. Marlo did file a contempt
22  action, alleging that Baker's assignment of royalties violated the Family Court Royalty
23  Reallocation Order, and **falsely claiming that Baker had assigned works**. Even if there
24  had been merit to Marlo's Contempt action (which there was not), this would be a dispute
25  between Baker and the Court. Marlo never alleged that Baker's assignment of royalties to
26  the LLC harmed her or affected her in any way, because it obviously did not.

27  280.   **The Family Court <u>dismissed</u> Marlo's Contempt action**, jeopardy attached, it
28  cannot be refiled, and is non-appealable. While there never was any merit to the idea that

1  there was a "dispute" between Baker and Marlo regarding the payment of ASCAP & BMI

2  royalties, the dismissal of Marlo's Contempt action must remove any lingering doubt,

3  even among the uninitiated.

4  281.    There is no dispute between Marlo and Baker regarding the current proper payee of

5  BMI royalties. BMI and Mike O'Neill and Erika Stallings and each of them know that

6  there is no dispute. BMI and Mike O'Neill and Erika Stallings and each of them falsely

7  contend that there is a dispute as a pretext for withholding royalties so as to intentionally

8  injure Baker and Adam Bravery LLC on the one hand, while benefitting Marlo on the

9  other hand.

10  282.    While Baker and Adam Bravery LLC never believed BMI in all their false

11  representations, Plaintiffs had no choice but to rely on them. BMI has total power over the

12  situation. If BMI doesn't pay the royalties, then the royalties are not getting paid.

13  283.    Because BMI and/or Mike O'Neill and/or Erika Stallings knew that there was no

14  royalty dispute between Baker and Marlo, and expended great thought and planning

15  towards trying to falsely convince Baker (and now the Court) that there was a dispute, and

16  maintained the false story about a dispute even in the face of the Family Court dismissing

17  Marlo's contempt action, the only reasonable inference to be drawn by the jury is that

18  BMI and/or Erika Stallings and/or Mike O'Neill acted with actual premeditated malice

19  toward Plaintiffs.

20  284.    BMI and/or Mike O'Neill and/or Erika Stallings knew that withholding money from

21  Adam Bravery LLC would injure and quite possibly destroy the business, BMI and/or

22  Mike O'Neill and/or Erika Stallings knew it was wrong to do so, and did it anyway,

23  having accepted money from as a bribe or kickback, in an amount and by methods to be

24  proven to the jury at trial. While Plaintiffs have no direct evidence of this bribe or

25  kickback, it is a reasonable inference from the facts which are known. At trial, Plaintiffs

26  will ask the jury to make this inference.

27

28

285.    Adam Bravery LLC depends crucially on the royalty money to operate, and has necessarily ceased all operations as a direct and proximate result of BMI and/or Mike O'Neill and/or Erika Stallings withholding payment.

286.    The net value of Adam Bravery LLC has diminished by at least $150,000 as a direct and proximate result of Defendants' intentional actions of withholding the royalties without justification.

287.    Plaintiffs believe, and on that basis allege that BMI has a policy and custom allowing for dishonest and injurious conduct, on an ad hoc basis. Alternatively, Plaintiffs allege that BMI does not have such a policy and custom, and that Erika Stallings and/or Mike O'Neill and/or Does acted on their own volition.

288.    BMI and/or Erika Stallings and/or Mike O'Neill withholding money constitutes malice, fraud and/or oppression as defined in California Civil Code § 3294.

289.    Therefore BMI and Erika Stallings and Mike O'Neill and each of them are jointly and severally liable to Plaintiffs for constructive fraud.

## ELEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Alexander C. Baker v. BMI,
### Mike O'Neill and Erika Stallings in their individual capacities)

290.    Plaintiff repeats, realleges and incorporates by reference the facts alleged above.

291.    Proving Intentional Infliction of Emotional Distress requires a showing that Defendant's conduct was both "extreme" and "outrageous." The words "extreme" and "outrageous" are not synonymous. Rather, they function as a double threshold for the nature of the conduct and how unusual it is. Restatement (Third) of Torts: Liability for Physical and Emotional Harm. § 46. (Am. Law Inst. 2012).

292.    Here, BMI and/or Mike O'Neill and/or Erika Stallings's conduct is extremely unusual, because it is the only time in BMI's entire existence that they have ever imposed a unilateral dispute hold, i.e. withholding money from one party to the supposed dispute, while paying the other.

293.    Knowing that there was no actual dispute between Baker and Marlo, BMI and/or Mike O'Neill and/or Erika Stallings undertook a series of steps intended to entrap Baker into "admitting" that there was a "dispute" upon which to withhold Baker's royalty stream from Adam Bravery LLC. First BMI and/or Mike O'Neill and/or Erika Stallings emailed Baker and simply asked him for his "position" on the "dispute." When Baker declined, ASCAP & BMI and/or Erika Stallings falsely threatened to withhold Plaintiff's money. This is extreme and outrageous conduct. Knowing that Baker depends on the royalty money to survive, BMI's conduct was extreme, and outrageous, and intended to cause emotional distress.

294.    BMI paid royalties in September 2019. Then, BMI and/or Mike O'Neill and/or Erika Stallings requested that Baker "stipulate" that there was a dispute.  After Baker refused to "stipulate" to a dispute (whatever that means), Marlo filed a Contempt action, alleging that Baker's assignment of royalties violated an Order of the Family Court. Because the Contempt action was baseless, and because it came only after BMI attempted to get Baker to "stipulate" to a dispute, it is reasonable to infer that BMI and/or Mike O'Neill and/or Erika Stallings then instructed Marlo to file the baseless Contempt action.

295.    After the Contempt action was filed, BMI and/or Mike O'Neill and/or Erika Stallings again threatened to withhold the money.

296.    Marlo's Contempt action was dismissed. Even after the Contempt action was dismissed with no possibility of appeal or refilling, BMI and/or Mike O'Neill and/or Erika Stallings continued to insist that they would withhold the money. BMI's conduct was extreme, outrageous and intended to cause emotional distress. BMI and/or Mike O'Neill and/or Erika Stallings knew at all times that Baker depended on the royalty money to survive.

297.    BMI and/or Mike O'Neill and/or Erika Stallings's threat of withholding turned out to be false again, as BMI paid the royalties in January 2020. BMI paid the royalties again in March 2020. But then, BMI and/or Mike O'Neill and/or Erika Stallings reversed

charges and took the money back. As emotionally injurious as the false threats of

withholding money are, making good on those threats is even more injurious.

298.    In repeatedly threatening to withhold money, and then actually withholding money,

with the full knowledge that there is no valid basis to withhold the money, BMI and/or

Mike O'Neill and/or Erika Stallings acted to intentionally injure the psyche of Baker.

299.    BMI and/or Erika Stallings injured Baker by depriving him of his livelihood,

starving him and threatening him with homelessness. Because neither BMI nor Erika

Stallings have any legal basis for withholding the royalty money has now been done, the

question of motive is reasonably raised. In addition to the reasonable inference of bribes

and kickbacks, Plaintiffs reserve the right to allege a motive such as bias based on race, or

sex, or any other motive revealed in discovery, or reasonably implied by facts obtained in

discovery.

300.    Whatever the motives, Erika Stallings and Mike O'Neill and BMI have the power

to destroy Baker's life, and they have done so, on purpose and with particular glee. BMI

and/or Erika Stallings and/or Mike O'Neill knew at all relevant times that Baker has no

options when it comes to his royalties.

301.    At minimum, BMI and/or Erika Stallings and/or Mike O'Neill acted with reckless

disregard of the probability that Baker would suffer emotional distress, knowing that

Baker depended on the money to survive, and knowing that all reasonable people will be

expected to suffer emotional distress if deprived of their livelihood for no legally valid

reason.

302.    With respect to the requirement that the plaintiff show severe emotional distress, the

courts have set a high bar. Severe emotional distress means "emotional distress of such

substantial quality or enduring quality that no reasonable [person] in civilized society

should be expected to endure it." *Potter v. Firestone Tire & Rubber Co*, 6 Cal. 4th at 1004.

303.    Here, no reasonable person could be expected to endure the emotional distress of

having BMI and/or Erika Stallings and/or Mike O'Neill baselessly threaten to withhold the

source of livelihood, then actually withholding the source of livelihood. BMI and/or Mike

O'Neill and/or Erika Stallings' repeated efforts to fabricate a false "dispute" as a pretext for stopping royalties, including but not limited to attempting to trick Baker into "stipulating" that there was a "dispute," are extreme and outrageous conduct by any reasonable standard.

304.    In deciding whether conduct meets the threshold of "outrageous," the RESTATEMENT (SECOND) OF TORTS §46(1)(1965) instructs us that the existence of a special relationship in which there is "abuse of a position, or a relation with the other, which gives [the actor] … the power to affect [the] interests" of another may "produce a character of outrageousness that otherwise might not exist." *Bridges v. Winn Dixie*, 176 Ga. App. 227, 230, 335 S.E.2d 445,447 (1985).

305.    Here, BMI occupies a vastly superior position of bargaining power as compared to Baker. If Baker wants to collect performance royalties, he must agree to BMI's terms, which terms are mandated in the Consent Decree. Baker has no bargaining power whatsoever. It is "take it or leave it."

306.    If Baker had any power vis-à-vis BMI whatsoever, then the moment BMI started abusively threatening to withhold royalties, he would have quit BMI and obtained performance royalties elsewhere. Under the terms of the BMI-Baker Writer "Agreement," and under the Consent Decree, which is the law, as far as Baker understands, it is not possible to change affiliation on any music titles in the past. As to all those royalty-earning music titles on which Baker has been getting paid for over two decades, Baker and BMI are "stuck with each other."

307.    Plaintiff Alexander C. Baker has suffered severe emotional distress, including fear, worry, mortification, outrage, shame, humiliation, degradation, anger, and depression. Baker faces the prospect of being homeless. Baker has extreme difficulty concentrating because he can't process or accept how the system allows BMI and Erika Stallings and Mike O'Neill to perpetrate such intentional injury.

308.    The intentional, malicious conduct of Defendants is maddening, and would be maddening to any reasonable person similarly-situated to Baker. Baker suffers Post

Traumatic Stress Disorder, but cannot afford the medical treatment required, which inability to afford treatment is directly and proximately caused by Defendants' tortious conduct described herein, and which inability to afford necessary treatment compounds the severity of Baker's emotional distress caused by Defendants.

309.    Plaintiffs believe, and on that basis allege that BMI has a policy and custom allowing for extreme and outrageous conduct, on an ad hoc basis. Alternatively, Plaintiffs allege that BMI does not have such a policy and custom, and that Erika Stallings and/or Mike O'Neill and/or Does acted on their own volition.

310.    Defendants' conduct is the direct and proximate cause of Baker's emotional distress.

311.    Therefore, BMI, Erika Stallings and Mike O'Neill are jointly and severably liable to Baker for Intentional Infliction of Emotional Distress.

## TWELVTH CAUSE OF ACTION
### Fraudulent Inducement
### (Alexander C. Baker v. BMI and Erika Stallings in her individual capacity)

312.    Plaintiff repeats, realleges and incorporates by reference the facts alleged above.

313.    The elements of fraudulent inducement are: (1) a knowingly false representation by the defendant; (2) and intent to deceive or induce reliance; (3) justifiable reliance by the plaintiff; and (4) resulting damage. Every element of the cause of action for fraud must be alleged in full, factually and specifically. *Wilhelm v. Pray, Price, Williams & Russell* (1986) 186 Cal.App.3d 1324, 1332. The critical pleading elements are that a misrepresentation was made, Defendants knew it untrue at the time, and they intended Plaintiff rely on the misrepresentation. At the pleading stage an averment that defendant knew it untrue and that Defendant intended reliance is sufficient. *Charpentier v. Los Angeles Rams Football Co., Inc.* (1999) 75 Cal. App.4th 301, 312. Further, the specificity pleading requires facts that "show how, when, where, to whom, and by what means the representations were tendered." *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.

314.    Alleging fraud against a corporation must include the names of the persons who made the misrepresentations; their authority to speak for the corporation; to whom they

spoke; what they said or wrote; and when it was said or written. See *Lazarat* 645; *Tarmann v. State Farm Mut. Auto. Ins. Co*. (1991) 2 Cal. App. 4th 153, 157; *Perlas v. GMAC Mortg., LLC* (2010) 187 Cal. App. 4th 429, 434.

315.    On August 26, 2019, after BMI began threatening to withhold royalties, Baker filed into the Family Law case a Motion for Joinder, seeking to add BMI as a party. Baker sought a simple order that BMI was required to pay royalties in equal amounts to both he and to Marlo, as the July 7, 2016 stipulation and order require, as the July 18, 2016 Letter of Direction instruct BMI to do, and as BMI has in fact been doing since September 2016.

316.    On September 3, 2019, Baker was contacted by email by attorney AnnMarie Mori, representing BMI. Plaintiff believes that Erika Stallings was at all times making the substantive decisions. Ms. Mori discussed the situation between Baker and Marlo, and concluded:

> Therefore, it does not appear that Mr. Baker or Ms. Marlo dispute that at this time the royalty payments should continue to be distributed 50/50.

EXHIBIT O, p. 76

317.    In the days immediately following September 3, 2019, Ms. Mori on behalf of BMI indicated that BMI wished to enter into a stipulation with Baker under which Baker would dismiss the Motion for Joinder seeking to join BMI to the Family Law case, and BMI would promise to be bound by any order the Family Court would make allocating the royalties.

318.    On or about September 12, 2019, a phone call was made between AnnMarie Mori for BMI, Baker, and attorney Marc Angelucci. The purpose of the call was to discuss the terms of the stipulation to relieve BMI from joinder. Baker sought assurances that, until further order of the Family Court, that BMI would continue to pay royalties, just as they had been doing. Ms. Mori repeated her assurances from the Sept. 3 email, stating:

> There is not a dispute regarding the current allocation of royalties. It is our understanding that that issue will be decided at trial.  Nothing will change at BMI until either the parties stipulate and we receive a new Letter of Direction, or there is a new Court Order.

319.    BMI's statement "it does not appear that Mr. Baker or Ms. Marlo dispute that at this time the royalty payments should continue to be distributed 50/50" is true, but highly misleading, because it is clearly intended to convince Baker that BMI would not stop paying royalties, when in fact BMI was planning to stop paying Baker's royalties all along. BMI knew that the statement was highly misleading and intended to induce a false belief in Baker that BMI would continue to pay royalties.

320.    BMI's statement "Nothing will change at BMI until either the parties stipulate and we receive a new Letter of Direction, or there is a new Court Order" is false, because something did change at BMI – they stopped paying Baker's royalties to Adam Bravery LLC – despite the fact that Marlo and Baker have not issued any new Letter of Direction, nor has there been a new Court Order regarding the allocation of royalties. ASCAP & BMI was planning to stop paying Baker's royalties all along, thus ASCAP & BMI knew it was a false statement.

321.    Both of BMI's above statements were intended to deceive Baker, and to induce him into believing that BMI would not stop paying royalties, when in fact BMI was so intending to stop paying royalties.

322.    Both of the above statements were intended to induce Baker's reliance, because Baker had brought a Motion for Joinder seeking to join BMI to the Family Law case, and BMI knew that Baker would not agree to release BMI from the Joinder Motion unless he was deceived into thinking that BMI would continue to pay royalties as the BMI-Baker Writer "Agreement" requires, as the Consent Decree requires, as the July 7, 2016 Court Order requires, and as the July 18, 2016 Letter of Direction requires.

323.    Baker relied on BMI's September 3, 2019 false statement that "it does not appear that Mr. Baker or Ms. Marlo dispute that at this time the royalty payments should continue to be distributed 50/50." Baker relied on BMI's false statement "Nothing will change at ASCAP & BMI until either the parties stipulate and we receive a new Letter of Direction, or there is a new Court Order." Had Baker not received these false assurances, Baker would not have agreed to the stipulation dismissing the Joinder action against BMI.

324.    On or about September 25, 2019, Baker did in fact sign a stipulation with BMI, dismissing the Joinder. EXHIBIT "P," p. 80-82.

325.    Plaintiff believes and thus alleges that BMI has a custom and policy which permits it to make fraudulent misrepresentations, despite such fraudulent misrepresentations being generally contrary to public policy. As an alternative theory, Plaintiff alleges that BMI does not have such a policy, but that Erika Stallings in her individual capacity was directly responsible for crafting and implementing intentional misrepresentations.

326.    Baker was damaged in his reliance on the false statements by BMI, because had he not dismissed the Joinder action, he could have obtained a Court order compelling BMI to obey the July 7, 2016 Order equalizing royalties between Baker and Marlo.

327.    Plaintiffs believe, and on that basis allege that BMI has a policy and custom allowing for dishonest and injurious conduct, on an ad hoc basis. Alternatively, Plaintiffs allege that BMI does not have such a policy and custom, and that Erika Stallings acted on her own volition.

328.    Therefore, BMI and/or Erika Stallings are liable to Baker for fraudulent inducement.

**THIRTEENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Deprivation of Federal Right to Collect Performance Royalties**
**(Alexander C. Baker v. ASCAP)**

329.    Plaintiff repeats, realleges and incorporates by reference the facts alleged above.

330.    Under the State Compulsion Test, ASCAP is a State Actor for civil rights purposes. *Supra*. Baker has a federally-protected right to collect performance royalties, *supra*.

331.    Acting under color of the Consent Decree, which is federal law, ASCAP intentionally denied Alexander Baker the Performance Royalty money that he has a federal right to collect. ASCAP knew that there was a July 2016 stipulation and court order to pay equal royalties between Baker and Marlo. With regard to the royalties covered in the July 2016 Stipulation and Court Order, ASCAP knew that there is no "dispute" between Marlo and Baker upon which to base any sort of "Dispute Hold."

332.    Plaintiffs believe, and on that basis allege, that ASCAP has a policy and custom allowing for the fabrication of a false pretext on which to impose a "dispute hold."

333.    Beginning September 2016, and continuing in each quarterly distribution thereafter, ASCAP did not pay Alexander Baker the equalized royalties.

334.    ASCAP intentionally deprived Baker of his federally-protected right to collect performance royalties. At minimum, ASCAP acted with a reckless disregard Baker's federally protected rights.

335.    As a direct and proximate result of the deprivation of civil rights, Baker is injured in the amount of ASCAP royalties improperly withheld to date, subject to proof.

336.    Therefore ASCAP is liable to Alexander Baker for Civil Rights violations.

### FOURTEENTH CAUSE OF ACTION
### Breach of Contract
### (Alexander Baker v. ASCAP)

337.    Plaintiff repeats, realleges and incorporates by reference the facts alleged above.

338.    If for whatever reason ASCAP is not held to be a State Actor, or Plaintiffs right to receive royalties is not held to be a federally-protected right, then without waiving the right to present the legal claims set forth above and below, Plaintiff *alternatively* presents a Breach of Contract theory, i.e. an alternative to Deprivation of Civil Rights.

339.    In 1990, Baker and ASCAP entered into a Writer "Agreement," a binding contract obligating ASCAP to pay performance royalties to Baker. At all relevant times prior to September 2016, Baker and ASCAP performed under the contract.

340.    In July 2016, Baker and co-writer Marlo instructed ASCAP to equalize royalties between them for all works registered after January 11, 1995 and before June 1, 2015. ASCAP did not comply with the reallocation.

341.    Starting in September 2016, ASCAP failed to pay the equalized royalties.

342.    Baker was harmed by ASCAP's failure to pay Baker, in an amount of money subject to proof at trial.

343.    Therefore, ASCAP is liable to Alexander Baker for Breach of Contract.

### FIFTEENTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Alexander Baker v. ASCAP)

344.    Plaintiff repeats, realleges and incorporates by reference the facts alleged above.

345.    ASCAP owes Alexander Baker a fiduciary duty. *Supra.*

346.    ASCAP is legally obligated to pay Performance Royalties to Alexander Baker. By failing to pay the court-ordered equalized royalties, ASCAP breached its fiduciary duty every quarter beginning September 2016 – present.

347.    Therefore, ASCAP is liable to Alexander Baker for Breach of Fiduciary Duty.

## XIV.  PRAYER FOR RELIEF ON UNDERLYING CLAIMS

348.    Wherefore, Plaintiffs pray for relief as follows:

### A.    Damages

349.    **General Damages against BMI** – for Baker's pain and suffering, for Adam Bravery's lost business, and for all other such general damages as are reasonably certain to flow from the misconduct proven, in an amount found reasonable at trial, but not less than $1,000,000;

**Actual Damages against BMI** – for the total value of Plaintiffs' BMI royalty stream, plus medical expenses, plus all other money damages actually and proximately caused by Defendants' conduct, such amounts to be proven at trial, but not less than $200,000;

**Punitive Damages against BMI** - to punish BMI Defendants for intentionally tortious conduct, to make examples of them, and to deter others from similar conduct, in an amount deemed sufficient to achieve the purpose of punitive damages, in light of BMI's stated yearly revenue of over $1 billion, and the net worth of Erika Stallings and of Mike O'Neill, subject to proof;

**Actual Damages against ASCAP** – for the amount of Performance Royalties improperly withheld, subject to proof;

1

### B.   Injunction

2   For a permanent injunction compelling ASCAP & BMI to pay the Performance

3 Royalties due and payable for performances of Alexander C. Baker's musical works to

4 Baker, to Adam Bravery LLC, or to whomever shall in the future become a valid assignee

5 of said royalties, such payments to be at all times compliant with any pending court order

6 as to proper allocation;

7   For a permanent injunction prohibiting BMI from requiring a Mandatory Arbitration

8 Clause as a pre-condition of obtaining performance royalties;

9   For a permanent injunction prohibiting ASCAP & BMI from disclaiming a fiduciary

10 duty to Baker;

11

### C.   Costs and Fees

12   For the cost of the suit plus pre-judgment interest;

13   For attorney fees as allowed by statute and/or by contract; and

14   For any other such relief as the Court may deem appropriate.

15

### XV.   DEMAND FOR JURY TRIAL

16   Plaintiffs hereby demand a jury trial on all issues so triable.

17

18

19                    Respectfully submitted on March 25, 2021,

20

21   _____

22                    G. Scott Sobel, Esq.
                     *Attorney for Plaintiffs*
23

24

25

26

27

28

## VERIFICATION AND SWORN DECLARATION
## OF ALEXANDER C. BAKER

I am the Plaintiff in this case. I have personal knowledge of the facts stated within this first amended complaint, and hereby attest to its accuracy. The documents attached hereto as exhibits to the complaint are true and correct copies of the documents they purport to be. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted on March 20, 2021,

Alexander C. Baker

## PROOF OF SERVICE BY ELECTRONIC MAIL

I am over the age of 18. I am not a party to this action. My business address is 1180 S. Beverly Drive, Suite 610, Los Angeles, CA 90035-1158. My email address is GScottSobel@gmail.com. On the date indicated below, I served the indicated persons the following documents:

## PLAINTIFF'S VERIFIED FIRST AMENDED COMPLAINT
## EXHIBITS TO FIRST AMENDED COMPLAINT

I accomplished service by attaching PDF copies of the document(s) to an email sent to the recipients indicated below. The service list is as follows:

Jackson Wagener
Attorney for ASCAP
jwagener@ascap.com

AnnMarie Mori
Attorney for BMI
amori@troygould.com

Date of service: March 25, 2021.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

March 25, 2021

G. Scott Sobel, Esq.

Attorney for Plaintiffs

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )
                                    )
          v.                        )        Civil No.
                                    )        64-Civ-3787
BROADCAST MUSIC, INC. and           )
RKO GENERAL, INC.,                  )
                                    )
                    Defendants.     )

### FINAL JUDGMENT

Plaintiff, United States of America, having filed its complaint herein on December 10, 1964, and defendant having filed its answer denying the substantive allegations of such complaint, and the parties by their respective attorneys having consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein and without this Final Judgment constituting evidence or an admission by either party with respect to any such issue:

Now, THEREFORE, before the taking of any testimony and without trial or adjudication of any issue of fact or law herein, and upon the consent of the parties hereto, it is hereby

ORDERED, ADJUDGED and DECREED as follows:

### I.

This Court has jurisdiction of the subject matter of this action and of the parties hereto. The complaint states claims for relief against the defendant under Sections 1 and 2 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

### II.

As used in this Final Judgment:

(A) "Defendant" means the defendant Broadcast Music, Inc., a New York Corporation;

(B) "Programming period" means a fifteen minute period of broadcasting commencing on the hour and at fifteen, thirty and

forty-five minutes past the hour without regard to whether such period contains one or more programs or announcements.

(C) "Defendant's repertory" means those compositions, the right of public performance of which defendant has or hereafter shall have the right to license or sublicense.

### III.

The provisions of this Final Judgment shall apply to defendant and to each of its subsidiaries, successors, assigns, officers, directors, servants, employees and agents, and to all persons in active concert or participation with defendant who receive actual notice of this Final Judgment by personal service or otherwise. None of the provisions of this Final Judgment shall apply outside the United States of America, its territories, and possessions.

### IV.

Defendant is enjoined and restrained from:

(A) Failing to grant permission, on the written request of all writers and publishers of a musical composition including the copyright proprietor thereof, allowing such persons to issue to a music user making direct performances to the public a non-exclusive license permitting the making of specified performances of such musical composition by such music user directly to the public, provided that the defendant shall not be required to make payment with respect to performances so licensed.

(B) Engaging in the commercial publication or recording of music or in the commercial distribution of sheet music or recordings.

### V.

(A) Defendant shall not refuse to enter into a contract providing for the licensing by defendant of performance rights with any writer who shall have had at least one copyrighted musical composition of his writing commercially published or recorded, or with any publisher of music actively engaged in the music publishing business whose musical publications have been commercially published or recorded and publicly promoted and distributed for at least one year, and who assumes the financial risk involved in the normal publication of musical works; provided, however, that defendant shall have the right to refuse to enter into any such contract with any writer or publisher who does not satisfy reasonable standards of literacy and integrity if the defendant is willing to submit to arbitration in the County, City

- 2 -

and State of New York the reasonableness and applicability of such standards, under the rules then prevailing of the American Arbitration Association, with any writer or publisher with whom defendant has refused so to contract.

(B) Defendant shall not enter into any contract with a writer or publisher requiring such writer or publisher to grant to defendant performing rights for a period in excess of five years, provided, however, that defendant may continue to license, as if under the contract, all musical compositions in which the defendant has performing rights at the date of termination of any such contract until all advances made by defendant to such writers and publishers shall have been earned or repaid.

(C) Upon the termination, at any time hereafter, of any contract with a writer or publisher relating to the licensing of the right publicly to perform any musical composition, defendant shall continue to pay for performances of the musical compositions of such writer or publisher licensed by defendant upon the basis of the current performance rates generally paid by defendant to writers and publishers for similar performances of similar compositions for so long as such performing rights are not otherwise licensed.

## VI.

(A) Defendant shall not acquire rights of public performance in any musical compositions from any publisher under a contract which requires the officers, directors, owners or employees of such publisher to refrain from publishing or promoting musical works licensed through another performing rights organization, provided that nothing contained in this paragraph shall prevent defendant from entering into a contract with a publishing entity which requires such entity not to license any performance rights through any other performing rights organization during the term of the contract, and requiring that any works licensed by such officers, directors, owners or employees through another performing rights organization be licensed by a separate publishing entity which does not have a name identical with or similar to the name of any publishing entity with which defendant has contracted.

(B) Defendant shall not enter into any agreement for the acquisition or the licensing of performing rights which requires the recording or public performance of any stated amount or percentage of music, the performing rights in which are licensed or are to be licensed by defendant.

- 3 -

## VII.

(A) Defendant shall make available at reasonable intervals, to all writers and publishers who have granted performance rights to it, a complete statement of the performance payment rates (to writers, those applicable to writers, and to publishers, those applicable to publishers), currently utilized by it for all classifications of performances and musical compositions.

(B) Defendant will not offer or agree to make payments in advance for a stated period for future performing rights which are not either repayable or to be earned by means of future performance to any writer or publisher who, at the time of such offer or agreement, is a member of or under direct contract for the licensing of such performing rights with any other United States performing rights licensing organization, provided that this restriction shall not apply (1) in the case of any such writer or publisher who at any time prior to said offer or agreement had licensed performing rights through defendant or (2) in the case of any such writer or publisher who is a member of or directly affiliated with any other United States performing rights licensing organization which makes offers or makes payments similar to those forbidden in this subparagraph to writers or publishers then under contract to defendant.

(C) Defendant shall include in all contracts which it tenders to writers, publishers and music users relating to the licensing of performance rights a clause requiring the parties to submit to arbitration in the City, County and State of New York under the then prevailing rules of the American Arbitration Association, all disputes of any kind, nature or description in connection with the terms and conditions of such contracts or arising out of the performance thereof or based upon an alleged breach thereof, except that in all contracts tendered by defendant to music users, the clause requiring the parties to submit to arbitration will exclude disputes that are cognizable by the Court pursuant to Article XIV hereof.

## VIII.

(A) Defendant shall not enter into, recognize as valid or perform any performing rights license agreement which shall result in discriminating in rates or terms between licensees similarly situated; provided, however, that differentials based upon applicable business factors which justify different rates or terms shall not be considered discrimination within the meaning of this section; and provided further that nothing contained in this section shall prevent changes in rates or terms from time to time by reason of changing conditions affecting the market for or marketability of performing rights.

- 4 -

(B) Defendant shall, upon the request of any unlicensed broadcaster, license the rights publicly to perform its repertory by broadcasting on either a per program or per programming period basis, at defendant's option. The fee for this license shall relate only to programs (including announcements), or to programming periods, during which a licensed composition is performed. The fee shall be expressed, at defendant's option, either (1) in dollars, (2) as a percentage of the revenue which the broadcaster received for the use of its broadcasting facilities or (3) in the case of sustaining programs or programming periods, as a percentage of the applicable card rate had the program or programming period been commercially sponsored. In the event defendant offers to license broadcasters on bases in addition to a per program or per programming period basis, defendant shall act in good faith so that there shall be a relationship between such per program or such per programming period basis and such other bases, justifiable by applicable business factors including availability, so that there will be no frustration of the purpose of this section to afford broadcasters alternative bases of license compensation.


IX.

(A) Defendant shall not license the public performance of any musical composition or compositions except on a basis whereby, insofar as network broadcasting by a regularly constituted network so requesting is concerned, the issuance of a single license, authorizing and fixing a single license fee for such performance by network broadcasting, shall permit the simultaneous broadcasting of such performance by all stations on the network which shall broadcast such performance, without requiring separate licenses for such several stations for such performance.

(B) With respect to any musical composition in defendant's catalogue of musical compositions licensed for broadcasting and which is or shall be lawfully recorded for performance on specified commercially sponsored programs on an electrical transcription or on other specially prepared recordation intended for broadcasting purposes, defendant shall not refuse to offer to license the public performance by designated broadcasting stations of such compositions by a single license to any manufacturer, producer or distributor of such transcription or recordation or to any advertiser or advertising agency on whose behalf such transcription or recordation shall have been made who may request such license, which single license shall authorize the broadcasting of the recorded composition by means of such transcription or recordation by all stations enumerated by the licensee, on terms and conditions fixed by defendant, without requiring separate licenses for such enumerated stations.

(C) Defendant shall not, in connection with any offer to license by it the public performance of musical compositions by

- 5 -

music users other than broadcasters, refuse to offer a license at a price or prices to be fixed by defendant with the consent of the copyright proprietor for the performance of such specific (i.e., per piece) musical compositions, the use of which shall be requested by the prospective licensee.

## X.

(A) Defendant shall not assert or exercise any right or power to restrict from public performance by any licensee of defendant any copyrighted musical composition in order to exact additional consideration for the performance thereof, or for the purpose of permitting the fixing or regulating of fees for the recording or transcribing of such composition; provided, however, that nothing in this paragraph shall prevent defendant from restricting performances of a musical composition in order reasonably to protect the work against indiscriminate performances or the value of the public performance rights therein or to protect the dramatic performing rights therein, or, as may be reasonably necessary in connection with any claim or litigation involving the performance rights in any such composition.

(B) Defendant, during the term of any license agreements with any class of licensees, shall not make any voluntary reductions in the fees payable under any such agreements, provided, however, that nothing herein shall prevent defendant from lowering any fees or rates to any or all classes of licensees in response to changing conditions affecting the value or marketability of its catalogue to such class or classes, or where necessary to meet competition.

## XI.

For the purpose of securing or determining compliance with this Final Judgment, and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division. and on reasonable notice to defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(A) Access, during office hours of such defendant, to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of defendant relating to any matters contained in this Final Judgment;

(B) Subject to the reasonable convenience of defendant and without restraint or interference from it, to interview officers or employees of defendant, who may have counsel present regarding any such matters.

- 6 -

Upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, defendant shall submit such reports in writing with respect to the matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment.

No information obtained by the means permitted in this Section XI shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the Plaintiff, except in the course of legal proceedings in which the United States is a party for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.


## XII.

All of the provisions of this Final Judgment shall become effective on the entry thereof, except as to paragraph C of Article VII, which shall not become effective until 90 days after the date of entry of this Final Judgment.


## XIII.

Jurisdiction is retained by this Court for the purpose of enabling either of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of the provisions thereof, for the enforcement of compliance therewith and for the punishment of violations thereof.

To best preserve the independent conduct of defendant's music licensing activities, the jurisdiction retained by this Court over this Final Judgment shall be exercised by a Judge of this Court other than one to whom has been assigned any action in which a judgment has been entered retaining jurisdiction over any music performing rights licensing organization (e.g. ASCAP) other than defendant. No reference or assignment of any issue or matter under this Final Judgment shall be made to a Magistrate Judge or Master to whom has been referred or assigned any pending issue or matter in which any music performing rights licensing organization other than defendant as to which this Court has entered judgment retaining jurisdiction, (e.g. ASCAP) is a party.


## XIV.

(A) Subject to all provisions of this Final Judgment, defendant shall, within ninety (90) days of its receipt of a written application from an applicant for a license for the right

- 7 -

of public performance of any, some or all of the compositions in defendant's repertory, advise the applicant in writing of the fee which it deems reasonable for the license requested. If the parties are unable to agree upon a reasonable fee within sixty (60) days from the date when defendant advises the applicant of the fee which it deems reasonable, the applicant may forthwith apply to this Court for the determination of a reasonable fee and defendant shall, upon receipt of notice of the filing of such application, promptly give notice thereof to the Assistant Attorney General in charge of the Antitrust Division. If the parties are unable to agree upon a reasonable fee within ninety (90) days from the date when defendant advises the applicant of the fee which it deems reasonable and no such filing by applicant for the determination of a reasonable fee for the license requested is pending, then defendant may forthwith apply to this Court for the determination of a reasonable fee and defendant shall promptly give notice of its filing of such application to the Assistant Attorney General in charge of the Antitrust Division. In any such proceeding, defendant shall have the burden of proof to establish the reasonableness of the fee requested by it. Should defendant not establish that the fee requested by it is a reasonable one, then the Court shall determine a reasonable fee based upon all the evidence. Pending the completion of any such negotiations or proceedings, the applicant shall have the right to use any, some or all of the compositions in defendant's repertory to which its application pertains, without payment of any fee or other compensation, but subject to the provisions of Subsection (B) hereof, and to the final order or judgment entered by this Court in such proceeding;

(B) When an applicant has the right to perform any compositions in defendant's repertory pending the completion of any negotiations or proceedings provided for in Subsection (A) hereof, either the applicant or defendant may apply to this Court to fix an interim fee pending final determination of what constitutes a reasonable fee. It is the purpose of this provision that an interim fee be determined promptly, and without prejudice as to the final determination of what constitutes a reasonable fee. It is further intended that interim fee proceedings be completed within 120 days of the date when application is made to fix an interim fee, subject to extension at the request of defendant or the applicant only in the interest of justice for good cause shown. If the Court fixes such interim fee, defendant shall then issue and the applicant shall accept a license providing for the payment of a fee at such interim rate from the date the applicant requested a license. If the applicant fails to accept such license or fails to pay the interim fee in accordance therewith, such failure shall be ground for the dismissal of its application. Where an interim license has been issued pursuant to this Subsection (B), the reasonable fee finally determined by this Court shall be retroactive to the date the applicant requested a license;

- 8 -

(C) When a reasonable fee has been finally determined by this Court, defendant shall be required to offer a license at a comparable fee to all other applicants similarly situated who shall thereafter request a license of defendant, but any license agreement which has been executed without any Court determination between defendant and another applicant similarly situated prior to such determination by the Court shall not be deemed to be in any way affected or altered by such determination for the term of such license agreement;

(D) Nothing in this Article XIV shall prevent any applicant from attacking in the aforesaid proceedings or in any other controversy the validity of the copyright of any of the compositions in defendant's repertory nor shall this Judgment be construed as importing any validity or value to any of said copyrights.


AND IT IS FURTHER ORDERED, ADJUDGED and DECREED that with respect to any music user heretofore licensed by defendant the license agreement of which expressly provides for determination by this Court of reasonable license fees or other terms for any period covered by such license, either defendant or such music user may apply to this Court for such determination provided that such license agreement provision has not otherwise expired.


Dated: New York, N. Y.
December 29, 1966

> EDWARD C. MCLEAN
> United States District Judge




JUDGMENT ENTERED DECEMBER 29, 1966

JOHN J. OLEAR, JR.
    *Clerk*


Dated: New York, New York
       November 18, 1994

> Robert P. Patterson, Jr.
> U.S.D.J.

- 9 -

# EXHIBIT B



Z8593
000733801

*BMI • 320 West 57th Street, New York, NY 10019-3790 • 212-586-2000 • FAX 212-245-8986*

Alexander Collin Baker
27837 N. Amberwood
Lane
Valencia CA 91354

Date    **June 4, 1999**

Dear    Alexander Baker:

The following shall constitute the agreement between us:

1. As used in this agreement:

(a) The word "Period" shall mean the term from **January 1, 1999**    to    **March 31, 2001** ,
and continuing thereafter for additional terms of two years each unless terminated by either party at the end of said initial term or any additional term, upon notice by registered or certified mail not more than six (6) months or less than three (3) months prior to the end of any such term.

(b) The words "Work" or "Works" shall mean:

(i) All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) composed by you alone or with one or more co-writers during the Period; and

(ii) All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) composed by you alone or with one or more co-writers prior to the Period, except those in which there is an outstanding grant of the right of public performance to a person other than a publisher affiliated with BMI.

2. You agree that:

(a) Within ten (10) days after the execution of this agreement you will furnish to us a completed clearance form available in blank from us with respect to each Work heretofore composed by you which has been published in printed copies or recorded commercially or synchronized commercially with film or tape or which is being currently performed or which you consider as likely to be performed.

(b) In each instance that a Work for which a clearance form has not been submitted to us pursuant to sub-paragraph 2(a) is published in printed copies or recorded commercially or in synchronization with film or tape or is considered by you as likely to be performed, whether such Work is composed prior to the execution of this agreement or hereafter during the Period, you will promptly furnish to us a completed clearance form with respect to each such Work.

(c) If requested by us in writing, you will promptly furnish to us a legible lead sheet or other written or printed copy of a Work.

3. The submission of each clearance form pursuant to paragraph 2 shall constitute a warranty and representation by you that all of the information contained thereon is true and correct and that no performing rights in such Work have been granted to or reserved by others except as specifically set forth therein in connection with Works heretofore written or co-written by you.

4. Except as otherwise provided herein, you hereby grant to us for the Period:

(a) All the rights that you own or acquire publicly to perform, and to license others to perform, anywhere in the world, any part or all of the Works.

(b) The non-exclusive right to record, and to license others to record, any part or all of any of the Works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such Work publicly by means of radio and television or for archive or audition purposes. This right does not include recording for the purpose of sale to the public or for the purpose of synchronization (i) with motion pictures intended primarily for theatrical exhibition or (ii) with programs distributed by means of syndication to broadcasting stations, cable systems or other similar distribution outlets.

(c) The non-exclusive right to adapt or arrange any part or all of any of the Works for performance purposes, and to license others to do so.

5. Notwithstanding the provisions of sub-paragraph 4(a):

(a) The rights granted to us by sub-paragraph 4(a) shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera, operetta or musical show or more than

five (5) minutes from a dramatic or dramatico-musical work which is a ballet, if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

(b) You, together with all the publishers and your co-writers, if any, shall have the right jointly, by written notice to us, to exclude from the grant made by sub-paragraph 4(a) performances of Works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (i) a score originally written for or performed as part of a theatrical or television film, (ii) a score originally written for or performed as part of a radio or television program, or (iii) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

(c) You, the publishers and/or your co-writers, if any, retain the right to issue non-exclusive licenses for performances of a Work or Works in the United States, its territories and possessions (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license we are given written notice thereof and a copy of the license is supplied to us.

6. (a) As full consideration for all rights granted to us hereunder and as security therefor, we agree to pay to you, with respect to each of the Works in which we obtain and retain performing rights during the Period:

(i) For radio and television performances of a Work in the United States, its territories and possessions, amounts calculated pursuant to our then current standard practices upon the basis of the then current performance rates generally paid by us to our affiliated writers for similar performances of similar compositions. The number of performances for which you shall be entitled to payment shall be estimated by us in accordance with our then current system of computing the number of such performances.

You acknowledge that we license performances of the Works of our affiliates by means other than on radio and television, but that unless and until such time as methods are adopted for tabulation of such performances, payment will be based solely on performances in those media and locations then currently surveyed. In the event that during the Period we shall establish a system of separate payment for performances by means other than radio and television, we shall pay you upon the basis of the then current performance rates generally paid by us to our other affiliated writers for similar performances of similar compositions.

(ii) In the case of a Work composed by you with one or more co-writers, the sum payable to you hereunder shall be a pro rata share, determined on the basis of the number of co-writers, unless you shall have transmitted to us a copy of an agreement between you and your co-writers providing for a different division of payment.

(iii) Monies received by us from any performing rights licensing organization outside of the United States, its territories and possessions, which are designated by such performing rights licensing organization as the author's share of foreign performance royalties earned by your Works after the deduction of our then current handling charge applicable to our affiliated writers and in accordance with our then current standard practices of payment for such performances.

(b) Notwithstanding the provisions of sub-paragraph 6(a), we shall have no obligation to make payment hereunder with respect to (i) any performance of a Work which occurs prior to the date on which we have received from you all of the information and material with respect to such Work which is referred to in paragraphs 2 and 3, or (ii) any performance of a Work as to which a direct license as described in sub-paragraph 5(c) has been granted by you, your co-writers, if any, or the publishers, or (iii) any performance for which no license fee shall be collected by us, or (iv) any performance of a Work which you claim was either omitted from or miscalculated on a royalty statement and for which we shall not have received written notice from you of such claimed omission or miscalculation within nine (9) months of the date of such statement.

7. In accordance with our then current standard practices, we will furnish periodic statements to you during each year of the Period showing the monies due pursuant to sub-paragraph 6(a). Each such statement shall be accompanied by payment of the sum thereby shown to be due you, subject to all proper deductions, if any, for taxes, advances or amounts due BMI from you.

8. (a) Nothing in this agreement requires us to continue to license the Works subsequent to the termination of this agreement. In the event that we continue to license your interest in any Work, however, we shall continue to make payments to you for such Work for so long as you do not make or purport to make directly or indirectly any grant of performing rights in such Work to any other licensing organization. The amounts of such payments shall be calculated pursuant to our then current standard practices upon the basis of the then current performance rates generally paid by us to our affiliated writers for similar performances of similar compositions. You agree to notify us by registered or certified mail of any grant or purported grant by you directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if you fail so to inform us thereof and we make payments to you for any period after the making of any such grant or purported grant, you agree to repay to us all amounts so paid by us promptly with or without demand by us. In addition, if we inquire of you by registered or certified mail, addressed to your last known address, whether you have made any such grant or purported grant and you fail to confirm to us by registered or certified mail within thirty (30) days of the mailing of such inquiry that you have not made any such grant or purported grant, we may, from and after such date, discontinue making any payments to you.

(b) Our obligation to continue payment to you after the termination of this agreement for performances outside of the United States, its territories and possessions, of Works which BMI continues to license after such termination shall be dependent upon our receipt in the United States of payments designated by foreign performing rights organizations as the author's share of foreign performance royalties earned by your Works. Payment of such foreign royalties shall be subject to deduction of our then current handling charge applicable to our affiliated writers and shall be in accordance with our then current standard practices of payment for such performances.

(c) In the event that we have reason to believe that you will receive, are entitled to receive, or are receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of your Works during a period when such Works were licensed by us pursuant to this agreement, we shall have the right to withhold payment for such performances from you until receipt of evidence satisfactory to us that you were not or will not be so paid by such other organization. In the event that you were or will be so paid or do not supply such evidence within eighteen (18) months from the date of our request therefor, we shall be under no obligation to make any payment to you for performances of such Works during such period.

9.   In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to you prior to the effective date of such termination, there remains an unearned balance of advances paid to you by us, such termination shall not be effective until the close of the calendar quarterly period during which (a) you shall repay such unearned balance of advances, or (b) you shall notify us by registered or certified mail that you have received a statement rendered by us at our normal accounting time showing that such unearned balance of advances has been fully recouped by us.

10.  You warrant and represent that you have the right to enter into this agreement; that you are not bound by any prior commitments which conflict with your commitments hereunder; that each of the Works, composed by you alone or with one or more co-writers, is original; and that exercise of the rights granted by you herein will not constitute an infringement of copyright or violation of any other right of, or unfair competition with, any person, firm or corporation. You agree to indemnify and hold harmless us, our licensees, the advertisers of our licensees and their respective agents, servants and employees from and against any and all loss or damage resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by you in this agreement. Upon notification to us or any of the other parties herein indemnified of a claim with respect to any of the Works, we shall have the right to exclude such Work from this agreement and/or to withhold payment of all sums which become due pursuant to this agreement or any modification thereof until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

11.  (a) We shall have the right, upon written notice to you, to exclude from this agreement, at any time, any Work which in our opinion is similar to a previously existing composition and might constitute a copyright infringement, or has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition.

(b) In the case of Works which in our opinion are based on compositions in the public domain, we shall have the right, upon written notice to you, either (i) to exclude any such Work from this agreement, or (ii) to classify any such Work as entitled to receive only a fraction of the full credit that would otherwise be given for performances thereof.

(c) In the event that any Work is excluded from this agreement pursuant to paragraph 10 or sub-paragraph 11(a) or (b), all rights in such Work shall automatically revert to you ten (10) days after the date of our notice to you of such exclusion. In the event that a Work is classified for less than full credit under sub-paragraph 11(b)(ii), you shall have the right, by giving notice to us, within ten (10) days after the date of our notice advising you of the credit allocated to the Work, to terminate our rights therein, and all rights in such Work shall thereupon revert to you.

12.  In each instance that you write, or are employed or commissioned by a motion picture producer to write, during the Period, all or part of the score of a motion picture intended primarily for exhibition in theaters, or by the producer of a musical show or revue for the legitimate stage to write, during the Period, all or part of the musical compositions contained therein, we agree, on request, to advise the producer of the film that such part of the score as is written by you may be performed as part of the exhibition of said film in theaters in the United States, its territories and possessions, without compensation to us, or to the producer of the musical show or revue that your compositions embodied therein may be performed on the stage with living artists as part of such musical show or revue, without compensation to us. In the event that we notify you that we have established a system for the collection of royalties for performance of the scores of motion picture films in theaters in the United States, its territories and possessions, we shall no longer be obligated to take such action with respect to motion picture scores.

13.  You make, constitute and appoint us, or our nominee, your true and lawful attorney, irrevocably during the Period, in our name or that of our nominee, or in your name, or otherwise, in our sole judgment, to do all acts, take all proceedings, execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in our sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by you hereunder, and to recover damages in respect to or for the infringement or other violation of said rights, and in our sole judgment to join you and/or others in whose names the copyrights to any of the Works may stand; to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the Works, provided that any action or proceeding commenced by us pursuant to the provisions of this paragraph shall be at our sole expense and for our sole benefit. Notwithstanding the foregoing, nothing in this paragraph 13 requires us to take any proceeding or other action against any person, firm, partnership or other entity or any writer or publisher, whether or not affiliated with us, who you claim may be infringing your Works or otherwise violating the rights granted by you hereunder. In addition, you understand and agree that the licensing by us of any musical compositions which you claim may be infringing your Works or otherwise violating the rights granted by you hereunder, shall not constitute an infringement of your Works on our part.

14.  BMI shall have the right, in its sole discretion, to terminate this agreement on at least thirty (30) days' notice by registered or certified mail if you, your agents, employees or representatives, directly or indirectly, solicit or accept payment from writers for composing music for lyrics or writing lyrics to music or for reviewing, publishing, promoting, recording or rendering other services connected with the exploitation of any composition, or permit use of your name or your affiliation with us in connection with any of the foregoing. In the event of such termination no payments shall be due to you pursuant to paragraph 8.

15.  No monies due or to become due to you shall be assignable, whether by way of assignment, sale or power granted to an attorney-in-fact, without our prior written consent. If any assignment of such monies is made by you without such prior written consent, no rights of any kind against us will be acquired by the assignee, purchaser or attorney-in-fact.

16. In the event that during the Period (a) mail addressed to you at the last address furnished by you pursuant to paragraph 20 shall be returned by the post office, or (b) monies shall not have been earned by you pursuant to paragraph 6 for a period of two consecutive years or more, or (c) you shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail addressed to the last address furnished by you pursuant to paragraph 20 and, in the case of your death, to the representative of your estate, if known to BMI. In the event of such termination no payments shall be due to you pursuant to paragraph 8.

17. You acknowledge that the rights obtained by you pursuant to this agreement constitute rights to payment of money and that during the Period we shall hold title to the performing rights granted to us hereunder. In the event that during the Period you shall file a petition in bankruptcy, such a petition shall be filed against you, you shall make an assignment for the benefit of creditors, you shall consent to the appointment of a receiver or trustee for all or part of your property, or you shall institute or shall have instituted against you any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, we shall retain title to the performing rights in all Works the rights to which are granted to us hereunder and shall subrogate your trustee in bankruptcy or receiver and any subsequent purchasers from them to your right to payment of money for said Works in accordance with the terms and conditions of this agreement.

18. (a) You hereby authorize us to negotiate for and collect royalties or monies to which you may become entitled as a writer pursuant to the Audio Home Recording Act of 1992 and/or any amendments thereto or substitutions therefor and, to the extent possible, collect for and distribute to you royalties arising from or as compensation for home recording in countries outside the United States, its territories and possessions. This authorization with respect to royalties and monies under the Audio Home Recording Act of 1992 may be revoked by you at the end of any calendar year on prior written notice by you to us by registered or certified mail. Such revocation shall be effective beginning with the calendar year subsequent to the time of notice and shall in no way affect the Period of this agreement with respect to any of the other rights granted to BMI by you hereunder.

(b) We agree to distribute to you royalties and monies collected by us pursuant to the authorization granted in sub-paragraph 18(a), pursuant to our then prevailing practices, including deduction of our expenses therefor.

19. All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules, the arbitrator(s) to be selected as follows: Each of us shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one of us, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator. If two arbitrators are so appointed, they shall appoint a third arbitrator. If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either of us may, in writing, request the American Arbitration Association to appoint the third arbitrator. The award made in the arbitration shall be binding and conclusive on both of us and shall include the fixing of the costs, expenses and reasonable attorneys' fees of arbitration, which shall be borne by the unsuccessful party. Judgment may be entered in New York State Supreme Court or any other court having jurisdiction.

20. You agree to notify our Department of Writer/Publisher Administration promptly in writing of any change in your address. Any notice sent to you pursuant to the terms of this agreement shall be valid if addressed to you at the last address so furnished by you.

21. This agreement constitutes the entire agreement between you and us, cannot be changed except in a writing signed by you and us and shall be governed and construed pursuant to the laws of the State of New York.

22. In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

Very truly yours,

BROADCAST MUSIC, INC.

By...........................................................
                    Assistant          Vice President

ACCEPTED AND AGREED TO:

X ...........................................................

Alexander Collin Baker
Z8593
000733801

4/94

# EXHIBIT C



*Broadcast Music, Inc., 7 World Trade Center, 250 Greenwich St., New York, NY 10007-0030*

THIS PAGE TO BE  COMPLETED BY BMI.
REMEMBER TO SIGN ON PAGE SEVEN.

Dear

The following shall constitute the agreement between us:

1.  As used in this agreement:

(a)  The word "Period" shall mean the term from [ ...... TO BE COMPLETED BY BMI ...... ] to [ ...... TO BE COMPLETED BY BMI ...... ] and continuing thereafter for additional terms of two (2) years each unless terminated by either party at the end of said initial term or any additional term, upon notice sent by registered, certified or Express mail, or other sending method that requires that the date that the item is sent be recorded by the courier (e.g., overnight mail or messenger service), not more than six (6) months or less than three (3) months prior to the end of any such term.

(b) The words "Work" or "Works" shall mean:

(i) All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) composed by you alone or with one or more co-writers during the Period; and

(ii) All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) composed by you alone or with one or more co-writers prior to the Period, except those in which there is an outstanding grant of the right of public performance to a person other than a publisher affiliated with BMI.

2.  You agree that:

(a)  Within ten (10) days after the execution of this agreement you will furnish to us a completed work registration form available in blank from us with respect to each Work heretofore composed by you which has been published in printed copies or recorded commercially or synchronized commercially with film or tape or which is being currently performed or which you consider as likely to be performed.

(b)  In each instance that a Work for which a work registration form has not been submitted to us pursuant to subparagraph 2(a) is published in printed copies or recorded commercially or in synchronization with film or tape or is considered by you as likely to be performed, whether such Work is composed prior to the execution of this agreement or hereafter during the Period, you will promptly furnish to us a completed work registration form with respect to each such Work.

(c)  If requested by us in writing, you will promptly furnish to us (i) a legible lead sheet or other written or printed copy of a Work, (ii) if such Work has been or shall be synchronized with or otherwise used in connection with a motion picture or television film or tape, a cue sheet showing the title, writers, publishers and nature and duration of the use of the Work in such film or tape, (iii) a copy of a commercial recording of the Work and (iv) a copy of your agreement with the publisher of the Work.

3.  The submission of each work registration form pursuant to paragraph 2 shall constitute a warranty and representation by you that all of the information contained thereon is true and correct and that no performing rights in such Work have been granted to or reserved by others except as specifically set forth therein in connection with Works heretofore written or co-written by you.

4.  Except as otherwise provided herein, you hereby grant to us for the Period:

(a) All the rights that you own or acquire publicly to perform, and to license others to perform, anywhere in the world, in any and all places and in any and all media, now known or which hereafter may be developed, any part or all of the Works.

4:21-cv-00022_EXHIBITS TO FIRST AMENDED COMPLAINT  p.17

*THIS PAGE INTENTIONALLY LEFT BLANK*

4:21-cv-00022_EXHIBITS TO FIRST AMENDED COMPLAINT  p.18

(b)  The non-exclusive right to record, and to license others to record, any part or all of any of the Works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such Work publicly by means of radio and television or for archive or audition purposes. This right does not include recording for the purpose of sale to the public or for the purpose of synchronization (i) with motion pictures intended primarily for theatrical exhibition or (ii) with programs distributed by means of syndication to broadcasting stations, cable systems or other similar distribution outlets.

(c)  The non-exclusive right to adapt or arrange any part or all of any of the Works for performance purposes, and to license others to do so.

5.  Notwithstanding the provisions of subparagraph 4(a):

(a)  The rights granted to us by subparagraph 4(a) shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera, operetta or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet, if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

(b)  You, together with all the publishers and your co-writers, if any, shall have the right jointly, by written notice to us, to exclude from the grant made by subparagraph 4(a) performances of Works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (i) a score originally written for or performed as part of a theatrical or television film, (ii) a score originally written for or performed as part of a radio or television program, or (iii) the original cast, soundtrack or similar album of a dramatic or dramatico-musical work.

(c)  You, the publishers and/or your co-writers, if any, retain the right to issue non-exclusive licenses for performances of a Work or Works in the United States, its territories and possessions (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license or within three (3) months of the performance of the Work or Works so licensed, whichever is earlier, we are given written notice thereof and a copy of the license is supplied to us.

6.  (a)  As full consideration for all rights granted to us hereunder and as security therefor, we agree to pay to you, with respect to each of the Works in which we obtain and retain performing rights during the Period:

(i)  For radio and television performances of a Work in the United States, its territories and possessions, amounts calculated pursuant to our then current standard practices upon the basis of the then current performance rates generally paid by us to our affiliated writers for similar performances of similar compositions. The number of performances for which you shall be entitled to payment shall be estimated by us in accordance with our then current system of computing the number of such performances.

You acknowledge that we license performances of the Works of our affiliates by means other than on radio and television, but that unless and until such time as methods are adopted for tabulation of such performances, payment will be based solely on performances in those media and locations then currently surveyed. In the event that during the Period we shall establish a system of separate payment for performances by means other than radio and television, we shall pay you upon the basis of the then current performance rates generally paid by us to our other affiliated writers for similar performances of similar compositions.

(ii)  In the case of a Work composed by you with one or more co-writers, the sum payable to you hereunder shall be a pro rata share, determined on the basis of the number of co-writers, unless you shall have transmitted to us a copy of an agreement between you and your co-writers providing for a different division of payment.

(iii)  Monies received by us from any performing rights licensing organization outside of the United States, its territories and possessions, which are designated by such performing rights licensing organization as the author's share of foreign performance royalties earned by your Works after the deduction of our then current handling charge applicable to our affiliated writers and in accordance with our then current standard practices of payment for such performances.

(b)  Notwithstanding the provisions of subparagraph 6(a), we shall have no obligation to make payment hereunder with respect to (i) any performance of a Work which occurs prior to the date on which we have received from you all of the information and material with respect to such Work which is referred to in paragraphs 2 and 3, or (ii) any performance of a Work as to which a direct license as described in subparagraph 5(c) has been granted by you, your co-writers, if any, or the publishers, or (iii) any performance for which no license fee shall be collected by us, or (iv) any performance of a Work which you claim was either omitted from or miscalculated on a royalty statement and for which we shall not have received written notice from you of such claimed omission or miscalculation within nine (9) months of the date of the royalty distribution seeking to be adjusted.

7.  In accordance with our then current standard practices, we will furnish periodic statements to you during each year of the Period showing the monies due pursuant to subparagraph 6(a). Each such statement shall be accompanied by payment of the sum thereby shown to be due you, subject to all proper deductions, if any, for taxes, advances or amounts due BMI from you.

8.    (a)  Nothing in this agreement requires us to continue to license the Works subsequent to the termination of this agreement. In the event that we continue to license your interest in any Work, however, we shall continue to make payments to you for such Work for so long as you do not make or purport to make directly or indirectly any grant of performing rights in such Work to any other licensing organization. The amounts of such payments shall be calculated pursuant to our then current standard practices upon the basis of the then current performance rates generally paid by us to our affiliated writers for similar performances of similar compositions. You agree to notify us by registered or certified mail of any grant or purported grant by you directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if you fail so to inform us thereof and we make payments to you for any period after the making of any such grant or purported grant, you agree to repay to us all amounts so paid by us promptly with or without demand by us. In addition, if we inquire of you by registered or certified mail, addressed to your last known address, whether you have made any such grant or purported grant and you fail to confirm to us by registered or certified mail within thirty (30) days of the mailing of such inquiry that you have not made any such grant or purported grant, we may, from and after such date, discontinue making any payments to you.

(b)  Our obligation to continue payment to you after the termination of this agreement for performances outside of the United States, its territories and possessions, of Works which BMI continues to license after such termination shall be dependent upon our receipt in the United States of payments designated by foreign performing rights organizations as your share of foreign performance royalties earned by your Works. Payment of such foreign royalties shall be subject to deduction of our then current handling charge applicable to our affiliated writers and shall be in accordance with our then current standard practices of payment for such performances.

9.  In the event that we have reason to believe that you will receive, are entitled to receive, or are receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of your Works during a period when such Works were licensed by us pursuant to this agreement, we shall have the right to withhold payment for such performances from you until receipt of evidence satisfactory to us that you were not or will not be so paid by such other organization. In the event that you were or will be so paid or do not supply such evidence within twelve (12) months from the date of our request therefor, we shall be under no obligation to make any payment to you for performances of such Works during such period.

10.  (a)  In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to you prior to the effective date of such termination, there remains an unearned balance of advances paid to you by us or any other indebtedness owed to BMI by you, such termination shall not be effective until the close of the calendar quarterly period during which (i) you shall repay such unearned balance of advances or indebtedness, or (ii) you shall notify us by registered or certified mail that you have received a statement rendered by us at our normal accounting time showing that such unearned balance of advances or indebtedness has been fully recouped by us.

(b)  The termination of this agreement shall be deemed subject to any rights or obligations existing between BMI and its licensees under licenses then in effect. As a result thereof, notwithstanding such termination, BMI shall have the right to continue to license all of your Works in all places and in all media with respect to which such licenses exist as of the date of termination, until such licenses expire.

11.  Notwithstanding the termination of this agreement, all of the terms and conditions of this agreement shall continue to apply subsequent to such termination with respect to any Works which may continue to be licensed by BMI and any monies payable to you by BMI pursuant to the provisions of this agreement.

12.  (a)  You warrant and represent that you have the right to enter into this agreement; that you are not bound by any prior commitments which conflict with your commitments hereunder; that each of the Works, composed by you alone or with one or more co-writers, is original; and that the exercise of the rights granted by you herein will not constitute an infringement of copyright or violation of any other right of, or unfair competition with, any person, firm or corporation. You agree to indemnify and hold harmless us, our licensees, the advertisers of our licensees and their respective agents, servants and employees from and against any and all loss or damage resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by you in this agreement.

(b)  Upon notification to us or any of the other parties herein indemnified of a claim with respect to any of the Works, we shall have the right to withhold payment of all sums which become due pursuant to this agreement or any modification thereof and/or

W800                                                                                                    Page 4 of  8

to exclude such Work from this agreement until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

13.  (a)  We shall have the right, upon written notice to you, to exclude from this agreement, at any time, any Work which in our opinion is similar to a previously existing composition and might constitute a copyright infringement, or has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition.

(b)  In the case of Works which in our opinion are based on compositions in the public domain, we shall have the right, upon written notice to you, either (i) to exclude any such Work from this agreement, or (ii) to classify any such Work as entitled to receive only a fraction of the full credit that would otherwise be given for performances thereof.

(c)  In the event that any Work is excluded from this agreement pursuant to subparagraph 12(b) or subparagraph 13 (a) or (b), all rights in such Work shall automatically revert to you ten (10) days after the date of our notice to you of such exclusion. In the event that a Work is classified for less than full credit under subparagraph 13 (b)(ii), you shall have the right, by giving notice to us, within ten (10) days after the date of our notice advising you of the credit allocated to the Work, to terminate our rights therein, and all rights in such Work shall thereupon revert to you.

14.  In each instance that you write, or are employed or commissioned by a motion picture producer to write, during the Period, all or part of the score of a motion picture intended primarily for exhibition in theaters, or by the producer of a musical show or revue for the legitimate stage to write, during the Period, all or part of the musical compositions contained therein, we agree, on request, to advise the producer of the film that such part of the score as is written by you may be performed as part of the exhibition of said film in theaters in the United States, its territories and possessions, without compensation to us, or to the producer of the musical show or revue that your compositions embodied therein may be performed on the stage with living artists as part of such musical show or revue, without compensation to us. In the event that we notify you that we have established a system for the collection of royalties for performance of the scores of motion picture films in theaters in the United States, its territories and possessions, we shall no longer be obligated to take such action with respect to motion picture scores.

15.  You make, constitute and appoint us, or our nominee, your true and lawful attorney, irrevocably during the Period, in our name or that of our nominee, or in your name, or otherwise, in our sole judgment, to do all acts, take all proceedings, execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in our sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by you hereunder, and to recover damages in respect to or for the infringement or other violation of said rights, and in our sole judgment to join you and/or others in whose names the copyrights to any of the Works may stand; to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the Works, provided that any action or proceeding commenced by us pursuant to the provisions of this paragraph shall be at our sole expense and for our sole benefit. Notwithstanding the foregoing, nothing in this paragraph 15 requires us to take any proceeding or other action against any person, firm, partnership or other entity or any writer or publisher, whether or not affiliated with us, who you claim may be infringing your Works or otherwise violating the rights granted by you hereunder. In addition, you understand and agree that the licensing by us of any musical compositions which you claim may be infringing your Works or otherwise violating the rights granted by you hereunder, shall not constitute an infringement of your Works on our part.

16.  BMI shall have the right, in its sole discretion, to terminate this agreement on at least thirty (30) days' notice by registered or certified mail if you, your agents, employees or representatives, directly or indirectly, solicit or accept payment from writers for composing music for lyrics or writing lyrics to music or for reviewing, publishing, promoting, recording or rendering other services connected with the exploitation of any composition, or permit use of your name or your affiliation with us in connection with any of the foregoing. In the event of such termination no payments shall be due to you pursuant to paragraph 8.

17.  No monies due or to become due to you shall be assignable, whether by way of assignment, sale or power granted to an attorney-in-fact, without our prior written consent. If any assignment of such monies is made by you without such prior written consent, no rights of any kind against us will be acquired by the assignee, purchaser or attorney-in-fact.

18.  In the event that during the Period (a) mail addressed to you at the last address furnished by you pursuant to paragraph 22 shall be returned by the post office, or (b) monies shall not have been earned by you pursuant to paragraph 6 for a period of two consecutive years or more, or (c) you shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail, electronic mail ("e-mail") or facsimile number addressed to the last postal or electronic address or transmitted to the last facsimile number furnished by you pursuant to paragraph 22 and, in the case of your death, to the representative of your estate, if known to BMI. If you failed to maintain a current address with BMI and BMI has made reasonable good-faith efforts in attempting to locate you without success, BMI shall have the right to terminate this agreement pursuant to this paragraph by regular

first-class U.S. mail, in lieu of the means otherwise specified. In the event of such termination no payments shall be due to you pursuant to paragraph 8.

19.  You acknowledge that the rights obtained by you pursuant to this agreement constitute rights to payment of money and that during the Period we shall hold title to the performing rights granted to us hereunder. In the event that during the Period you shall file a petition in bankruptcy, such a petition shall be filed against you, you shall make an assignment for the benefit of creditors, you shall consent to the appointment of a receiver or trustee for all or part of your property, or you shall institute or shall have instituted against you any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, we shall retain title to the performing rights in all Works the rights to which are granted to us hereunder and shall subrogate your trustee in bankruptcy or receiver and any subsequent purchasers from them to your right to payment of money for said Works in accordance with the terms and conditions of this agreement.

20.  (a)  You hereby authorize us to negotiate for and collect royalties or monies to which you may become entitled as a writer pursuant to the Audio Home Recording Act of 1992 and/or any amendments thereto or substitutions therefor and, to the extent possible, collect for and distribute to you royalties arising from or as compensation for home recording in countries outside the United States, its territories and possessions. This authorization with respect to royalties and monies under the Audio Home Recording Act of 1992 may be revoked by you at the end of any calendar year on prior written notice by you to us by registered or certified mail. Such revocation shall be effective beginning with the calendar year subsequent to the time of notice and shall in no way affect the Period of this agreement with respect to any of the other rights granted to BMI by you hereunder.

(b)  We agree to distribute to you royalties and monies collected by us pursuant to the authorization granted in subparagraph 20(a), pursuant to our then prevailing practices, including deduction of our expenses therefor.

21.  All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules, the arbitrator(s) to be selected as follows: Each of us shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one of us, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator. If two arbitrators are so appointed, they shall appoint a third arbitrator. If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either of us may, in writing, request the American Arbitration Association to appoint the third arbitrator. The award made in the arbitration shall be binding and conclusive on both of us and shall include the fixing of the costs, expenses and reasonable attorneys' fees of arbitration, which shall be borne by the unsuccessful party. Judgment may be entered in New York State Supreme Court or any other court having jurisdiction.

22.  You agree to notify our Department of Writer/Publisher Administration promptly in writing of any change in your postal or electronic ("e-mail") address, or facsimile number.  Any notice sent to you pursuant to the terms of this agreement shall be valid if addressed to you at the last postal or electronic address or facsimile number so furnished by you.

23.  This agreement shall be subject to BMI's standard practices and procedures which are in effect as of the effective date of this agreement and as they may be modified and/or supplemented from time to time.

24.  You acknowledge that the relationship between you and us which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations hereunder.

25.  You authorize the inclusion of your name, likeness and biographical information in publicly distributed material relating to your association with us.

26.  This agreement constitutes the entire agreement between you and us, cannot be changed except in a writing signed by you and us and shall be governed and construed pursuant to the laws of the State of New York.

27.  In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

28.  All works that were embraced by any prior agreement between you and us and in which no other licensing organization controls your performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to you by us or unpaid indebtedness owed to us by you shall be deemed to be recoupable by us from any monies which become payable to you pursuant to this agreement and any extensions, renewals or modifications.

Very truly yours,

**BROADCAST MUSIC, INC.**

By ...................……………………………….
                    Vice President

**ACCEPTED AND AGREED TO:**

...................……………………..……….
                    (Signature)

...................……………………..……….
                    (Print name)

**THE FOLLOWING INFORMATION IS REQUIRED FOR ALL SONGWRITERS/COMPOSERS UNDER THE AGE OF 18:**

………………………………………………….                    ………………………………………………………
(Signature of Parent/Legal Guardian)-**CIRCLE ONE**                    (Printed Name of Parent/Legal Guardian)

4:21-cv-00022_EXHIBITS TO FIRST AMENDED COMPLAINT  p.23

# EXHIBIT D

NAME, ADDRESS AND TELEPHONE NUMBER OF ATTORNEY OR PARTY WITHOUT ATTORNEY:

*Jacqueline Y. Blade #214125*
*3625 E. Thousand Oaks Blvd #235*
*Westlake Village CA 91362*

STATE BAR NUMBER

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Los Angeles

JUL 07 2016

Sherri R. Carter, Executive Officer/Clerk
A. Kidder, Deputy

ATTORNEY FOR (NAME): *Respondent*

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURT HOUSE ADDRESS: *6230 Sylmar Ave., Van Nuys, CA 91401*

PETITIONER / PLAINTIFF: *Alexander Collin Baker*

RESPONDENT / DEFENDANT: *Clara Vescliza Baker*

CLAIMANT:

CASE NUMBER: *LD 068701*

RELATED CASES (IF ANY):

DEPARTMENT / COURTROOM: *J*

HEARING DATE:

CONTINUATION DATE / TIME:

- [x] STIPULATION AND ORDER ON ORDER TO SHOW CAUSE
- [ ] SETTLEMENT AGREEMENT AT TIME OF TRIAL
- [ ] STIPULATION TO FURTHER JUDGMENT ON RESERVED ISSUES

RESPONDENT'S FILING FEE: [ ] PAID  [ ] NOT PAID

**THE PARTIES AGREE TO THE FOLLOWING MATTERS, WHICH SHALL BE THE ORDERS OF THE COURT.**

- [ ] **TEMPORARY ORDERS PENDING JUDGMENT OR FURTHER COURT ORDER (*PENDENTE LITE*)**
  The orders agreed to herein shall stay in effect until superseded by judgment or further order of Court, whichever first occurs, and all other orders made in this case shall remain in full force and effect except as otherwise provided herein.

- [ ] **SETTLEMENT AGREEMENT**
  The orders agreed to herein shall be included in a judgment or further judgment to be filed herein.

- [ ] **MODIFICATION**
  The orders agreed to herein modify the prior orders and/or the judgment made in this case.
  All other orders made in this case shall remain in full force and effect except as provided herein.
  The judgment in this case was filed on _____. The last order modified hereby was filed on _____.

**NOTICE AND OPPORTUNITY TO BE HEARD** (Mandatory for custody orders under FC§3048a): The parties understand that they have the right to advance notice of court proceedings and an opportunity to be heard by the court, including the rights to present evidence, cross examine witnesses and argue, and by signing this agreement, waive any right to further notice and opportunity to be heard for the purpose of the validity of court orders made from this agreement. *Without prejudice & from any source subject to reallocation at the time of trial, all royalty payments received by either party for creative work from 1-11-1995 through 4-7-15 shall be shared 50/50. This order excludes any work created before 1-11-95 and after 4-7-15. Neither party shall sell, transfer, assign, or make any deal whatsoever*

**INSTRUCTIONS FOR USE OF THIS FORM:** This form is provided in three sections.
Part A (4 pages) includes this title page and a signature page which should be used in all cases, and also provides for agreements for restraining orders, attorney fees, judgment and other orders.
Part B (6 pages) provides for agreements for parentage, child custody and child, spousal and family support orders.
Part C (4 pages) provides for agreements for property division orders.

**USE ONLY THOSE PAGES THAT ARE NECESSARY FOR YOUR AGREEMENTS.**
**NUMBER THE PAGES CONSECUTIVELY WITH THE SIGNATURE PAGE AT THE END.**
**AFTER SIGNING, SEPARATE THE COPIES FROM THE ORIGINALS BEFORE SUBMITTING TO THE CLERK.**

FAM 024(A) 10/04 | STIPULATION / SETTLEMENT AGREEMENT | PAGE 1 OF ___

IN RE: THE MATTER OF:

| DATE | (NAME) PETITIONER: Alexander Collin Baker | CASE NUMBER: LD 068 701 |
|---|---|---|
| 7/7/16 | (NAME) RESPONDENT: Clara Veseliza Baker | RELATED CASES (IF ANY): |

**700. SEPARATE STIPULATION RE WAIVER OF FINAL DECLARATION OF DISCLOSURE** (FC§2105, Optional):

☐ The parties waive the requirements of FC§2105a for service on the other of a final declaration of disclosure and make the followin representations:

(1) Both parties have complied with FC§2104 and the preliminary declarations of disclosure have been completed and exchanged.

(2) Both parties have completed and exchanged a current income and expense declaration, that includes all material facts and informatio regarding that party's earnings, accumulations, and expenses.

(3) Both parties have fully complied with FC§2102 and have fully augmented the preliminary declarations of disclosure, including disclosure of al material facts and information regarding the characterization of all assets and liabilities, the valuation of all assets that are contended to be community property or in which it is contended the community has an interest, and the amounts of all obligations that are contended to be community obligations or for which it is contended the community has liability.

(4) This waiver is knowingly, intelligently, and voluntarily entered into by each of the parties.

(5) Each party understands that this waiver does not limit the legal disclosure obligations of the parties, but rather is a statement under penalty of perjury that those obligations have been fulfilled. Each party further understands that noncompliance with those obligations will result in the court setting aside the judgment.

**THE UNDERSIGNED DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE FACTS STATED IN THE FORGOING WAIVER OF FINAL DECLARATION OF DISCLOSURE ARE TRUE AND CORRECT.**

Date:_____

## SIGN HERE FOR OPTIONAL DISCLOSURE WAIVER ONLY

| | |
|---|---|
| Petitioner | Respondent |

**750. OTHER ORDERS:** → without the written consent of the ot with any third party for any work created between 1-1-95 through 4-7-16. It is the specific intent of the parties that no authorship, and no ownership of copyright is effected by this order.

Other than ASCAP, BMI, Universal, and SESAC, both parties will produce royalty statements within 30 days, and make payment thereon within 30 days, paid to the other party, in an amount of 50% of money received.

FAM 024(A)  10/04

**STIPULATION / SETTLEMENT AGREEMENT**

PAGE_____ OF _____

IN RE: THE MATTER OF:

| DATE | (NAME) PETITIONER: | CASE NUMBER |
|---|---|---|
| 7/7/16 | *Alexander Collin Baker* | *LD 068701* |
| | (NAME) RESPONDENT: *Clara Veseliza Baker* | RELATED CASES (IF ANY): |

**800. ATTORNEY FEE ORDERS** (FC§§270-72, 2030-32, 7640):

☐ The issue of attorney's fees and costs for either party is reserved until further order of court.

☐ ☐ Petitioner ☐ Respondent ☐ Claimant shall pay to attorney for ☐ Petitioner ☐ Respondent ☐ Claimant, as a contributory share of the payee's attorney fees and costs, the sum of $_____, ☐ payable by_____, ☐ OR payable in installments of $_____ per month on the_____day of each month commencing_____and continuing until paid in full.

☐ If any_____ installments remain unpaid for _____ or more days after the due date, the entire remaining balance shall become immediately due and payable and shall bear interest at the legal rate from the date of default.

☐ Neither party shall be responsible for the attorney fees and costs of the other except as otherwise ordered herein or in any other court order.

**850. OTHER ORDERS:**

**851.** ☐ Each of the parties shall, upon demand, execute and deliver all documents necessary to carry out the terms of this stipulation / agreement, and upon failure to do so, the court, upon appropriate application, may appoint the Clerk of the Superior Court as its commissioner to execute documents specified by court order (LASC Local Rule 3.0c).

**852.** ☐ This agreement covers all matters in dispute in this hearing / Order to Show Cause / motion / trial.

**853.** ☐ All issues not resolved by this agreement are reserved for determination at a further hearing or trial.

**854.** ☐ This hearing / Order to Show Cause / motion / trial is continued to_____ at a.m./p.m. in Department _____. ☐ On the following issues only:

**900. ORDERS RELATING TO JUDGMENTS ONLY:**

**901.** ☐ The parties waive their rights to a trial and to notice of trial for the purpose of having the court grant a judgment pursuant to the terms of this agreement which may be heard by a court commissioner sitting as a judge pro tem.

**902.** ☐ All parties waive the right to appeal, to request a statement of decision, and to move for a new trial.

**903.** ☐ The parties were married on_____and separated on_____

**904.** ☐ Respondent was served with the summons herein on_____ or first appeared herein on _____

**905.** ☐ The parties' marital status shall terminate upon filing of the judgment of dissolution unless a later date is specified here: _____
_____ (FC§§2339-40).

**906.** ☐ The parties are the parents of each minor child named in the petition or complaint filed herein and a judgment establishing the parent child relationship may be granted herein under the Uniform Parentage Act (FC§7600-7730).

**907.** The attorney for the ☐ Petitioner ☐ Respondent, or that party if unrepresented, shall, within 10 days, prepare a judgment according to this agreement and submit it to the other party's attorney, or to the other party if unrepresented, for approval as to the form and content thereof and then file it with the court. If either party or attorney fails to prepare or approve the judgment, or file objections to it within 10 days of service, the other party or attorney may prepare and submit the judgment to the court with a proof of service on the other party or attorney. (See LA Local Rules 3.0,14.7, CRC Rule 232e and CCP§664.6).

**908.** ☐ The court is requested to sign this agreement to make these orders effective immediately as temporary orders pending the filing of the judgment. (Otherwise these agreements do not become orders until filing of the judgment)

**909.** ☐ All prior orders made in this case shall terminate upon the filing of this agreement.

**910.** ☐ _____

I HAVE READ AND I AGREE TO EACH PAGE OF THIS DOCUMENT. I UNDERSTAND THAT THESE AGREEMENTS ARE TO BE COURT ORDERS AND THAT WILLFUL VIOLATION OF COURT ORDERS MADE AS A RESULT OF THESE AGREEMENTS MAY SUBJECT THE PARTY IN VIOLATION TO CIVIL OR CRIMINAL PENALTIES, OR BOTH.

| Petitioner | Respondent |
|---|---|
| Attorney for Petitioner | Attorney for Respondent |

**IT IS SO ORDERED.**

VIRGINIA KEENY

DATED: _____7/7/16_____ _____
Judge of the Superior Court

FAM 024(A) 10/04        **STIPULATION / SETTLEMENT AGREEMENT**        PAGE_____ OF _____

Cynthia Oliver
Head of Global Royalties and Copyright
Universal Music Group
2100 Colorado Ave.
Santa Monica, CA 90404

Dear Ms. Oliver,

Pursuant to July 7, 2016 orders of the Court in Los Angeles Superior Court case LD
068701, immediately and until further notice adjust all royalty payments due to each of
the identified parties below according to these conditions:

### Musical Works Affected - January 11, 1995 - June 1, 2015

This directive applies to all songs registered after January 11, 1995 and before June 1,
2015, and applies to all royalties of any kind, writer and publisher, foreign and domestic.
The directive also applies to the songs listed in attachment A, regardless of registration
date.

### Payment Adjustment - Equal Between Parties

All affected royalty payments shall be equal between the parties.

### Authorship and Publishing Splits - No Effect

This directive relates to royalty payment only, and shall not affect any authorship or
publishing splits. The parties acknowledge that there are pending disputes regarding
authorship and publishing splits to be resolved in the future.

### Third Parties Affected

This directive shall not affect any other writer, publisher or any other party besides the
undersigned.

Dated: **July 18, 2016**

Alexander Collin Baker, aka Ace Baker,
aka Alejandro Panadero, aka Invisible
Hand

SS no. XXX-XX-9305

Dated: 7-18-16

Clara Veseliza Baker, aka Clair Marlo, aka
Despejar Panadero, aka Invisible Hand

SS no. XXX-XX-1605

# EXHIBIT E

Cynthia Oliver
Head of Global Royalties and Copyright
Universal Music Group
2100 Colorado Ave.
Santa Monica, CA 90404

Dear Ms. Oliver,

Pursuant to July 7, 2016 orders of the Court in Los Angeles Superior Court case LD
068701, immediately and until further notice adjust all royalty payments due to each of
the identified parties below according to these conditions:

**Musical Works Affected - January 11, 1995 - June 1, 2015**
This directive applies to all songs registered after January 11, 1995 and before June 1,
2015, and applies to all royalties of any kind, writer and publisher, foreign and domestic.
The directive also applies to the songs listed in attachment A, regardless of registration
date.

**Payment Adjustment - Equal Between Parties**
All affected royalty payments shall be equal between the parties.

**Authorship and Publishing Splits - No Effect**
This directive relates to royalty payment only, and shall not affect any authorship or
publishing splits. The parties acknowledge that there are pending disputes regarding
authorship and publishing splits to be resolved in the future.

**Third Parties Affected**
This directive shall not affect any other writer, publisher or any other party besides the
undersigned.

Dated:  **July 18, 2016**

Alexander Collin Baker, aka Ace Baker,
aka Alejandro Panadero, aka Invisible
Hand

SS no. XXX-XX-9305

Dated:  7 -18 -16

Clara Veseliza Baker, aka Clair Marlo, aka
Despejar Panadero, aka Invisible Hand

SS no. XXX-XX-1605

# EXHIBIT F



### ROYALTY ASSIGNMENT FORM

USE THIS FORM TO ASSIGN ROYALTIES EARNED BY WORKS IN YOUR BMI CATALOGUE TO
ANOTHER PERSON OR COMPANY. YOUR "WORKS" INCLUDE THOSE SUBMITTED TO BMI ON
REGISTRATION FORMS, ONLINE OR VIA CUE SHEETS FROM THIRD PARTIES. AN ASSIGNMENT WITH
RESPECT TO LESS THAN A WHOLE CATALOGUE WILL BE ACCEPTED ONLY IF ALL THE WORKS OF
WHICH ROYALTIES ARE BEING ASSIGNED ARE IN YOUR CATALOGUE WHEN THIS FORM IS
RECEIVED AND ARE LISTED ON AN ATTACHED SCHEDULE. IF YOU ARE ASSIGNING YOUR
COPYRIGHTS UNDER A SONGWRITER/PUBLISHER AGREEMENT, YOU SHOULD NOT USE THIS FORM.
PUBLISHER ROYALTIES WILL BE PAID TO THE PUBLISHER THAT ACQUIRED THE COPYRIGHTS.

1. My name Alexander Baker                          2. My social security number 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

3. I am permanently and irrevocably assigning (insert a number between 1 and 100) 100 % of my royalties

as indicated in number 4 below from my BMI account number(s), listed immediately below _____ to
(State their name, complete address and contact person if a company or other entity)

From BMI accounts: 1766039, 733801, 1766041, 687033

To my business: Write Hear, LLC    contact person: Alexander Baker
E-mail address of above party (for other access to account)  acebaker1234@yahoo.com

If a company or other entity is entered above, is it solely owned by you? ☑Yes ☐No

4. My assignment applies to (You must initial inside one applicable box below)

[✓] my royalties earned from all works that are in my BMI catalogue on the date of this assignment or
that may be entered into in my BMI catalogue afterwards

[ ] my royalties earned only from the works that are in my BMI catalogue on the date of this
assignment, but not my royalties earned by works that may be entered into my catalogue afterwards.

[ ] my royalties earned only by the works on the attached schedule.

**CERTIFICATION AND TRANSFER:** I warrant and represent to BMI that, by my signature below, I am knowingly
and without coercion assigning as specified above my right to receive my BMI royalties to the party named
above, that I have consulted a legal or financial advisor regarding the implications of the assignment or have
knowingly waived my right to do so, that I am making the assignment with full knowledge and understanding of
its consequences with respect to payment of my BMI royalties, that I have received valuable consideration for
making the assignment, that I intend for the assignment to be irrevocable, and that I have not made the
assignment with the intent to evade the income tax or other laws of the United States or of any state or local
jurisdiction or foreign nation to which I may be subject.

_____    Today's Date: 4-12-2017
Sign on the line above

Sworn to and subscribed before me at  Los Angeles, CA  on  April 12th  20 17

_____
Signature of Notary Public.         IMPRINT NOTARY
                                    STAMP HERE

VACHE AMIRIAN
COMM. #2061747
Notary Public - California
LOS ANGELES COUNTY
My Comm. Exp. Mar 17, 2018

This assignment will not be processed if any portion is incomplete. BMI will update its records to pay the assignee shortly after completion of processing. However, due to the nature of some assignments, several royalty distributions may be added before processing is complete. Given the limitations of BMI's systems may cause some assigned works to be paid to the assignor, including but not limited to retroactive royalty payments and foreign royalties. Assignments are only accepted subject to those conditions and no retroactive adjustments are available. The fee for processing an assignment is $500 per payee, except if the payee is a corporation, LLC or trust of which you are sole owner, for which the fee is $250. There is no fee if this assignment is submitted with an application for BMI affiliation or with an Estate Questionnaire for a deceased BMI affiliate.

RAF 3/12

# EXHIBIT G

**BMI.**

### ROYALTY ASSIGNMENT FORM

USE THIS FORM TO ASSIGN ROYALTIES EARNED BY WORKS IN YOUR BMI CATALOGUE TO
ANOTHER PERSON OR COMPANY. YOUR "WORKS" INCLUDE THOSE SUBMITTED TO BMI ON
REGISTRATION FORMS, ONLINE OR VIA CUE SHEETS FROM THIRD PARTIES. AN ASSIGNMENT WITH
RESPECT TO LESS THAN A WHOLE CATALOGUE WILL BE ACCEPTED ONLY IF ALL THE WORKS OF
WHICH ROYALTIES ARE BEING ASSIGNED ARE IN YOUR CATALOGUE WHEN THIS FORM IS
RECEIVED AND ARE LISTED ON AN ATTACHED SCHEDULE. IF YOU ARE ASSIGNING YOUR
COPYRIGHTS UNDER A SONGWRITER/PUBLISHER AGREEMENT, YOU SHOULD NOT USE THIS FORM.
PUBLISHER ROYALTIES WILL BE PAID TO THE PUBLISHER THAT ACQUIRED THE COPYRIGHTS.

1. My name Alexander Baker for Write Hear, LLC  2. My social security number EIN 81-4491548

3. I am permanently and irrevocably assigning (insert a number between 1 and 100) 100  % of my royalties

as indicated in number 4 below from my BMI account number(s) see following  to
(State their name, complete address and contact person if a company or other entity)

From:   BMI accounts 1766039, 733801, 1766041, and 667033 - currently paid to Write Hear, LLC
To: Adam Bravery, LLC   160 N. Pantano Rd. # 1114  Tucson, AZ.  85701   see attach. bank info
Contact: Alexander Baker, member  3505 8th Ave. Los Angeles, CA. 90018   323-313-7653
E-mail address of above party (for online access to account)  acebaker1234@yahoo.com

If a company or other entity is entered above, is it solely owned by you? ☐ Yes ☑ No

4. My assignment applies to (You must initial inside one applicable box below)

[X]  my royalties earned from all works that are in my BMI catalogue on the date of this assignment or
that may be entered into in my BMI catalogue afterwards.

[ ]  my royalties earned only from the works that are in my BMI catalogue on the date of this
assignment, but not my royalties earned by works that may be entered into my catalogue afterwards.

[ ]  my royalties earned only by the works on the attached schedule.

**CERTIFICATION AND TRANSFER:** I warrant and represent to BMI that, by my signature below, I am knowingly
and without coercion assigning as specified above my right to receive my BMI royalties to the party named
above, that I have consulted a legal or financial advisor regarding the implications of the assignment or have
knowingly waived my right to do so, that I am making the assignment with full knowledge and understanding of
its consequences with respect to payment of my BMI royalties, that I have received valuable consideration for
making the assignment, that I intend for the assignment to be irrevocable, and that I have not made the
assignment with the intent to evade the income tax or other laws of the United States or of any state or local
jurisdiction or foreign nation to which I may be subject.

_____  Today's Date: July 9, 2018
Sign on the line above

Sworn to and subscribed before me at _____ on _____ 20 _____

_____          IMPRINT NOTARY
Signature of Notary Public               STAMP HERE:

This assignment will not be processed if any portion is incomplete. BMI will update its records to pay the assignee as of the royalty distribution following
completion of processing. However, due to the nature of some assignments, several royalty distributions may be made before processing is completed. Also,
the limitations of BMI's systems may cause some royalties on assigned works to be paid to the assignor, including but not limited to retroactive royalty
payments and foreign royalties. Assignments are only accepted subject to those conditions and no retroactive adjustments are available. The fee for
processing an assignment is $500 per payee, except if the payee is a corporation, LLC or trust of which you are sole owner, for which the fee is $250. There is
no fee if this assignment is submitted with an application for BMI affiliation or with an Estate Questionnaire for a deceased BMI affiliate.

RAF 3/12

rance Services
X. 8082
CA 90008

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of LOS ANGELES

Subscribed and sworn to (or affirmed) before me on this 09 day of JULY_____, 20 18 , by ALEXANDER BAKER_____

_____
proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.



ERICA SIMONE SYKES
Commission # 2076557
Notary Public - California
Los Angeles County
My Comm. Expires Aug 28, 2018

(Seal)                    Signature_____

Black Sheep Ins
P.O. B.O
Los Angeles

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
## Identification Number (TIN) and Certification

Give Form to the
requester. Do not
send to the IRS.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Alexander Collin Baker

**2** Business name/disregarded entity name, if different from above

Adam Bravery, LLC

**3** Check appropriate box for federal tax classification; check only **one** of the following seven boxes:

☐ Individual/sole proprietor or  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate
single-member LLC

☑ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ S

**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above
for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only
to certain entities, not individuals;
see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting
code (if any)

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.)

160 N. Pantano Rd. #1114

**6** City, state, and ZIP code

Tucson, AZ. 85701

Requester's name and address (optional)

**7** List account number(s) here (optional)

### Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to
avoid backup withholding. For individuals, this is generally your social security number (SSN).
However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions
on page 3. For other entities, it is your employer identification number (EIN). If you do not have a
number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page
4 for guidelines on whose number to enter.

**Social Security Number**

or

**Employer Identification number**

83 – 0943386

### Part II   Certification

Under penalties of perjury, I certify that:

1.  The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2.  I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal
    Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has
    notified me that I am no longer subject to backup withholding, and
3.  I am a U.S. citizen or other U.S. person (defined below), and
4.  The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup
withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply.
For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement
arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide
your correct TIN. See the instructions on page 3.

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to
avoid backup withholding.**

**Sign
Here**

Signature of
U.S. person ▶

Date ▶ 07-09-2018

Client Account Number:

Control Account Number:

I understand that by signing below I am authorizing the use of my tax certification to open a bank account on my behalf, which will not be under my
control ("Client/Tenant Account"). I authorize acceptance of deposits made into my Client/Tenant Account by check payable to me but endorsed by the
person(s) controlling my Client/Tenant account or by the Bank and I acknowledge that I will not receive notice of any transactions, including deposits
or withdrawals affecting my Client/Tenant account. I understand that the person(s) controlling my Client/Tenant account will enter into agreements
with the Bank concerning terms and conditions of the Client/Tenant Account including fees and charges and may receive financial benefits associated
with use of the Client/Tenant Account and deposits therein.

Signature:

PLEASE FAX THIS COMPLETED FORM TO (866) 535-6783

© 2015 Citigroup Inc. Citibank, N.A. Member FDIC. Equal opportunity lender. Citi and Arc Design is a registered service mark of Citigroup.

1289237  2569  02/15

Page 1 of 1

Form **W-9** (Rev. 12-2014)

July 9, 2017

To BMI:

Below please find the Chase business bank account number and routing number for Adam Bravery, LLC, into which my royalties will now be paid.

Thank you,

Alexander Baker

Acct#
298872091

Routing#
122100024

Arizona Corporation Commission - RECEIVED: 5/22/2018          18052208019947
Arizona Corporation Commission - FILED: 5/22/2018

# ARTICLES OF ORGANIZATION

## OF LIMITED LIABILITY COMPANY

### ENTITY INFORMATION

| | |
|---|---|
| **ENTITY NAME:** | ADAM BRAVERY, LLC |
| **ENTITY ID:** | 1859617 |
| **ENTITY TYPE:** | Domestic LLC |
| **EFFECTIVE DATE:** | 5/22/2018 12:00:00 AM |
| **CHARACTER OF BUSINESS:** | Any legal purpose |
| **MANAGEMENT STRUCTURE:** | Member-Managed |
| **PERIOD OF DURATION:** | Perpetual |
| **PROFESSIONAL SERVICES:** | |

### STATUTORY AGENT INFORMATION

| | |
|---|---|
| **STATUTORY AGENT NAME:** | LEGALINC CORPORATE SERVICES INC |
| **PHYSICAL ADDRESS:** | 2 EAST CONGRESS STREET SUITE 900-126 , TUCSON, AZ 85701 |
| **MAILING ADDRESS:** | 2 EAST CONGRESS STREET SUITE 900-126 , TUCSON, AZ 85701 |

### KNOWN PLACE OF BUSINESS

160 N PANTANO RD APT 1114, TUCSON, AZ 85701

### PRINCIPALS

Member: ALEXANDER BAKER - 3505 8TH AVE, LOS ANGELES, CA 90018 - - Date of Taking Office: 1900-01-01

Member: CHRISTOPHER GEBBIA - 160 N. PANTANO RD #1114, TUCSON, AZ 85710 - - Date of Taking Office: 1900-01-01

Member: LISA MARGULIES - 3505 8TH AVE, LOS ANGELES, CA 90018 - - Date of Taking Office: 1900-01-01

Organizer: MARSHA SIHA - 17350 STATE HWY 249 STE 220, HOUSTON, TX 77064 - - Date of Taking Office: 1900-01-01

### ORGANIZERS

MARSHA SIHA; 17350 STATE HWY 249 STE 220 , HOUSTON, TX 77064;

### SIGNATURES

Organizer: MARSHA SIHA - 05/22/2018

# EXHIBIT H

11/20/2019                                    Yahoo Mail - BMI Royalty Assignment

## BMI Royalty Assignment

From:   Stallings, Erika (estallings@bmi.com)

To:     acebaker1234@yahoo.com

Date:   Tuesday, July 16, 2019, 08:42 AM PDT

Hello,

I am writing with respect to the July 7, 2016 order from the Superior Court of California regarding the terms of your divorce with Clair Marlo. Pursuant to that order, all works created between November 11, 1995 through April 7, 2015 are to be split 50/50 and both parties agreed to not to make any deals with any third parties regarding the aforementioned works. You assigned your share of the works to Adam Bravery LLC which is owned by you and three other individuals which is seemingly in violation of the terms of the order. Please advise as to your position. If you have legal counsel in this matter please forward me their contact information.

Regards,

Erika Stallings



Erika Stallings | Attorney
Legal
7 World Trade Center, 250 Greenwich Street, New York, NY 10007 | 212-220-3077 | EStallings@bmi.com

** BMI DISCLAIMER ** This message is intended only for the use of the Addressee and may contain information that is PRIVILEGED and CONFIDENTIAL. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately. Thank you.

1/1

4:21-cv-00022_EXHIBITS TO FIRST AMENDED COMPLAINT  p.40

# EXHIBIT I



Erika M. Stallings
Attorney
Legal

August 21, 2019

<u>VIA FIRST CLASS MAIL AND ELECTRONIC MAIL</u>

Alexander Collin Baker
3505 8th Avenue
Los Angeles, California 90018-3310

Clara Veseliza Baker
13725 Metcalf Avenue Apt # 154
Overland Park, Kansas 66223-7899

        Re:     <u>Broadcast Music, Inc. Royalties</u>

Dear Mr. Baker and Ms. Baker,

        My name is Erika Stallings and I am writing on behalf of the legal department at Broadcast Music, Inc. ("BMI"). BMI was recently made aware of a July 7, 2016 order issued by the Superior Court of California, County of Los Angeles (the "Order") relating to musical works written during your marriage. Specifically, the Order prohibits either party from making a deal with a third party without the written consent of the other or court order, for any work created between January 11, 1995 and April 7, 2015.

        In 2018, Mr. Baker transferred his BMI royalties for the above referenced works to Adam Bravery, LLC, a multimember LLC. Ms. Baker has alleged that this transfer is in violation of the Order. Mr. Baker's position is that the transfer was merely a transfer of payment of royalties, not a transfer of the works and that no violation of the Order has occurred.

        As this is now a disputed matter between the parties, please be advised that unless the parties come to a resolution of this matter by **September 5, 2019**, BMI will be placing the disputed royalties on withhold and will proceed with filing a third party interpleader action to deposit the royalties with the court until the dispute is resolved.

        If you have any questions, please feel free to contact me via e-mail or telephone.

                                Very truly yours,

                                /s/ Erika Stallings

                                Erika Stallings


cc:     AnnMarie Mori, Esq. (amori@troygould.com)
        Joe Yanny, Esq. (joeyanny@gmail.com)


7 World Trade Center, 250 Greenwich Street, New York, NY 10007-0030   (212) 220-3077   Fax: (212) 220-4494
E-Mail: estallings@bmi.com

# EXHIBIT J

# How We Pay Royalties

## Miscellaneous Royalty Rules

### Direct Licensing of Works

If a songwriter, composer or publisher directly licenses to a user or source licenses to a production company the right to perform one or more works, BMI must be notified in writing **within ten days of the issuance of the license or within three months of the performance, whichever comes first.**

A copy of the license should be attached to the notification (with the amount paid for the license deleted, if desired). As license fees for direct or source licensed performances cannot be collected by BMI, no royalties will be paid by BMI for these performances. If the direct or source license includes performances for periods for which BMI has already paid royalties because we were unaware that such a license had been issued, a debit will be made to the songwriters' or composers' and the publishers' accounts with respect to such performances.

### Royalty Adjustments

All claims for adjustments to royalty distributions must be made in writing to your local Writer/Publisher Relations office within nine months of the date of the distribution seeking to be adjusted. Adjustments to royalties which were

4:21-cv-00022_EXHIBITS TO FIRST AMENDED COMPLAINT  p.44

or should have been paid more than **nine months** before notice of the claim is received by BMI will not be considered.

BMI will prepare timely-requested adjustments to U.S. royalty distributions in those situations where royalties were paid incorrectly, as long as the total amount of the adjustment likely will exceed $25. If no payment was made because of missing/late cue sheets or work registrations, royalties will be paid beginning with the first possible distribution after all documents are received and processed, provided that they are received within nine months after the distribution in which royalties otherwise would have been paid had the necessary documents been submitted to BMI in a timely fashion.

Because many foreign PROs have strict cutoff dates beyond which they will not consider adjustment requests, all claims for foreign adjustments should be submitted in writing within nine months of the date of the foreign distribution in which royalties were incorrectly paid or expected royalties were missing, along with detailed information about the incorrect or missing payments. BMI will research the matter and request an adjustment, where appropriate, from the foreign PRO, provided that the amount expected to be received from the foreign PRO will exceed $25. Any additional royalties received from the foreign PRO as a result of BMI's adjustment request will be remitted to you as part of the next possible distribution following receipt of the royalties by BMI.

## Overpayment of Royalties

In the event that royalties are paid in error to any writer or publisher, BMI will debit the mistakenly-paid affiliate's account in the amount of the overpayment. In addition, if based upon past BMI earnings history and projected future royalty earnings from BMI, there is no reasonable expectation that BMI will be able to fully recoup the overpaid amount within the four distribution quarters following the debit, the affiliate will be expected to repay on request the balance of the overpayment that remains unrecouped. In the event that BMI makes a royalty distribution based upon interim fees received from a licensee and the final fees subsequently determined to be payable by that licensee are less than the interim fees upon which the distribution was based, BMI reserves the right to debit all writers and publishers to whom such interim fees were distributed in an amount that appropriately reflects the difference between the interim and final license fees.

## Payment From Another Organization

4:21-cv-00022_EXHIBITS TO FIRST AMENDED COMPLAINT  p.45

In the event that BMI has reason to believe that you will receive or are receiving payment from a performing rights organization other than BMI for or based upon United States performances of one or more works for a period when those works were licensed by BMI for you, BMI shall have the right to withhold payment from you for such performances until BMI receives satisfactory evidence that you have not been paid or will not be paid by the other organization. In the event that you were or will be paid or do not supply such evidence within 12 months from the date of BMI's request, BMI shall be under no obligation to make any payment to you for performances of such works for that period.

## Assignments of Royalties

BMI will recognize an assignment of your royalties to a third party in certain circumstances, including to a lending institution or other person or entity who makes a bona fide loan of a specific sum of money to you which is intended to be repaid, in whole or in part, from your BMI royalties. A special loan assignment form, executed by both you and the lender and acknowledged by BMI, must be completed and signed before BMI will pay your royalties to the lender. The form can be obtained from your local Writer/Publisher Relations office. There is no fee to update BMI's records to reflect temporary loan assignments.

BMI also will accept certain irrevocable permanent assignments of royalties to a third party who purchases your royalty income stream. BMI requires the completion of and your signature before a Notary Public on the BMI Royalty Assignment Form (RAF) and an IRS Form W-9 from the purchaser. The current fee for handling these kinds of assignments is $500 for each payee account that must be established to redirect your royalties and will be deducted from the first monies due the purchaser. The fee is $250 if the assignment is made to your solely-owned corporation, LLC or trust. The RAF can be downloaded from **the forms page** on bmi.com. Please note that BMI's acceptance of permanent assignments is subject to specific limitations and conditions.

## Royalties Withheld Due to Litigation

If BMI is named as a party to a lawsuit, BMI may withhold royalties relating to that dispute.  Further, BMI will withhold royalties earned by any works that are the subject of litigation, upon receipt of a copy of the complaint as filed with the court and a written directive to BMI from the court requiring such withholding.

In addition, upon the written request of any affiliate whose royalties are being

withheld, when accumulated royalties exceed $1,000, the royalties will be transferred to an interest-bearing bank account, at money-market rates. All such principal and interest is remitted to the writer(s) and/or publisher(s) who are determined by final, unappealable decision, or by settlement between the litigants, to be entitled to the funds, upon submission to BMI of a copy of the final court order or settlement documents.

In lieu of the withholding of royalties during litigation, BMI will accept a letter of direction, signed by all parties to the lawsuit, to pay the royalties to a third party escrow agent as they become payable. In such case, the royalties will not generate interest through BMI.

## Legal Process Administration Charges

Due to BMI's increased costs in handling legal process that is received against certain affiliates, it has become necessary to institute an administration fee for such matters. If BMI is served with a state or federal tax levy, restraining notice, order to withhold, judgment, child support order, or the like against you which requires BMI to hold or pay your royalties to another party who has a legal entitlement to them, you will be assessed a handling fee of $100 (or such lesser amount as may be required by the authority issuing the process). The $100 fee will be deducted from the next royalty distribution of each affected account following adjustment of BMI's records to reflect the process. The handling fee will be assessed for each new process received, except that you will not be charged an additional fee if BMI receives updated process while previous process for the same obligation is still in force according to BMI's records.

If you are obtaining a divorce and you request BMI to separately account to you and your ex-spouse with respect to works for which royalties are divided between you (or if BMI is provided with a copy of your signed divorce decree that contemplates such separate accountings), a fee of $250 will be charged to update your account if you have 500 or less registrations (feature works and cues) to be divided. If there are more than 500 registrations to be divided, the charge is $250 for the first 500, then $1 per registration thereafter.

## Stop Payments And Re-Issuance Of Royalty Checks

An oral request to BMI to stop payment of and reissue a royalty check will be accepted, but the request must be confirmed in writing and received by BMI within two days of the oral request. An administrative charge of $30 will be

Miscellaneous Royalty Rules | Royalties | BMI.com                    https://www.bmi.com/creators/royalty/miscellaneous_royalty_rules

deducted from the amount of the reissued check. Stop payment orders

cannot be accepted, however, for royalties which have been directly

deposited into the payee's bank account.


**Next Royalty Page**

4:21-cv-00022_EXHIBITS TO FIRST AMENDED COMPLAINT  p.48

# EXHIBIT K

## Re: Baker v. Baker

From:  Alexander Baker (acebaker1234@yahoo.com)

To:     AMori@troygould.com

Date:  Thursday, September 26, 2019, 04:53 PM PDT

I'm responding as quickly as possible. I've never heard of stipulating to a dispute. That's agreeing to disagree, which is the same as no agreement. I don't understand why you are representing Clair. I do know that neither she nor any of her attorneys has ever once contacted me on this issue, so that's strange. I do not know that Clair disputes the propriety of the assignments, I only know that Erica Stallings and AnnMarie Mori represent that Clair disputes the assignments. I have never been served with any court document that indicates that she disputes this, and, frankly Ms. Mori, I don't believe you. The reason I don't believe you is that you lied about being unaware of the Order. Do you have any evidence that Clair disputes the assignment? I will certainly consider any evidence that you proffer on her behalf. I as an individual have no direct interest in the royalty stream since 2017. I am not legally authorized to make any representations on behalf of Adam Bravery LLC, but I would suggest contacting them through their registered agent for service of process. On behalf of myself as an individual, I cannot take a position on a legal dispute that does not exist.

-Alex Baker

Sent from my iPhone

On Sep 26, 2019, at 4:07 PM, Mori, AnnMarie <AMori@troygould.com> wrote:

Dear Mr. Angelucci and Mr. Baker:


We are pleased that we were able to reach a resolution regarding the motion to compel joinder.


We would like to propose a resolution relating to the dispute over the assignment of royalties from Mr. Baker to Write Hear, LLC, and then subsequently to Adam Bravery, LLC.


As you know, Ms. Marlo alleges that the 4/17 assignment by Mr. Baker to Write Hear, LLC, and the subsequent 7/18 assignment by Mr. Baker on behalf of Write Hear, LLC to Adam Bravery LLC ("Assignments") violated the July 2016 Court order issued in the marital dissolution action. Therefore, we would like to enter into a stipulation with the parties to be filed in the dissolution action that: (1) advises the Court that Ms. Marlo contends that the Assignments were in violation of the 2016 Court order; and (2) requests that the Court clarify the order and/or resolve the dispute expeditiously.  BMI will also stipulate to hold the assigned royalties pending resolution, and can release the funds upon an order of the Court resolving the dispute.


In the alternative, BMI will likely file an interpleader action.  As you may know, an interpleader would entail the following: (1) BMI will be required to name Alex Baker, Write Hear Music, LLC, Adam Bravery LLC and Clair Marlo as parties to the action; (2) BMI will be required to deposit the funds into the Court registry, where they will remain pending a determination of the interpleader action; (3) the parties will be served with the action and will be required to respond; and (4) as permitted by statute, BMI will seek to be discharged from the action, and will be entitled to seek

an award that its attorney's fees and costs incurred in connection with the interpleader be reimbursed from the deposited funds.

Therefore, a stipulation will likely result in the following: (1) faster resolution in the appropriate Court; (2) faster distribution of the funds upon a Court order; (3) less expense to the parties as they will not be named in an interpleader action and required to respond to the complaint; and (4) preservation of funds as they will not be depleted by fees and costs incurred in filing and serving an interpleader.

Please advise us as soon as possible  if you will agree to such a stipulation; we are able to draft such a stipulation for the parties to present to the Court for filing.

AnnMarie

<image002.jpg>

**AnnMarie Mori**
(310) 789-1204 - Fax (310) 789-1404
amori@troygould.com
TroyGould PC
1801 Century Park East, Suite 1600
Los Angeles, CA 90067-2367
www.troygould.com

**Tax Advice Disclaimer**: Any federal tax advice contained in this communication (including attachments) was not intended to be used, and it cannot be used, by you for the purpose of (1) avoiding any penalty that may be imposed by the Internal Revenue Service or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein. If you would like such advice, please contact us.

**Notice to Recipient**: This e-mail is meant only for the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of the e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and delete this message from your system. Thank you in advance for your cooperation.

4:21-cv-00022_EXHIBITS TO FIRST AMENDED COMPLAINT  p.51

# EXHIBIT L

**FL-300**

| PARTY WITHOUT ATTORNEY OR ATTORNEY | STATE BAR NUMBER: 97979 | FOR COURT USE ONLY |
|---|---|---|

NAME: Joseph A Yanny
FIRM NAME: Yanny and Smith
STREET ADDRESS: 1801 Century Park East, suite 2400
CITY: Los Angeles    STATE: CA    ZIP CODE: 90067
TELEPHONE NO.: 310-551-2966    FAX NO.:
E-MAIL ADDRESS: joeyanny@yannylaw.com
ATTORNEY FOR (name): Clara Veseliza Baker

**CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles**

**OCT 02 2019**

Sherri R. Carter, Executive Officer/Clerk
By: Lashawnda Mosby-Keys, Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles CA . 90012
BRANCH NAME: Central District

PETITIONER: Alexander Collin Baker
RESPONDENT: Clara Veseliza Baker
OTHER PARENT/PARTY:

**REQUEST FOR ORDER** [ ] CHANGE [X] TEMPORARY EMERGENCY ORDERS

CASE NUMBER: LD068701

[ ] Child Custody [ ] Visitation (Parenting Time) [ ] Spousal or Partner Support
[ ] Child Support [ ] Domestic Violence Order [X] Attorney's Fees and Costs
[ ] Property Control [X] Other (specify): Ex Parte
OSC FOR CONTEMPT

## NOTICE OF HEARING

1. TO (name(s)): Alexander Collin Baker
   [X] Petitioner [ ] Respondent [ ] Other Parent/Party [ ] Other (specify):

2. A COURT HEARING WILL BE HELD AS FOLLOWS:
   a. Date: 11/7/19    Time: 8:30am    Dept.: 65    Room.:
   b. Address of court [ ] same as noted above [ ] other (specify):

3. WARNING to the person served with the *Request for Order:* The court may make the requested orders without you if you do not file a *Responsive Declaration to Request for Order* (form FL-320), serve a copy on the other parties at least nine court days before the hearing (unless the court has ordered a shorter period of time), and appear at the hearing. *(See form FL-320-INFO for more information.)*

   *(Forms FL-300-INFO and DV-400-INFO provide information about completing this form.)*

**COURT ORDER**
(FOR COURT USE ONLY)

*It is ordered that:*

4. [ ] Time [ ] for service [ ] until the hearing is shortened. Service must be on or before (date):
5. [ ] A *Responsive Declaration to Request for Order* (form FL-320) must be served on or before (date):
6. [ ] The parties must attend an appointment for child custody mediation or child custody recommending counseling as follows (specify date, time, and location):
7. [ ] The orders in *Temporary Emergency (Ex Parte) Orders* (form FL-305) apply to this proceeding and must be personally served with all documents filed with this *Request for Order.*
8. [ ] Other (specify):

Date: _____    JUDICIAL OFFICER _____    Page 1 of 4

Form Adopted for Mandatory Use
Judicial Council of California
FL-300 [Rev. July 1, 2016]

**REQUEST FOR ORDER**

Family Code, §§ 2045, 2107, 6224, 6226, 6320-6326, 6380-6383; Government Code, § 26826; Cal. Rules of Court, rule 5.92
www.courts.ca.gov

**FL-300**

| | |
|---|---|
| PETITIONER: Alexander Collin Baker<br>RESPONDENT: Clara Veseliza Baker<br>OTHER PARENT/PARTY: | CASE NUMBER: LD068701 |

## REQUEST FOR ORDER

**Note:** Place a mark ☒ in front of the box that applies to your case or to your request. If you need more space, mark the box for "Attachment." For example, mark "Attachment 2a" to indicate that the list of children's names and birth dates continues on a paper attached to this form. Then, on a sheet of paper, list each attachment number followed by your request. At the top of the paper, write your name, case number, and "FL-300" as a title. (You may use *Attached Declaration* (form MC-031) for this purpose.)

1. ☐ **RESTRAINING ORDER INFORMATION**
   One or more domestic violence restraining/protective orders are now in effect between *(specify):*
   ☐ Petitioner   ☐ Respondent   ☐ Other Parent/Party   *(Attach a copy of the orders if you have one.)*
   The orders are from the following court or courts *(specify county and state):*
   a. ☐ Criminal: County/state *(specify):*          Case No. *(if known):*
   b. ☐ Family: County/state *(specify):*            Case No. *(if known):*
   c. ☐ Juvenile: County/state *(specify):*          Case No. *(if known):*
   d. ☐ Other: County/state *(specify):*             Case No. *(if known):*

2. ☐ **CHILD CUSTODY**                                    ☐ I request temporary emergency orders
   **VISITATION (PARENTING TIME)**
   a. I request that the court make orders about the following children *(specify):*

   | Child's Name | Date of Birth | ☐ Legal Custody to *(person who decides: health, education, etc):* | ☐ Physical Custody to *(person with whom child lives):* |
   |---|---|---|---|
   | | | | |

   b. ☐ The orders I request for ☐ child custody ☐ visitation (parenting time) are:          ☐ Attachment 2a.
      (1) ☐ Specified in the attached forms:
          ☐ Form FL-305    ☐ Form FL-311    ☐ Form FL-312    ☐ Form FL-341(C)
          ☐ Form FL-341(D)    ☐ Form FL-341(E)    ☒ Other *(specify):*
      (2) ☐ As follows *(specify):*                                                        ☐ Attachment 2b.

   c. The orders that I request are in the best interest of the children because *(specify):*          ☐ Attachment 2c.

   d. ☐ This is a change from the current order for ☐ child custody ☐ visitation (parenting time).
      (1) ☐ The order for legal or physical custody was filed on *(date):*          . The court ordered *(specify):*

      (2) ☐ The visitation (parenting time) order was filed on *(date):*          . The court ordered *(specify):*

                                                                                        ☐ Attachment 2d.

FL-300 [Rev. July 1, 2016]                    **REQUEST FOR ORDER**                           Page 2 of 4

**FL-300**

| | |
|---|---|
| PETITIONER: Alexander Collin Baker<br>RESPONDENT: Clara Veseliza Baker<br>OTHER PARENT/PARTY: | CASE NUMBER: LD068701 |

3. [ ] **CHILD SUPPORT**
   (Note: An earnings assignment may be issued. See *Income Withholding for Support* (form FL-195)
   a. I request that the court order child support as follows:

   <u>Child's name and age</u>          [ ] I request support for each child          <u>Monthly amount ($) requested</u>
                                          based on the child support guideline. (if not by guideline)

   [ ] Attachment 3a.

   b. [ ] I want to change a current court order for child support filed on *(date):*
      The court ordered child support as follows *(specify):*

   c. I have completed and filed with this *Request for Order* a current *Income and Expense Declaration* (form FL-150) or I filed
      a current *Financial Statement (Simplified)* (form FL-155) because I meet the requirements to file form FL-155.

   d. The court should make or change the support orders because *(specify):*          [ ] Attachment 3d.

4. [ ] **SPOUSAL OR DOMESTIC PARTNER SUPPORT**
   (Note: An *Earnings Assignment Order For Spousal or Partner Support* (form FL-435) may be issued.)
   a. [X] Amount requested *(monthly):* $ 1,000
   b. [ ] I want the court to [ ] change [ ] end   the current support order filed on *(date):*
      The court ordered $ _____ per month for support.
   c. [ ] This request is to modify (change) spousal or partner support after entry of a judgment.
      I have completed and attached *Spousal or Partner Support Declaration Attachment* (form FL-157) or a declaration
      that addresses the same factors covered in form FL-157.
   d. [ ] I have completed and filed a current *Income and Expense Declaration* (form FL-150) in support of my request.
   e. The court should should make, change, or end the support orders because *(specify):*          [ ] Attachment 4e.
      Petitioner has cost me over $1,000,000 in legal fees compared to his $7,000 fees as his Pro Per filings of 8 lawsuits
      against me in Federal and State Courts.  He has been declared a Vexatious Litigant and I have had to get a Domestic
      Violence Restraining Order against him. He owes me over $220,000 for a judgement I have against him. His lawsuits
      have cost me all of my sole and separate property, and he continues to file Ex-Partes without the court's permission,
      costing me more. His filings have been deemed a method to harass and abuse me by the DVRO Judge.  Petitioner has
      caused my royalties to be stopped and I can't afford to pay my bills anymore.

5. [ ] **PROPERTY CONTROL**          [ ] I request temporary emergency orders
   a. The [ ] petitioner [ ] respondent [ ] other parent/party   be given exclusive temporary use, possession, and
      control of the following property that we [ ] own or are buying   [ ] lease or rent *(specify):*

   b. The [ ] petitioner [ ] respondent [ ] other parent/party   be ordered to make the following payments on debts
      and liens coming due while the order is in effect:
      Pay to: _____ For: _____ Amount: $ _____ Due date:_____
      Pay to: _____ For: _____ Amount: $ _____ Due date:_____
      Pay to: _____ For: _____ Amount: $ _____ Due date:_____
      Pay to: _____ For: _____ Amount: $ _____ Due date:_____

   c. [ ] This is a change from the current order for property control filed on *(date):*
   d. Specify in *Attachment 5d* the reasons why the court should make or change the property control orders.

FL-300 [Rev. July 1, 2016]          **REQUEST FOR ORDER**          Page 3 of 4

**FL-300**

| PETITIONER:<br>RESPONDENT:<br>OTHER PARENT/PARTY: | CASE NUMBER: |
|---|---|

6. ☐ **ATTORNEY'S FEES AND COSTS**

I request attorney's fees and costs, which total *(specify amount):* $_____ . I filed the following to support my request:

   a. A current *Income and Expense Declaration* (form FL-150).

   b. A *Request for Attorney's Fees and Costs Attachment* (form FL-319) or a declaration that addresses the factors covered in that form.

   c. A *Supporting Declaration for Attorney's Fees and Costs Attachment* (form FL-158) or a declaration that addresses the factors covered in that form.

7. ☐ **DOMESTIC VIOLENCE ORDER**

> • Do not use this form to ask for domestic violence restraining orders! Read form DV-505-INFO, *How Do I Ask for a Temporary Restraining Order,* for forms and information you need to ask for domestic violence restraining orders.
> • Read form DV-400-INFO, *How to Change or End a Domestic Violence Restraining Order* for more information.

   a. The *Restraining Order After Hearing* (form DV-130) was filed on *(date):*

   b. I request that the court ☐ change ☐ end the personal conduct, stay-away, move-out orders, or other protective orders made in *Restraining Order After Hearing* (form DV-130). *(If you want to change the orders, complete 7c.)*

   c. ☐ I request that the court make the following changes to the restraining orders *(specify):*    ☐ Attachment 7c.

   d. I want the court to change or end the orders because *(specify):*    ☐ Attachment 7d.

8. ☒ **OTHER ORDERS REQUESTED** *(specify):*    ☐ Attachment 8.

   OSC re Contempt<br>   see FL-410

9. ☐ **TIME FOR SERVICE / TIME UNTIL HEARING**  I urgently need:

   a. ☐ To serve the *Request for Order* no less than *(number):*_____ court days before the hearing.

   b. ☐ The hearing date and service of the the *Request for Order* to be sooner.

   c. I need the order because *(specify):*    ☐ Attachment 9c.

10. ☒ **FACTS TO SUPPORT** the orders I request are listed below. The facts that I write in support and attach to this request cannot be longer than 10 pages, unless the court gives me permission.    ☐ Attachment 10.

   OSC re Contempt<br>   see FL-410

I declare under penalty of perjury under the laws of the State of California that the information provided in this form and all attachments is true and correct.

Date: 09/30/2019

Clara Veseliza Baker                ▶ *Clara Veseliza Baker*
(TYPE OR PRINT NAME)                               (SIGNATURE OF APPLICANT)

**Requests for Accommodations**

Assistive listening systems, computer-assisted real-time captioning, or sign language interpreter services are available if you ask at least five days before the proceeding. Contact the clerk's office or go to *www.courts.ca.gov/forms* for *Request for Accommodations by Persons With Disabilities and Response* (form MC-410). (Civ. Code, § 54.8.)

**FL-410**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Joseph A Yanny (SBN 97979)<br>1801 Century Park East, Suite 2400<br>Los Angeles CA 90067<br><br>TELEPHONE NO.: 310-551-2966    FAX NO. (optional):<br>E-MAIL ADDRESS (optional): joeyanny@yannylaw.com<br>ATTORNEY FOR (name): Clara Veseliza Baker | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill St.
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles CA 90012
BRANCH NAME: Central District

PETITIONER/PLAINTIFF: Alexander Collin Baker
RESPONDENT/DEFENDANT: Clara Veseliza Baker
OTHER PARTY/PARENT:

| ORDER TO SHOW CAUSE AND<br>AFFIDAVIT FOR CONTEMPT | CASE NUMBER:<br>LD068701 |
|---|---|

| NOTICE!<br>A contempt proceeding is criminal in nature. If the court finds you in contempt, the possible penalties include jail sentence, community service, and fine.<br><br>You are entitled to the services of an attorney, who should be consulted promptly in order to assist you. If you cannot afford an attorney, the court may appoint an attorney to represent you. | ¡AVISO!<br>Un proceso judicial por desacato es de índole criminal. Si la corte le declara a usted en desacato, las sanciones posibles incluyen penas de prisión y de servicio a la comunidad, y multas.<br><br>Usted tiene derecho a los servicios de un abogado, a quien debe consultar sin demora para obtener ayuda. Si no puede pagar a un abogado, la corte podrá nombrar a un abogado para que le represente. |

1. TO CITEE (name of person you allege has violated the orders): Alexander Collin Baker
2. YOU ARE ORDERED TO APPEAR IN THIS COURT AS FOLLOWS, TO GIVE ANY LEGAL REASON WHY THIS COURT SHOULD NOT FIND YOU GUILTY OF CONTEMPT, PUNISH YOU FOR WILLFULLY DISOBEYING ITS ORDERS AS SET FORTH IN THE AFFIDAVIT BELOW AND ANY ATTACHED *AFFIDAVIT OF FACTS CONSTITUTING CONTEMPT;* AND REQUIRE YOU TO PAY, FOR THE BENEFIT OF THE MOVING PARTY, THE ATTORNEY FEES AND COSTS OF THIS PROCEEDING.

| a. Date: | Time: | Dept.: | Rm.: |
|---|---|---|---|

b. Address of court: ☐ same as noted above   ☐ other (specify):


Date: _____  ▶ _____
                                                              JUDICIAL OFFICER

**AFFIDAVIT SUPPORTING ORDER TO SHOW CAUSE FOR CONTEMPT**

3. [X] An *Affidavit of Facts Constituting Contempt* (form FL-411 or FL-412) is attached.
4. Citee has willfully disobeyed certain orders of this court as set forth in this affidavit and any attached affidavits.
5. a. Citee had knowledge of the order in that
    (1) [X] citee was present in court at the time the order was made.
    (2) [X] citee was served with a copy of the order.
    (3) [X] citee signed a stipulation upon which the order was based.
    (4) ☐ other (specify):

               Continued on Attachment 5a(4).
  b. Citee was able to comply with each order when it was disobeyed.
6. Based on the instances of disobedience described in this affidavit
  a. [X] I have not previously filed a request with the court that the citee be held in contempt.
  b. ☐ I have previously filed a request with the court that the citee be held in contempt (specify date filed and results):

☐ Continued on Attachment 6b.                                                                 Page 1 of 4

Form Adopted for Mandatory Use
Judicial Council of California
FL-410 [Rev. January 1, 2015]
**ORDER TO SHOW CAUSE AND AFFIDAVIT FOR CONTEMPT**
Family Code, § 292;
Code of Civil Procedure, §§ 1211.5, 2015.5
www.courts.ca.gov

FL-410

| PETITIONER/PLAINTIFF: | Alexander Collin Baker | CASE NUMBER: |
|---|---|---|
| RESPONDENT/DEFENDANT: | Clara Veseliza Baker | LD068701 |
| OTHER PARTY/PARENT: | | |

7. ☐ Citee has previously been found in contempt of a court order *(specify case, court, date):*

☐ Continued on Attachment 7.

8. ☒ Each order disobeyed and each instance of disobedience is described as follows:

  a. ☐ Orders for child support, spousal support, family support, attorney fees, and court or other litigation costs (see attached *Affidavit of Facts Constituting Contempt* (form FL-411))

  b. ☐ Domestic violence restraining orders and child custody and visitation orders (see attached *Affidavit of Facts Constituting Contempt* (form FL-412))

  c. ☒ Injunctive or other order *(specify which order was violated, how the order was violated, and when the order was violated):*

    June 6, 2014 ATROS Violation and July 7, 2016 Court Order.
    Petitioner took songs that are still subject to allocation, including some that are my sole and separate songs, and transferred them into a jointly owned LLC which he controls. July 7th order says "Neither party shall sell, transfer, assign, or make any deal whatsoever with any third party for any work created between 1-11-945 through 4-7-15 without the written consent of the other or court order.
    ATROS violation, Petitioner took publishing companies that are community property and transferred them to his LLC jointly owned company as a way to gain a financial and tactical advantage over me in this divorce. There are over 100 songs that are my sole and separate property.

    ☒ Continued on Attachment 8c.

  d. ☒ Other material facts, including facts indicating that the violation of the orders was without justification or excuse *(specify):*

    Petitioner is attempting to hide his assets from the Court and from his main creditor - me. I have a $220,000 judgement against Petitioner for a Federal case he filed against me and lost. Petitioner has money laundered, along with his Financial Advisor girlfriend Lisa Margulies, by putting his monies in Fidelity accounts in his and her names, "loaning" her $59,000 and co-mingling bank accounts. All os this is with money that was from the sale of my sole and separate property. The violation of orders is his attempt at shielding his royalty stream and our publishing companies from satisfying my judgement.

    ☒ Continued on Attachment 8d.

  e. ☒ I am requesting that attorney fees and costs be awarded to me for the costs of pursuing this contempt action. (A copy of my *Income and Expense Declaration* (form FL-150) is attached.)

---

**WARNING: IF YOU PURSUE THIS CONTEMPT ACTION, IT MAY AFFECT THE ABILITY OF THE DISTRICT ATTORNEY TO PROSECUTE THE CITEE CRIMINALLY FOR THE SAME VIOLATIONS.**

---

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 09/29/2019

Clara Veseliza Baker
    (TYPE OR PRINT NAME)

▶ *(signature)*
    (SIGNATURE)

FL-410 [Rev. January 1, 2015]    **ORDER TO SHOW CAUSE AND AFFIDAVIT FOR CONTEMPT**    Page 2 of 4

Baker v Baker                                                      LD068701

ATTACHMENT 8C

1. July 7, 2016 Court Order by Stipulation for Temporary royalty splits, subject to reallocation

   at trial, states that "*Without prejudice and subject to reallocation at time of trial, all royalty*

   *payments received by either party from any source, for creative work from 1-11-1995 through*

   *4-7-15 will be shared and paid 50/50. This order excludes any work created before 1-11-95*

   *and after 4-7-15. Neither party shall sell, transfer, assign, or make any deal whatsoever*

   *with any third party for any work created between 1-11-95 through 4-7-15 without the*

   *written consent of the other or court order. It is the specific intent of the parties that no*

   *authorship, and no ownership of copyright is affected by this order. Other than ASCAP, BMI,*

   *Universal, and SESAC, both parties will produce royalty statements within 30 days, and*

   *make payment thereon within 30 days, paid to the other party in an amount of 50% of money*

   *received*". (emphasis added)

   A. Petitioner took songs that are still subject to reallocation, some of them my sole and

      separate songs, and publishing companies that are community property and that hold

      my sole and separate publishing, and transferred and assigned them first to Write

      Hear LLC, and then to Adam Bravery LLC without approval from the Court or

      agreement from me. This was directly against our agreement and the Order of the

      Court.

2. April 7, 2015 first date of ATROS - date of Separation

   A. Petitioner took publishing companies belonging to both parties and transferred them

      to his own LLCs directly an ATROS violation

Baker v Baker                                                    LD068701

ATTACHMENT 8D - OTHER MATERIAL FACTS:

1. Petitioner is attempting to hide his assets, most of which are from the sale of my sole and separate property, and some of which are my sole and separate property, from the Court and from his main creditor - me. Mr. Baker is attempting to keep his income stream from being used to satisfy a judgement I have against him for $220,000 for a Federal case he filed against me and lost. Petitioner and his Financial Advisor girlfriend, Lisa Margulies, have money laundered and converted his assets by putting his monies in his LLCs, Fidelity accounts, and by commingling with Lisa Margulies' bank accounts. As an example, Petitioner "loaned" Lisa Margulies $59,000 and then "sold" that loan to his LLCs with no payments on the loan having been made to date. In another example, Petitioner had a check to him for $25,000 deposited into Ms. Margulies account, by putting his name on her account right before the check was deposited without disclosure. This was all found during discovery in his fraudulent bankruptcy. I cannot collect on my judgement and all of his accounts are now empty.

1

2

3   Joseph A. Yanny (CA Bar 97979)
    YANNY & SMITH
4   1801 Century Park East, Suite 2400
    Los Angeles, CA 90067
5   (310) 551-2966
    (310) 551-1949
6   jyanny@yannylaw.com

7   Attorney for Clara Veseliza Baker

8

9                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                        FOR THE COUNTY OF LOS ANGELES

11

12

13

14   ALEXANDER COLLIN BAKER,          )   Case No.  LD068701
                                      )   Related Case: LC103241
         Petitioner,                  )
15                                    )
                                      )   **CLARA VESELIZA BAKER**
16   vs.                              )   **AFFIDAVIT OF FACTS**
                                      )   **CONSTITUTING CONTEMPT**
17   CLARA VESELIZA BAKER,            )   **DATE:** October 2, 2019
                                      )   **TIME:  8:30 a.m.**
18       Respondent.                  )   **DEPT: 65**
                                      )   **HON: Emily T. Spear**
19                                    )
                                      )
20                                    )
                                      )
21                                    )
                                      )
22                                    )

23

24        I, Clara Veseliza Baker, declare as follows:

25   1.   That I am the Respondent in this action. I am over the age of 18 years. I have personal

26        knowledge of the facts contained in this declaration, and if called upon to testify I

27

28        could and would testify competently as to the truth of the facts stated herein.

                                    - 1 -
                      DECLARATION OF CLARA VESELIZA BAKER

2.     Petitioner is in Contempt of Court for violating the July 7, 2016 stipulation and order equalizing certain royalty payments subject to reallocation at trial. The contempt arises because subsequent to the July 7, 2016 stipulation and order, Petitioner assigned his royalty stream to two different LLCs, in which I have no interest. I am informed and believe that Petitioner executed such assignment in order to prevent me – his main creditor – from attaching such royalty stream. A true and correct copy of the July 7, 2016 Stipulation and Order is hereto attached as **Exhibit A.**

3.     Petitioner is also in Contempt of Court for holding, isolating, and controlling our community property publishing companies Tarzana Jane Music, Write Hear Music, Cocoloco Toons, and Mantlepiece Music, which is an ATROS violation. Such publishing companies hold my sole and separate catalogue in them as well as our community property catalogues. I am informed and believe that Petitioner is doing this in order to prevent me from accessing my separate property, my share of community property, and to otherwise gain an advantage in our divorce.

4.     I need access to our publishing companies because they hold copyrights that would allow me to make music deals and make money.

5.     I recently lost a deal for $11,000 to release one of my songs in a movie because I did not have control of my sole and separate copyright and couldn't make the deal. The copyright in the subject property is held in one of our community property publishing companies - Tarzana Jane Music – which is controlled by Petitioner.

- 2 -

DECLARATION OF CLARA VESELIZA BAKER

6. ASCAP (American Society of Composers, Authors, and Publishers), BMI (Broadcast Music, Inc.) and SESAC are US public performance organizations (PROs) who collect publishing royalties (performance royalties) for the PUBLIC PERFORMANCE of musical works as stipulated by the U.S. Copyright Act.

7. ASCAP, BMI, and SESAC currently collect royalties for me worldwide.

8. 17 U.S.C. 102(a) states that Ownership of Copyright initially vests in the author or authors of the work.  "Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."

9. Date of creation is the standard for establishing initial copyright ownership. "Copyright registration does not establish the copyright, which attaches at the moment of creation."  Brownstein v Lindsay, 743 F .3d 55, (3d Cir 2014)

1. A copyright holder has rights to copy, perform, display, distribute for sale, prepare derivative works and grant licenses.  17 U.S.C. 106 *et.seq.* and Id 201 *et.seq.*

10. Before I met my ex-husband in 1993, I was a recording artist with a Platinum selling album in the Far East and Europe. I was also a record producer for other artists, including a posthumous Harry Chapin record.  I held copyrights  in various forms, including as songs and as sound recordings.  I had my own publishing companies, Clair Marlo Music, and Cocoloco Toons, with ASCAP and was making approximately

- 3 -
DECLARATION OF CLARA VESELIZA BAKER

$90,000 a year in the music business from various streams of income including copyrights.

11.   When we met, Petitioner was a touring musician but had never been published or made any money from writing songs. He had no publishing company or income streams from songwriting at that time.

12.   I taught Petitioner a lot about how to build a music catalogue, and record and release music. We got married, became a writing and producing team, had two children, bought a house, created numerous publishing companies together, and operated a successful production company. Things went well until he started taking drugs and stopped contributing to our business and family.

13.   Petitioner filed for divorce on June 14, 2014. We tried to reconcile from September 2014 until our final date of separation of April 7, 2015, when Petitioner left the home and never came back.

14.   On July 7th, 2016, we were granted a divorce only, through bifurcation, with the remaining issues to be decided at trial. A true and correct copy of the divorce order is herewith attached as **Exhibit B**

15.   On July 7, 2016, Petitioner and I stipulated to the terms stated in the Stipulation Court Order which states that: *"Without prejudice and subject to reallocation at time of trial, all royalty payments received by either party from any source, for creative work from 1-11-1995 through 4-7-15 will be shared and paid 50/50. This order excludes any work created before 1-11-95 and after 4-7-15. Neither party shall sell, transfer,*

- 4 -
DECLARATION OF CLARA VESELIZA BAKER

*assign, or make any deal whatsoever with any third party for any work created*

*between 1-11-95 through 4-7-15 without the written consent of the other or court*

*order. It is the specific intent of the parties that no authorship, and no ownership of*

*copyright is affected by this order. Other than ASCAP, BMI, Universal, and SESAC,*

*both parties will produce royalty statements within 30 days, and make payment*

*thereon within 30 days, paid to the other party in an amount of 50% of money*

*received."* (emphasis added)  A true and correct copy of the Court Order has been

herewith submitted as **Exhibit A.**

16.   On July 18th, 2016, Petitioner wrote a letter for both of us to give to ASCAP, BMI,

and Universal to adjust all royalty payments according to dates *registered* and not

dates *created* as the court order said. The substitution of the word *"registered"* for

*"created"* was not apparent at the time that I reviewed and signed the letter.  Petitioner

did not call attention to the fact that he replaced "created" with "registered" in the

letters.  I was being sued by Petitioner in numerous lawsuits and I was defending them,

working a new job, and trying to take care of my special needs daughter.  It's not an

excuse, but it's the only reason I have for missing such an important fact.  True and

correct copies of the co-signed letters sent to ASCAP, BMI, and Universal are herewith

submitted as **Exhibits C1-C** 2

17.   Petitioner incorrectly states that it is date of registration with ASCAP and BMI, and

not date of creation, we should be using. Date of creation is the standard for

establishing initial copyright ownership. "Copyright registration does not establish the

copyright, which attaches at the moment of creation ."  <u>In re Brownstein v Lindsay,</u>

<u>743 F ,3d 55, (3d Cir 2014)</u>

18.  Creation dates for our copyrights are easily established, as they would have a date in which we first recorded them somewhere (even on a portable cassette), or put them into the computer as lyrics, or wrote sheet music.  My sole and separate copyrights are also easy established because most of them were recorded and released publicly before marriage.

19.  Because it was subject to reallocation at trial, and because there were court orders in place stating he couldn't transfer the copyrights, I elected to wait until trial to remedy the situation. I thought trial would happen soon.  I didn't know it would be this many years to get to trial because of Petitioner's vexatious and excessive litigation against me.  A true and correct copy of the Vexatious Litigant order against Petitioner is herewith submitted as **Exhibit D**

20.  On April 12, 2017, in Contempt of that Court Order dated July 7, 2016,  Petitioner assigned his BMI royalty stream to an LLC I had no interest in - Write Hear Music LLC.  He has also violated ATROS, which was implemented at least as early as April 7, 2015, the date of separation.  Petitioner's improper assignment included our community property and my sole and separate property in the form of songs, song publishing, and our jointly-owned publishing companies.  These publishing companies also control sole and separate publishing copyrights I owned before we married.  By transferring his interest in the royalties, he transferred my rights under copyright law.

- 6 -
DECLARATION OF CLARA VESELIZA BAKER

A true and correct copy of Petitioner's transfer of his royalty stream is herewith submitted as **Exhibit E.**

21.  Mr. Baker has no separate property in the form of music publishing, or music copyrights because everything he did with songwriting and copyrights began after marriage.

22.  On July 5, 2018, I obtained a judgment against Petitioner declaring that the registered song splits on over 600 song properties, with the exception of two albums, accurately reflected our songwriting contribution to the subject works. I had previously obtained summary judgment in my favor on Petitioner's claims for RICO violations and copyright infringement. Petitioner's conversion and fraud claims were dismissed. I won Petitioner similarly lost claims against Firstcom, although Petitioner and Firstcom settled their dispute before trial on Firstcom's counterclaims.

23.  I am informed and believe that Petitioner was concerned that he would lose everything if I and/or Firstcom pursued legal fees. Right after I won my judgment against him, Petitioner quickly moved to protect his income streams from any potential creditors. On July 9, 2018, Petitioner transferred his interest in the copyrights from Write Hear LLC to a company he jointly owned with two other people - Adam Bravery LLC. This transfer of interest in copyright violated the court order by transferring his interest in the royalty stream from the copyrights. Now other people have control of rights derived by my intellectual property and companies I co-own. Petitioner did not seek consent from me or the Court for this transfer. As with the prior transfer to Write Hear

- 7 -
DECLARATION OF CLARA VESELIZA BAKER

Music, LLC, this transfer violated the July 7, 2016 Stipulation and Order. A true and correct copy of Petitioner's assignment of the royalty stream to Adam Bravery, LLC is herewith submitted as **Exhibit F.**

24. On August 14th, 2018, I won a judgement of attorneys' fees and costs in the Federal RICO case – for legal fees in the amount of $219,811.70 and costs in the amount of $2,136.75. A true and correct copy of the Order awarding attorney fees and costs is herewith submitted as **Exhibit G.**

25. On May 18, 2019, I obtained Writs of Execution for the Fees and Costs. True and correct copies of the Writs of Execution for Fees and Costs are herewith submitted as **Exhibits H1 and H2.**

26. I now have an executable Federal judgement of at least $221,948.34 plus accruing interest, because Petitioner did not post a bond. However now, his royalty stream has been transferred to a third party and I cannot collect it. Petitioner has defrauded a major judgement creditor by transferring –the royalty stream in violation of the Court's July 7, 2016 order.

27. To add to that, Petitioner and his Financial Planner girlfriend, Lisa Margulies, emptied all of his accounts across various financial institutions that held monies from the sale of my sole and separate property so that I could not collect on that either. A true and correct copy of the notice that Fidelity and Citibank were zero balances is herewith attached as **Exhibit I1 and I2**

- 8 -
DECLARATION OF CLARA VESELIZA BAKER

28. Petitioner also engaged in a fraudulent bankruptcy, in an attempt to keep me from executing on the judgement. He later dismissed that bankruptcy after I opposed it and showed a clear trail of all of his money laundering and conversion. However since he emptied his accounts, I still cannot collect. A true and correct copy of the bankruptcy filing is herewith attached as **Exhibit J.**

29. **Petitioner is in Contempt of Court** for transferring and assigning rights in a royalty stream from copyrights, including my sole and separate property, to third parties. I informed ASCAP and BMI that Petitioner was holding my sole and separate songs, and alerted them that Petitioner is holding our joint publishing companies. True and correct copies of emails are herewith attached as **Exhibit K1-K5.**

30. **Petitioner is in Contempt of Court** for transferring and controlling community businesses Write Hear Music (BMI), Tarzana Jane Music (ASCAP), Cocoloco Toons (ASCAP), and Mantlepiece Music (ASCAP), and neither sharing their assets with me, nor allowing me to conduct normal business or collect royalties for our joint and my sole intellectual properties. My lawyer notified Petitioner immediately after he locked me out of publishing companies that he was in violation of ATROS. A true and correct copy of the email is herewith attached as **Exhibit L**

31. I am informed and believe that Petitioner is trying to gain an advantage in this divorce and starve me out of being able to survive it. I am being starved out. I have attached a true and correct copy of my most current Income and Expense herewith as **Exhibit M.**

- 9 -
DECLARATION OF CLARA VESELIZA BAKER

32. I ask the Court to find Petitioner in Contempt of Court for violating copyright rules, for violating ATROS by stealing our publishing companies, and for violating specific Court Orders not to assign or transfer any of our community properties until time of trial.

33. I ask the Court to make Petitioner pay my legal fees for this hearing and for the trial. A copy of the legal fees will be supplied after trial.

34. Each song is a separate violation of the Court Order. I ask the Court to impose fines of $1,000 for each of the 3,000 plus songs that were transferred, for Contempt of Court and to impose jail time to Petitioner of up to five days for each violation, in the hopes that it will deter him from further ignoring Court Orders. Petitioner shows no respect for the Judicial Process, the Rules of Court, or the norms of common decency. This is best evidenced by the fact that he already has a DVRO against him and the Vexatious Litigant Order.

35. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed on September 30 , 2019 at Johnson County, Kansas.

_____

Clara Veseliza Baker

- 10 -
DECLARATION OF CLARA VESELIZA BAKER

# EXHIBIT M



AnnMarie Mori • (310) 789-1204 • amori@troygould.com

**TROYGOULD PC**

1801 Century Park East, 16th Floor
Los Angeles, California 90067-2367
**Tel** (310) 553-4441 | **Fax** (310) 201-4746
www.troygould.com

File No. 03202-0069

October 7, 2019

**BY ELECTRONIC MAIL AND U.S. MAIL**

Alex Baker
3505 8th Avenue
Los Angeles, California 90018
acebaker1234@yahoo.com

Write Hear, LLC
c/o Alex Baker
3505 8th Avenue
Los Angeles, California 90018
acebaker1234@yahoo.com

Adam Bravery, LLC
c/o Adam Baker, Member
3505 8th Avenue
Los Angeles, California 90018
acebaker1234@yahoo.com

Joe Yanny
Yanny & Smith
1801 Century Park East 24th Floor
Los Angeles, California 90067
joeyanny@yannylaw.com

Re:    _Baker v. Baker_, Los Angeles Superior Court Case No. LD068701

Dear Mr. Baker and Mr. Yanny:

This letter is to notify you that on or about October 3, 2019, BMI received notice that an Order to Show Cause re Contempt was filed against Mr. Baker in _Baker v. Baker_, Los Angeles Superior Court Case No. LD068701 (the "marital dissolution action").

The Order to Show Cause sets forth that the that the 4/2017 assignment by Mr. Baker of his royalties to Write Hear, LLC, and the subsequent 7/2018 assignment of royalties by Mr. Baker on behalf of Write Hear, LLC to Adam Bravery LLC violated the July 2016 Court Order issued in the marital dissolution action. (The royalties will hereinafter be referred to as "Assigned Royalties.")

The hearing on the Order to Show Cause is set for November 7, 2019.

Please be advised that BMI has placed a hold on the Assigned Royalties pending an order of the Court resolving the dispute or the written agreement of the parties as to the disposition of the Assigned Royalties.

Please be further advised that if the Court does not make a determination as to the validity of the assignments and/or does not instruct the parties as to how the Assigned Royalties should be directed, then BMI may file an interpleader action to resolve that issue. In light of the foregoing, in order to allow for expeditious resolution of the dispute relating to the Assigned Royalties, we request that you ask the Court to specifically make



Alex Baker
Write Hear, LLC
Adam Bravery, LLC
Joe Yanny
October 7, 2019
Page 2

such a determination in connection with any ruling on the Order to Show Cause or subsequent hearing relating thereto.

BMI reserves all rights.

Very truly yours,

AnnMarie Mori

cc:    Erika Stallings (via email only estallings@bmi.com)
       Mike Di Nardo (via email only Mike@kelly-kelleylaw.com)

03202-0069 332464.1

# EXHIBIT N

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division
### Stanley Mosk Dept. - 65

LD068701
**BAKER, ALEXANDER COLLIN VS. BAKER, CLARA VESELIZA**

**November 7, 2019**
**8:30 AM**

Honorable Emily T. Spear, Judge

Cindy Kim, Judicial Assistant                              Debra Rivera (#10785), Court Reporter
Adglae Davila, Court Services Assistant

---

**NATURE OF PROCEEDINGS:**  Request for Order Hearing OSC RE: Contempt

The following parties are present for the aforementioned proceeding:

> Alexander Baker, Petitioner, Appellant
> Clara Baker, Respondent, Respondent (to Appeal)
> Michael A. DiNardo, Attorney for Respondent
> Joseph Yanny, Attorney for Respondent
> Christopher Thomas, Public Defender

The matter is called for hearing.

The parties are placed under oath and testify.

The Court finds a courtesy copy of another contempt hearing set for January 09, 2020. The Court notes that it is in attempts to correct the matter this date.

Counsel for Respondent the request for dismissal was filed untimely and requests the matter proceed.

The Court notifies the parties that it discussed with another judicial officer and that the parties cannot be sent to trial until the contempt proceedings have concluded.

The Court inquires of the parties and the matter is heard.

Public Defender requests the matter be dismissed this date.

The matter is further heard.

The Court orders the matter dismissed pursuant to Penal Code Section 1385.

The parties are ordered to department 2, forthwith, to obtain trial dates.

The Court finds all issues should be litigated at time of trial.

Minute Order is to be delivered to Department 2 by counsel for Respondent .

---

Minute Order                              Page 1 of 1

# EXHIBIT O

Yahoo Mail - Baker / Marlo BMI royalties                    https://mail.yahoo.com/d/search/name=AnnMarie%20Mori&emai...

## Baker / Marlo BMI royalties

From:  Mori, AnnMarie (amori@troygould.com)

To:     joeyanny@gmail.com; acebaker1234@yahoo.com

Cc:     Mike@kelly-kelleylaw.com; estallings@bmi.com; marc.angelucci@yahoo.com

Date:  Tuesday, September 3, 2019, 12:06 PM PDT

Mr. Yanny and Mr. Baker:

On August 27, 2019, Mr. Baker made a demand that BMI stop royalties payments and advised BMI that there is currently a dispute relating to the musical works registered with BMI that were created by Mr. Baker and Ms. Clara Veseliza Baker aka Clair Marlo ("Ms. Marlo").

As you know, on July 7, 2016, the Court in Los Angeles Superior Court case LD 068701 (the "marital dissolution action") issued an order relating to the division of royalty payments for works created by Mr. Baker and Ms. Marlo. Subsequently, BMI received a July 18, 2016 letter of direction ("letter of direction"), signed by both parties, instructing that all royalties earned from the musical works "registered after January 11, 1995 and before June 1, 2015" ("marital works") were to be split 50/50.

Since that time, the royalty payments earned on behalf of the marital works have been paid 50/50 to Mr. Baker and Ms. Marlo.

On August 27, 2019, Mr. Baker advised BMI that: (1) the "marital royalties" should be "characterized as community property;" and (2) the July 7, 2017 Order requires Mr. Baker and Ms. Marlo to "split royalties on all works "created" after January 11, 1995 and before May 7, 2015."

Because the royalty payments for the marital works are being split 50/50 in accordance with the letter of direction (and Mr. Baker's August 27 email), it does not appear that Mr. Baker has identified a current "dispute" is as to the royalties.

Mr. Baker's August 27 email also stated that Mr. Baker is seeking a final judgment in the marital dissolution action regarding the "characterization" and "reallocation" of the royalties. A dispute (or potential dispute) as to the ownership or "characterization" of the marital works does not appear to currently impact the parties agreement to split the royalty payments 50/50 pending a final order in the marital dissolution action.

Therefore, it does not appear that Mr. Baker or Ms. Marlo dispute that at this time the royalty payments should continue to be distributed 50/50.

Please advise of your position as to whether there is a current dispute with respect to the royalty payments relating to the marital works, and if so, why you believe that there is a dispute. Please provide us with your response by no later than September 5, 2019.

Also, as you know, Ms. Marlo currently disputes an assignment made by Mr. Baker that transfers his share of the marital royalties to Adam Bravery, LLC. This dispute is based upon the July 7, 2016 Court Order that stated that all royalty payments shall "be shared *and paid* 50/50" (emphasis added) and that neither party shall make "any deal whatsoever" including assignments for the marital works. In July 2018, Mr. Baker assigned his royalties, directing BMI to pay 100% of Mr. Baker's royalties to Adam Bravery. As previously advised by Ms. Erika Stallings in her August 21, 2019 letter, please advise us by September 5, 2019 if the parties reach a resolution as to the dispute relating to the Adam Bravery assignment.

BMI reserves all rights.

4:21-cv-00022_EXHIBITS TO FIRST AMENDED COMPLAINT  p.77

Yahoo Mail - Baker / Marlo BMI royalties                    https://mail.yahoo.com/d/search/name=AnnMarie%20Mori&emai...

AnnMarie Mori



**AnnMarie Mori**
(310) 789-1204 - Fax (310) 789-1404
amori@troygould.com
TroyGould PC
1801 Century Park East, Suite 1600
Los Angeles, CA 90067-2367
www.troygould.com

**Tax Advice Disclaimer**: Any federal tax advice contained in this communication (including attachments) was not intended to be used, and it cannot be used, by you for the purpose of (1) avoiding any penalty that may be imposed by the Internal Revenue Service or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein. If you would like such advice, please contact us.

**Notice to Recipient**: This e-mail is meant only for the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of the e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and delete this message from your system. Thank you in advance for your cooperation.

4:21-cv-00022_EXHIBITS TO FIRST AMENDED COMPLAINT  p.78

# EXHIBIT P

1 | Marc E. Angelucci, Esq. (SBN 211291)
2 | P.O. Box 6414, Crestline, CA 92325
   | Phone (626) 319-3081
3 | Fax: (818) 236-4127
   | Marc.angelucci@yahoo.com
4 |
5 | Attorney for Petitioner
   | ALEXANDER C. BAKER
6 |
7 |                 SUPERIOR COURT OF CALIFORNIA
8 |                   COUNTY OF LOS ANGELES
   |                       CENTRAL DISTRICT
9 |                 111. N. Hill St. Los Angeles, CA. 90012

**RECEIVED**
**SEP 24 2019**

10 |
11 | ALEXANDER COLLIN BAKER               Case No. LD068701
12 |
13 |        Petitioner,                   **STIPULATION RE PETITIONER'S**
   |                                      **MOTION FOR JOINDER OF BMI**
14 |
15 |             v.                        DATE: October 10, 2019
16 |                                       TIME: 8:30 AM
17 | CLARA VESELIZA BAKER                  DEPT. 65
   |                                       HON. Emily T. Spear
18 |
19 |        Respondent.
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

Law Office of the National Coalition For Men
Marc E. Angelucci. Esq.
(626) 319-3081

03202-0069 332078.3

Law Office of the National Coalition For Men
Marc E. Angelucci Esq
(626) 319-3081

1 **STIPULATION**

2     WHEREAS, Petitioner, Alexander Collin Baker ("Petitioner"), is a "writer

3 member" of non-party Broadcast Music Inc. ("BMI"); and

4     WHEREAS, Respondent, Clara Veseliza Baker ("Respondent"), is a "writer

5 member" of non-party BMI; and

6     WHEREAS, Petitioner and Respondent collectively own three music publishers that

7 are current "publisher members" of BMI: Write Hear Music, Clair Marlo Music and

8 Veselica Music (collectively the "Publisher Members"); and

9     WHEREAS, BMI's works records include the date on which each musical work

10 was registered with BMI, but BMI's works records do not include information regarding

11 when any of the particular works at issue here was created; and

12     WHEREAS, Petitioner and Respondent entered into a "Stipulation and Order on

13 Order to Show Cause," in this matter that was "So Ordered" by the Court on July 7, 2016

14 (the "Prior Order"), pursuant to which royalties otherwise payable to Petitioner or

15 Respondent for works *created between* January 11, 1995 and April 7, 2015 were to be

16 "shared and paid 50/50" (emphasis added); and

17     WHEREAS, on or around July 18, 2016, Petitioner and Respondent sent a jointly-

18 signed letter to BMI directing BMI to pay equally to Petitioner and Respondent,

19 "immediately and until further notice," all BMI royalties for "all songs *registered* after

20 January 11, 1995 and before June 1, 2015" (emphasis added); and

21     WHEREAS, BMI immediately complied with the July 18, 2016 Letter of Direction

22 by creating "Special Accounts" for all songs registered by either Petitioner or Respondent

23 after January 11, 1995 and before June 1, 2015 and allocating the royalties for those songs

24 equally among Petitioner and Respondent, and since then both parties have been receiving

25 royalties equalized as per the Letter of Direction; and

26     WHEREAS, the July 2016 Stipulation and Order was not a final judgment, and no

27 final judgment has been reached on this royalty reallocation issue; and

28

1

MEMORANDUM OF POINTS AND AUTHORITIES

03202-0069 332078.3

1  WHEREAS, on August 26, 2019, Petitioner filed a Notice of Motion and

2  Declaration seeking to join BMI as a party in this action (the "Motion for Joinder of BMI")

3  on the grounds that, absent this stipulation, joinder is necessary to allow the Court to issue

4  an order regarding the proper allocation of royalties that is binding upon BMI; and

5  WHEREAS, BMI does not agree that it should be joined as a party to this action;

6  and

7  NOW THEREFORE, SUBJECT TO THE APPROVAL OF THE COURT,

8  Petitioner, Respondent, and BMI, hereby STIPULATE AND AGREE as follows:

9  I.   BMI allocated the parties' royalties in accordance with the July 18,

10  2016 Letter of Direction, pending notice of a final order in the parties' marital

11  dissolution action. Upon receipt of a further letter or direction by the parties

12  ("LOD"), or upon receipt of a final court order regarding the ownership and/or

13  allocation of royalties between Petitioner and Respondent, BMI will allocate

14  royalties in accordance with such further LOD or Final Order.

15  II.   Upon execution of this Stipulation, Petitioner withdraws his Motion

16  for Joinder of BMI, and the parties hereby respectfully request the Court take

17  Petitioner's Motion for Joinder of BMI off calendar.

18  III.   Upon execution of this Stipulation, Petitioner agrees that the

19  Summons purportedly issued and served on BMI is hereby withdrawn and of no

20  force and effect. Nothing in this Stipulation shall be construed as an agreement by

21  BMI to submit to the jurisdiction of the Court in connection with this action.

22  Respectfully submitted September 23, 2019

23  **PREPARED AND REVIEWED BY:**

24  Dated: September 24, 2019

25

26  ANNMARIE MORI          Marc Angelucci
                                MARC E. ANGELUCCI (SBN 211291)

27

28                    2

MEMORANDUM OF POINTS AND AUTHORITIES

03202-0069 332078.3

Law Office of the National Coalition For Men
Marc E. Angelucci  Esq
(626) 319-3081

Law Office of the National Coalition For Men
Marc E. Angelucci  Esq.
(626) 319-3081

1  | **TROYGOULD**
2  | 1801 Century Park E Ste 1600
   | Los Angeles, CA 90067
3  | Telephone:          (310) 789-1204
   | Facsimile:          (310) 789-1404
4  | Email:  amori@troygould.com
5  |
6  | *Attorney for Non-Party Broadcast Music*
   | *Inc. ("BMI")*
7  |

PO Box 6414
Crestline, CA 92325
Telephone:          (626) 319-3081
Email:  marc.angelucci@yahoo.com

*Attorney for Petitioner Alexander Collin*
*Baker*

8
9  | **CONSENTED TO BY:**
10
11 | BROADCAST MUSIC INC. ("BMI")
12
13 | By: Euka Dulup
14 | Date: 9/25/2019
15
16

ALEXANDER COLLIN BAKER

Date: 9-25-2019

17
18
19
20
21
22
23
24
25
26
27
28

3

MEMORANDUM OF POINTS AND AUTHORITIES

03202-0069 332078.3

Law Office of the National Coalition For Men
Marc E. Angelucci, Esq.
(626) 319-3081

1       SUPERIOR COURT OF THE STATE OF CALIFORNIA

2      FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

3

4

5  ALEXANDER COLLIN BAKER,           Case No. LD068701
                        Related Case No. LC103241

        Petitioner,

6                          Assigned to the Honorable Emily T.
v.                         Spear

7                            Department: 65
CLARA VESELIZA BAKER,

8                      **[PROPOSED] ORDER VACATING**
        Respondent.          **HEARING ON PETITIONER'S**

9                      **MOTION TO JOIN NON-PARTY**
                    **ASCAP**

10

11       IT IS HEREBY ORDERED, pursuant to the Stipulation between Petitioner and non-party

12  Broadcast Music Inc. ("BMI") and good cause having been shown:

13       1.     The October 10, 2019, hearing on Petitioner's Notice of Motion and Declaration to

14  join BMI as a party to this action is VACATED and taken off calendar.

15

16      **IT IS SO ORDERED.**

17

18  DATE:_____    BY: _____

19                           Honorable Emily T. Spear,

20                           Judge of the Los Angeles County Superior Court

21

22

23

24

25

26

27

28

03202-0069 332078.3

POS-030

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Marc E. Angelucci  SBN #211291<br>PO Box 6414<br>Crestline, CA 92325-6414<br><br>TELEPHONE NO.: (626) 319-3081    FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* Alexander Collin Baker | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
  STREET ADDRESS: 111 N. Hill St.
  MAILING ADDRESS:
  CITY AND ZIP CODE: Los Angeles, CA 90018
  BRANCH NAME: Central District

PETITIONER/PLAINTIFF: Alexander Collin Baker

RESPONDENT/DEFENDANT: Clara Veseliza Baker

| PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL | CASE NUMBER:<br>LD068701 |
|---|---|

**(Do not use this Proof of Service to show service of a Summons and Complaint.)**

1. I am over 18 years of age and **not a party to this action.** I am a resident of or employed in the county where the mailing took place.

2. My residence or business address is:
   7135 W. Manchester Ave. Suite 2
   Los Angeles, CA 90045

3. On *(date):* 9-24-201    I mailed from *(city and state):* Los Angeles, CA
   the following **documents** *(specify):*

   Notices of Withdrawal of Motion for Joinder of ASCAP, BMI and
   Stipulation Re Petitioner's Motion for Joinder of Non-

   ☐ The documents are listed in the *Attachment to Proof of Service by First-Class Mail—Civil (Documents Served)*
   (form POS-030(D)).

4. I served the documents by enclosing them in an envelope and *(check one):*
   a. ☑ **depositing** the sealed envelope with the United States Postal Service with the postage fully prepaid.
   b. ☐ **placing** the envelope for collection and mailing following our ordinary business practices. I am readily familiar with this
   business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is
   placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in
   a sealed envelope with postage fully prepaid.

5. The envelope was addressed and mailed as follows:
   a. **Name** of person served: See attached service list
   b. **Address** of person served:
      See attached service list

   ☑ The name and address of each person to whom I mailed the documents is listed in the *Attachment to Proof of Service
   by First-Class Mail—Civil (Persons Served)* (POS-030(P)).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 9-24-201

LISA MARGULIES                                              ▶ *Lisa Margulies*
(TYPE OR PRINT NAME OF PERSON COMPLETING THIS FORM)                (SIGNATURE OF PERSON COMPLETING THIS FORM)

| Form Approved for Optional Use<br>Judicial Council of California<br>POS-030 [New January 1, 2005] | **PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL**<br>**(Proof of Service)** | Code of Civil Procedure, §§ 1013, 1013a<br>www.courtinfo.ca.gov |
|---|---|---|

POS-030(P)

| SHORT TITLE: Baker v Baker | CASE NUMBER: LD068701 |
|---|---|

## ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL (PERSONS SERVED)

*(This Attachment is for use with form POS-030)*

**NAME AND ADDRESS OF EACH PERSON SERVED BY MAIL:**

| Name of Person Served | Address *(number, street, city, and zip code)* |
|---|---|
| Joseph A. Yanny<br>Atty. for Respondent | 1801 Century Park E 24th Fl<br>Los Angeles, CA 90067 |
| AnnMarie Mori<br>Atty. for BMI | 1801 Century Park East, Suite 1600<br>Los Angeles, CA 90067-2367 |
| Justin Thiele<br>Atty. for ASCAP | 10250 Constellation Blvd., 19th Floor<br>Los Angeles, CA 90067 |
| David Kokakis<br>Atty. for UNIVERSAL | 2100 Colorado Avenue<br>Santa Monica, CA 90404 |
| Alicia M. Clough<br>Atty. for SESAC | 10100 Santa Monica Blvd Ste 2200<br>Los Angeles, CA 90067 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Form Approved for Optional Use<br>Judicial Council of California<br>POS-030(P) [New January 1, 2005] **ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL (PERSONS SERVED)<br>(Proof of Service)** Page ____ of ____

# EXHIBIT Q



# Writer Member Agreement

## WARRANTIES AND REPRESENTATIONS

**A.** I represent that there are no existing assignments or licenses, direct or indirect, of non-dramatic performing rights in my musical works, except to or with the publisher(s). If there are assignments or licenses other than with publishers, I have attached copies of such assignments or licenses.

**B.** I have read the ASCAP Articles of Association, Compendium of Rules and Regulations, and Second Amended Final Judgment entered in *U.S. v. ASCAP* (*"AFJ2"*), and agree to be bound by them, as now in effect, and as they may be amended, and I agree to execute agreements in such form and for such periods as the Board of Directors shall have required and shall hereafter require for all members.

**C.** I represent that I meet the eligibility requirements for membership as set forth herein as I have written or co-written a musical work or song that has been performed publicly in any venue licensable by ASCAP (club, live concert, symphonic concert or recital venue, college or university, etc.), performed in an audio visual or electronic medium (film, website, television program, radio station, etc.), commercially recorded, or published as sheet music, a score, or folio which is available for sale or rental. I understand that ASCAP reserves the right to request substantiation of my eligibility for ASCAP membership at any time.

**D.** I warrant and represent that all of the information furnished in this application is true. I acknowledge that any agreement entered into between ASCAP and me will be in reliance upon the representations contained in this application, and that my membership will be subject to termination if the information contained in this application is not complete and accurate.

## MEMBERSHIP AGREEMENT

Agreement made between the Undersigned (for brevity called "*Owner*") and the AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS (for brevity called "Society"), in consideration of the premises and of the mutual covenants hereinafter contained, as follows:

**1.** The *Owner* grants to the *Society* for the term hereof, the right to license non-dramatic public performances (as hereinafter defined), of each musical work:

Of which the *Owner* is a copyright proprietor; or

Which the *Owner*, alone, or jointly, or in collaboration with others, wrote, composed, published, acquired or owned; or

In which the *Owner* now has any right, title, interest or control whatsoever, in whole or in part; or

Which hereafter, during the term hereof, may be written, composed, acquired, owned, published or copyrighted by the *Owner*, alone, jointly or in collaboration with others; or

In which the *Owner* may hereafter, during the term hereof, have any right, title, interest or control, whatsoever, in whole or in part.

The right to license the public performance of every such musical work shall be deemed granted to the *Society* by this instrument for the term hereof, immediately upon the work being written, composed, acquired, owned, published or copyrighted.

The rights hereby granted shall include:

(a) All the rights and remedies for enforcing the copyright or copyrights of such musical works, whether such copyrights are in the name of the *Owner* and/or others, as well as the right to sue under such copyrights in the name of the *Society* and/or in the name of the *Owner* and/or others, to the end that the *Society* may effectively protect and assured of all the rights hereby granted.

(b) The non-exclusive right of public performance of the separate numbers, songs, fragments or arrangements, mel-

odies or selections forming part or parts of musical plays and dramatico-musical compositions, the *Owner* reserving and excepting from this grant the right of performance of musical plays and dramatico-musical compositions in their entirety, or any part of such plays or dramatico-musical compositions on the legitimate stage.

(c) The non-exclusive right of public performance by means of radio broadcasting, telephony, "wired wireless," all forms of synchronism with motion pictures, and/or any method of transmitting sound other than television broadcasting.

(d) The non-exclusive right of public performance by television broadcasting; provided, however, that:

(i) This grant does not extend to or include the right to license the public performance by television broadcasting or otherwise of any rendition or performance of (a) any opera, operetta, musical comedy, play or like production, as such, in whole or in part, or (b) any composition from any opera, operetta, musical comedy, play or like production (whether or not such opera, operetta, musical comedy, play or like production was presented on the stage or in motion picture form) in a manner which recreates the performance of such composition with substantially such distinctive scenery or costume as was used in the presentation of such opera, operetta, musical comedy, play or like production (whether or not such opera, operetta, musical comedy, play or like production was presented on the stage or in motion picture form): provided, however, that the rights hereby granted shall be deemed to include a grant of the right to license non-dramatic performances of compositions by television broadcasting of a motion picture containing such composition if the rights in such motion picture other than those granted hereby have been obtained from the parties in interest.

(ii) Nothing herein contained shall be deemed to grant the right to license the public performance by television broadcasting of dramatic performances. Any performance of a separate musical composition which is not a dramatic performance, as defined herein, shall be deemed to be a non-dramatic performance. For the purposes of this agreement, a dramatic performance shall mean a performance of a musical composition on a television program in which there is a definite plot depicted by action and where the performance of the musical composition is woven into and carries forward the plot and its accompanying action. The use of dialogue to establish a mere program format or the use of any non-dramatic device merely to introduce a

performance of a composition shall not be deemed to make such performances dramatic.

(iii) The definition of the terms "dramatic" and "non-dramatic" performances contained herein are purely for the purposes of this agreement and for the term thereof and shall not be binding upon or prejudicial to any position taken by either of us subsequent to the term hereof or for any purpose other than this agreement.

(e) The *Owner* may at any time and from time to time, in good faith, restrict the radio or television broadcasting of compositions from musical comedies, operas, operettas and motion pictures, or any other composition being excessively broadcast, only for the purpose of preventing harmful effect upon such musical comedies, operas, operettas, motion pictures or compositions, in respect of other interest under the copyrights thereof; provided, however, that the right to grant limited licenses will be given, upon application, as to restricted compositions, if and when the *Owner* is unable to show reasonable hazards to his or its major interests likely to result from such radio or television broadcasting; and provided further that such right to restrict any such composition shall not be exercised for the purpose of permitting the fixing or regulating of fees for the recording or transcribing of such composition, and provided further that in no case shall any charges, "free plugs," or other consideration be required in respect of any permission granted to perform a restricted composition; and provided further that in no event shall any composition, after the initial radio or television broadcast thereof, be restricted for the purpose of confining further radio or television broadcasts thereof to a particular artist, station, network or program. The *Owner* may also at anytime and from time to time, in good faith, restrict the radio or television broadcasting of any composition, as to which any suit has been brought or threatened on a claim that such composition infringes a composition not contained in the repertory of *Society* or on a claim by a non-member of *Society* that *Society* does not have the right to license the public performance of such composition by radio or television broadcasting.

2.  The term of this Agreement shall be for a period commencing on the date hereof and continuing indefinitely thereafter unless terminated by either party in accordance with the Articles of Association.

3.  The *Society* agrees, during the term hereof, in good faith to use its best endeavors to promote and carry out the objects for which it was organized, and to hold and apply all roy-

alties, profits, benefits and advantages arising from the exploitation of the rights assigned to it by its several members, including the *Owner*, to the uses and purposes as provided in its Articles of Association (which are hereby incorporated by reference), as now in force or as hereafter amended.

4. The *Owner* hereby irrevocably, during the term hereof, authorizes, empowers and vests in the *Society* the right to enforce and protect such rights of public performance under any and all copyrights, whether standing in the name of the *Owner* and/or others, in any and all works copyrighted by the *Owner*, and/or by others; to prevent the infringement thereof, to litigate, collect and receipt for damages arising from infringement, and in its sole judgment to join the *Owner* and/or others in whose names the copyright may stand, as parties plaintiff or defendants in suits or proceedings; to bring suit in the name of the *Owner* and/or in the name of the *Society*, or others in whose name the copyright may stand, or otherwise, and to release, compromise, or refer to arbitration any actions, in the same manner and to the same extent and to all intents and purposes as the *Owner* might or could do, had this instrument not been made.

5. The *Owner* hereby makes, constitutes and appoints the *Society*, or its successor, the *Owner's* true and lawful attorney, irrevocably during the term hereof, and in the name of the *Society* or its successor, or in the name of the *Owner*, or otherwise, to do all acts, take all proceedings, execute, acknowledge and deliver any and all instruments, papers, documents, process and pleadings that may be necessary, proper or expedient to restrain infringements and recover damages in respect to or for the infringement or other violation of the rights of public performance in such works, and to discontinue, compromise or refer to arbitration any such proceedings or actions, or to make any other disposition of the differences in relation to the premises.

6. The *Owner* agrees from time to time, to execute, acknowledge and deliver to the *Society*, such assurances, powers of attorney or other authorizations or instruments as the *Society* may deem necessary or expedient to enable it to exercise, enjoy and enforce, in its own name or otherwise, all rights and remedies aforesaid.

7. It is mutually agreed that during the term hereof the Board of Directors of the *Society* shall be composed of an equal number of writers and publishers respectively, and that the royalties distributed by the Board of Directors shall be divided into two (2) equal sums, and one (1) each of such sums credited respectively to and for division amongst (a)

the writer members, and (b) the publisher members, in accordance with the system of apportionment and distribution of royalties as determined by the Board of Directors in accordance with the Articles of Association as they may be amended from time to time.

8. The *Owner* agrees that the apportionment and distribution of royalties by the *Society* as determined from time to time by the Board of Directors of the *Society*, in case of appeal by him, shall be final, conclusive and binding upon him. The *Society* shall have the right to transfer the right of review of any apportionment and distribution of royalties from the Board of Directors to any other agency or instrumentality that in its discretion and good judgment it deems best adapted to assuring to the *Society's* membership a just, fair, equitable and accurate apportionment and distribution of royalties. The *Society* shall have the right to adopt from time to time such systems, means, methods and formulae for the establishment of a member's apportionment and distribution of royalties as will assure a fair, just and equitable distribution of royalties among the membership.

9. **"Public Performance" Defined.** The term "public performance" shall be construed to mean vocal, instrumental and/or mechanical renditions and representations in any manner or by any method whatsoever, including transmissions by radio and television broadcasting stations, transmission by telephony and/or "wired wireless"; and/or reproductions of performances and renditions by means of devices for reproducing sound recorded in synchronism or timed relation with the taking of motion pictures.

10. **"Musical Works" Defined.** The phrase "musical works" shall be construed to mean musical compositions and dramatico-musical compositions, the words and music there of, and the respective arrangements thereof, and the selections therefrom.

11. The powers, rights, authorities and privileges by this instrument vested in the *Society*, are deemed to include the World, provided, however, that such grant of rights for foreign countries shall be subject to any agreements now in effect, a list of which is attached hereto.

12. The grant made herein by the *Owner* is modified by and subject to the provisions of (a) the Second Amended Final Judgment in United States vs ASCAP, Civ. Action No. 41-1395 (S.D.N.Y. June 11, 2001), as the same may be amended from time to time, and (b) the provisions of the Articles of Association and resolutions of the Board of Directors.

# EXHIBIT R

2001 WL 1589999
United States District Court, S.D. New York.

UNITED STATES, Plaintiff
v.
AMERICAN SOCIETY OF COMPOSERS,
Authors and Publishers, Defendants-Appellants.

No. 41-1395 (WCC).    |    June 11, 2001.

**Attorneys and Law Firms**

For plaintiff: Hadrian R. Katz of Arnold & Porter, New York, N.Y.

For defendants: Jonathan M. Rich of Morgan, Lewis & Bockius, Washington, D.C., Philip H. Schaeffer of White & Case, New York, N.Y. , and Richard H. Reimer, New York, N.Y.

**SECOND AMENDED FINAL JUDGMENT**

CONNER, D.J.

*1 Plaintiff having filed its complaint herein on February 26, 1941, the original defendants having appeared and filed their answer to the complaint denying the substantive allegations thereof, all parties having consented, without trial or adjudication of any issue of fact or law therein, to the entry of a Civil Decree and Judgment, filed March 4, 1941 [1940-1943 TRADE CASES ¶ 56,104], to the entry of an Amended Final Judgment on March 14, 1950 [1950-1951 TRADE CASES ¶ 62,595], as subsequently amended and modified and to the entry of an Order thereunder issued on January 7, 1960 [1960 TRADE CASES ¶ 69,612], as subsequently amended and modified;

The parties having moved the Court to amend the Amended Final Judgment,

NOW, THEREFORE, before the taking of any testimony, and without trial or adjudication of any issue of fact or law herein, without admission by the defendant American Society of Composers, Authors and Publishers with respect to any such issue, and upon consent of all remaining parties hereto, it is hereby

ORDERED, ADJUDGED, AND DECREED that the Amended Final Judgment be amended as follows:

I. Jurisdiction. This Court has jurisdiction of the subject matter hereof and of all parties hereto. The complaint states a claim upon which relief may be granted against ASCAP under Section 1 of the Sherman Act, 15 U.S.C. § 1.

II. Definitions. As used in this Second Amended Final Judgment:

(A) "ASCAP" means the American Society of Composers, Authors and Publishers;

(B) "ASCAP music" means any work in the ASCAP repertory;

(C) "ASCAP repertory" means those works the right of public performance of which ASCAP has or hereafter shall have the right to license at the relevant point in time;

(D) "Background/foreground music service" means a person that transmits performances of music to subscribers and that furnishes to those subscribers equipment not otherwise available to the general public that enables subscribers to make the transmitted performances on their premises. A background/ foreground music service does not include radio or television stations or networks, cable television networks or systems, persons that transmit renditions of music to private homes, apartments, or hotel or motel guest rooms, or persons that transmit renditions of music to subscribers that charge admission;

(E) "Blanket License" means a non-exclusive license that authorizes a music user to perform ASCAP music, the fee for which does not vary depending on the extent to which the music user in fact performs ASCAP music;

(F) "Broadcaster" means any person who transmits audio or audio-visual content substantially similar to content that is transmitted by over-the-air or cable radio or television stations or networks as they existed on the date of entry of this Second Amended Final Judgment or that transmits the signal of another broadcaster: (1) over the air, (2) via cable television or direct broadcast satellite, or (3) via other existing or yet-to-be-developed transmission technologies, to audiences using radios, television sets, computers, or other receiving or playing devices;

U.S. v. American Society of Composers, Authors, Publishers, Not Reported in...

2001 WL 1589999, 2001-2 Trade Cases P 73,474, 2001 Copr.L.Dec. P 28,341

**\*2** (G) "Music user" means any person that (1) owns or operates an establishment or enterprise where copyrighted musical compositions are performed publicly, or (2) is otherwise directly engaged in giving public performances of copyrighted musical compositions;

(H) "On-line music user" means a person that publicly performs works in the ASCAP repertory via the Internet or similar transmission facility including any succeeding transmission technologies developed after entry of this Second Amended Final Judgment;

(I) "Performing rights organization" means an association or corporation, such as ASCAP, Broadcast Music, Inc., or SESAC, Inc., that collectively licenses rights of public performance on behalf of numerous copyright owners;

(J) "Per-program license" means a non-exclusive license that authorizes a broadcaster to perform ASCAP music in all of the broadcaster's programs, the fee for which varies depending upon which programs contain ASCAP music not otherwise licensed for public performance;

(K) "Per-segment license" means a non-exclusive license that authorizes a music user to perform any or all works in the ASCAP repertory in all segments of the music user's activities in a single industry, the fee for which varies depending upon which segments contain ASCAP music not otherwise licensed for public performance;

(L) "Person" means an individual, partnership, firm, association, corporation or other business or legal entity;

(M) "Program" means either a discrete program exhibited by a broadcaster or on-line music user or, if such broadcaster or on-line music user does not exhibit discrete programs, such other portion of the transmissions made by the broadcaster or on-line music user as shall be agreed to by ASCAP and the broadcaster or on-line music user or as shall be determined by the Court in a proceeding conducted under Section IX of this Second Amended Final Judgment;

(N) "Public list" means such records that indicate the title, date of U.S. copyright registration, if any, writer and current publisher or other copyright owner of all works in the ASCAP repertory, including, but not limited to, the public electronic list;

(O) "Public electronic list" means separate databases of: (1) works in the ASCAP repertory that have been registered with ASCAP since January 1, 1991, or identified in ASCAP's surveys of performed works since January 1, 1978, identifying the title, writer, and current publisher or other copyright owner of each work; and (2) current ASCAP members;

(P) "Representative music user" means a music user whose frequency, intensity and type of music usage is typical of a group of similarly situated music users;

(Q) "Right of public performance" means, and "perform" refers to, the right to perform a work publicly in a nondramatic manner, sometimes referred to as the "small performing right," and any equivalent rights under foreign copyright law, including, but not limited to, rights known as the rights of transmission, retransmission, communication, diffusion and rediffusion;

**\*3** (R) "Similarly situated" means music users or licensees in the same industry that perform ASCAP music and that operate similar businesses and use music in similar ways and with similar frequency; factors relevant to determining whether music users or licensees are similarly situated include, but are not limited to, the nature and frequency of musical performances, ASCAP's cost of administering licenses, whether the music users or licensees compete with one another, and the amount and source of the music users' revenue;

(S) "Through-to-the-Audience License" means a license that authorizes the simultaneous or so-called "delayed" performances of ASCAP music that are contained in content transmitted or delivered by a music user to another music user with whom the licensee has an economic relationship relating to that content;

(T) "Total license, fee" means the sum of all fees paid by the music user in connection with the license, including any fee for ambient or incidental uses but excluding the administrative charges authorized by Section VII(B) of this Second Amended Final Judgment;

(U) "Work" means any copyrighted musical composition; and

U.S. v. American Society of Composers, Authors, Publishers, Not Reported in...

2001 WL 1589999, 2001-2 Trade Cases P 73,474, 2001 Copr.L.Dec. P 28,341

(V) "Writer" means a person who has written the music or lyrics of a work.

III. Applicability. The provisions of this Second Amended Final Judgment shall apply to ASCAP, its successors and assigns, and to each of its officers, directors, agents, employees, and to all other persons in active concert or participation with any of them who shall have received actual notice of this Second Amended Final Judgment by personal service or otherwise. Except as provided in Sections IV(A) and (B) of this Second Amended Final Judgment, none of the injunctions or requirements herein imposed upon ASCAP shall apply to the acquisition or licensing of the right to perform musical compositions publicly solely outside the United States of America, its territories or possessions.

IV. Prohibited Conduct. ASCAP is hereby enjoined and restrained from:

(A) Holding, acquiring, licensing, enforcing, or negotiating concerning any foreign or domestic rights in copyrighted musical compositions other than rights of public performance on a non-exclusive basis; provided, however, that ASCAP may collect and distribute royalties for home recording devices and media to the extent such royalty collection is required or authorized by statute;

(B) Limiting, restricting, or interfering with the right of any member to issue, directly or through an agent other than a performing rights organization, non-exclusive licenses to music users for rights of public performance;

(C) Entering into, recognizing, enforcing or claiming any rights under any license for rights of public performance which discriminates in license fees or other terms and conditions between licensees similarly situated;

(D) Granting any license to any music user for rights of public performance in excess of five years' duration;

**\*4** (E) Granting to, enforcing against, collecting any monies from, or negotiating with any motion picture theater exhibitor concerning the right of public performance for music synchronized with motion pictures;

(F) Asserting or exercising any right or power to restrict from public performance by any licensee of ASCAP any work in order to exact additional consideration for the performance thereof, or for the purpose of permitting the fixing or regulating of fees for the recording or transcribing of such work; nothing in this Section IV(F) shall be construed to prevent ASCAP, when so directed by the member in interest in respect of a work, from restricting performances of a work in order reasonably to protect the work against indiscriminate performances, or the value of the public performance rights therein, or the dramatic or "grand" performing rights therein, or to prevent ASCAP from restricting performances of a work so far as may be reasonably necessary in connection with any claim or litigation involving the performing rights in any such work;

(G) Instituting, threatening to institute, maintaining, continuing, sponsoring, funding or providing any legal services for any suit or proceeding against any motion picture theater exhibitor for copyright infringement relating to the nondramatic public performance of any work contained in a motion picture, provided, however, that nothing in this Section IV(G) shall preclude ASCAP from pursuing its own *bona fide* independent interest in any such suit or proceeding; and

(H) Issuing to any broadcaster any license the fee for which is based upon a percentage of the income received by the licensee from programs that include no ASCAP music unless the broadcaster to whom such license shall be issued shall desire a license on such a basis; provided, however, that this Section IV(H) shall not limit the discretion of the Court in a proceeding conducted under Section IX of this Second Amended Final Judgment to determine a license fee on any appropriate basis.

V. Through-to-the-Audience Licenses. ASCAP is hereby ordered and directed to issue, upon request, a through-to-the-audience license to a broadcaster, an on-line user, a background/foreground music service, and an operator of any yet-to-be-developed technology that transmits content to other music users with whom it has an economic relationship relating to that content; provided, however, that, in accordance with Section III of this Second Amended Final Judgment, ASCAP shall not be required to issue a through-to-the-audience license to perform ASCAP music outside the United States. The fee for a through-to-the-audience license shall take into account the value of all performances made pursuant to the license.

VI. Licensing. ASCAP is hereby ordered and directed to grant to any music user making a written request therefor a non-exclusive license to perform all of the works in the ASCAP repertory; provided, however, that ASCAP shall not be required to issue a license to any music user that is in material breach or default of any license agreement by failing to pay to ASCAP any license fee that is indisputably owed to ASCAP. ASCAP shall not grant to any music user a license to perform one or more specified works in the ASCAP repertory, unless both the music user and member or members in interest shall have requested ASCAP in writing to do so, or unless ASCAP, at the written request of the prospective music user shall have sent a written notice of the prospective music user's request for a license to each such member at the member's last known address, and such member shall have failed to reply within thirty (30) days thereafter.

**\*5**  VII. Per-Program and Per-Segment Licenses.

(A) ASCAP is ordered and directed to offer, upon written request:

(1) To a broadcaster, a per-program license that shall, in addition, cover ambient and incidental uses and shall not require any record-keeping or monitoring of ambient and incidental uses; and

(2) To a background/foreground music service or to an on-line music user, a per-segment license if (a) the music user's performances of music can be tracked and monitored to determine with reasonable accuracy which segments of the music user's activity are subject to an ASCAP license fee; (b) the music user's performances of music can be attributed to segments commonly recognized within the music user's industry for which a license fee can be assessed; and (c) administration of the license will not impose an unreasonable burden on ASCAP; the per-segment license shall, in addition, cover ambient and incidental uses without any record-keeping or monitoring of those uses if that is reasonably necessary to afford a genuine choice among the various types of licenses offered, or of the benefits of any of those types of licenses; if a portion of any on-line music user's transmissions consists of programs substantially similar to those transmitted by over-the-air or cable radio or television stations or networks as they existed on the date of entry of this Second Amended Final Judgment, or is a retransmission of any broadcaster's programs, it shall be presumed that each individual program shall

constitute a segment and for those segments the on-line music user need not meet the requirements of subsections (a), (b) and (c) of this section.

(B) ASCAP may charge any music user that selects a per-program license or a per-segment license a fee to recover its reasonable cost of administering the license.

(C) Nothing in this Second Amended Final Judgment shall prevent ASCAP and any music user from agreeing on any other form of license.

(D) The fee for a per-program license and for any per-segment license issued to an on-line user shall be at the option of ASCAP either:

(1) Expressed in terms of dollars, requiring the payment of a specified amount for each program or segment that contains works in the ASCAP repertory not otherwise licensed for public performance, or

(2) Expressed as a percentage of the music users' revenue attributable to each program or segment that contains works in the ASCAP repertory not otherwise licensed for public performance.

VIII. Genuine Choice.

(A) ASCAP shall use its best efforts to avoid any discrimination among the various types of licenses offered to any group of similarly situated music users that would deprive those music users of a genuine choice among the various types of licenses offered, or of the benefits of any of those types of licenses.

(B) For a representative music user, the total license fee for a per-program or per-segment license shall, at the time the license fee is established, approximate the fee for a blanket license; for the purpose of making that approximation, it shall be assumed for the purposes of this Section VIII(B) that all of the music user's programs or segments that contain performances of ASCAP music are subject to an ASCAP fee.

**\*6**  (C) ASCAP shall maintain an up-to-date system for tracking music use by per-program and per-segment licensees; ASCAP shall not be required to incur any unreasonable costs in maintaining such system; ASCAP may require its members and such licensees to provide ASCAP with all information reasonably necessary to administer the per-program or per-segment license including, but not limited to:

U.S. v. American Society of Composers, Authors, Publishers, Not Reported in...

2001 WL 1589999, 2001-2 Trade Cases P 73,474, 2001 Copr.L.Dec. P 28,341

(1) cue sheets or music logs;

(2) the date of performance of a work and identification of the program or other segment of the music user's activities that contained the performance;

(3) the title of the work performed; and

(4) the writer, publisher or performing artist;

such requirements shall be designed to avoid unreasonable burdens on ASCAP, ASCAP members and licensees.

(D) The terms and requirements of any license shall be designed to avoid imposing any unreasonable burdens or costs on licensees or ASCAP.

IX. Determination of Reasonable Fees.

(A) ASCAP shall, upon receipt of a written request for a license for the right of public performance of any, some or all of the works in the ASCAP repertory, advise the music user in writing of the fee that it deems reasonable for the license requested or the information that it reasonably requires in order to quote a reasonable fee. In the event ASCAP requires such additional information, it shall so advise the music user in writing, and shall advise the music user in writing of the fee that it deems reasonable within sixty (60) days of receiving such information. If the parties are unable to reach agreement within sixty (60) days from the date when the request for a license is received by ASCAP, or within sixty (60) days of ASCAP's request for information, whichever is later, the music user may apply to the Court for a determination of a reasonable fee retroactive to the date of the written request for a license, and ASCAP shall, upon receipt of notice of the filing of such request, promptly give notice of the filing to the Assistant Attorney General in charge of the Antitrust Division. If the parties are unable to agree upon a reasonable fee within ninety (90) days from the date when ASCAP advises the music user of the fee that it deems reasonable or requests additional information from the music user, and if the music user has not applied to the Court for a determination of a reasonable fee, ASCAP may apply to the Court for the determination of a reasonable fee retroactive to the date of a written request for a license and ASCAP shall upon filing such application promptly

give notice of the filing to the Assistant Attorney General in charge of the Antitrust Division.

(B) In any such proceeding, the burden of proof shall be on ASCAP to establish the reasonableness of the fee it seeks except that, where a music user seeks a per-segment license, the music user shall have the burden of demonstrating that its performances of music can be tracked and monitored to determine with reasonable accuracy which segments of the music user's activity are subject to an ASCAP fee and of demonstrating that the music user's performances of music can be attributed to segments commonly recognized within the music user's industry for which a license fee can be assessed.

*7  (C) The fees negotiated by ASCAP and any music user during the first five years that ASCAP licenses music users in that industry shall not be evidence of the reasonableness of any fees (other than an interim fee as provided in Section IX(F) of this Second Amended Final Judgment) for any license in any proceeding under this Section IX.

(D) Should ASCAP not establish that the fee it requested is reasonable, then the Court shall determine a reasonable fee based upon all the evidence.

(E) The parties shall have the matter ready for trial by the Court within one year of the filing of the application unless ASCAP and at least one music user request that the Court delay the trial for an additional period not to exceed one year. No other delay shall be granted unless good cause is shown for extending such schedule Pending the completion of any such negotiations or proceedings, the music user shall have the right to perform any, some or all of the works in the ASCAP repertory to which its application pertains, without payment of any fee or other compensation, but subject to the provisions of Section IX(F) of this Second Amended Final Judgment, and to the final order or judgment entered by the Court in such proceeding.

(F) When a music user has the right to perform works in the ASCAP repertory pending the completion of any negotiations or pending proceedings provided for in Section IX(A) of this Second Amended Final Judgment, either the music user or ASCAP may apply to the Court to fix an interim fee pending final determination or negotiation of a reasonable fee. The Court shall then fix an interim fee within ninety (90) days of such application for an interim fee retroactive to the date of

U.S. v. American Society of Composers, Authors, Publishers, Not Reported in...

2001 WL 1589999, 2001-2 Trade Cases P 73,474, 2001 Copr.L.Dec. P 28,341

the written request for a license, allowing only such limited discovery, if any, that the Court deems necessary to the fixing of such interim fee. In fixing such interim fee, there shall be a presumption that the last existing license (if any) between the music user and ASCAP, or between licensees similarly situated to the music user and ASCAP, sets forth the appropriate interim fee. If the Court fixes such interim fee, ASCAP shall then issue and the music user shall accept a license providing for the payment of a fee at such interim rate from the date of the request by such music user for a license pursuant to Section IX(A) of this Second Amended Final Judgment. If the music user fails to accept such a license or fails to pay the interim fee in accordance therewith, such failure shall be ground for the dismissal of its application for a reasonable fee, if any.

(G) When a reasonable fee has been determined by the Court, ASCAP shall be required to offer a license at a comparable fee to all other similarly situated music users who shall thereafter request a license of ASCAP; provided, however, that any license agreement that has been executed between ASCAP and another similarly situated music user prior to such determination by the Court shall not be deemed to be in any way affected or altered by such determination for the term of such license agreement.

**\*8**  (H) Nothing in this Section IX shall prevent any applicant or licensee from attacking in the aforesaid proceedings or in any other controversy the validity of the copyright of any of the compositions in the ASCAP repertory, nor shall this Second Amended Final Judgment be construed as importing any validity or value to any of said copyrights.

(I) Pursuant to its responsibility to monitor and ensure compliance with this Second Amended Final Judgment, the United States may participate fully in any proceeding brought under this Section IX. Any order or agreement governing the confidentiality of documents or other products of discovery in any such proceeding shall contain the following provisions:

(1) The Department of Justice (the "Department") may make a written request for copies of any documents, deposition transcripts or other products of discovery ("products of discovery") produced in the proceeding. If the Department makes such a request to a party other than the party who produced the materials in the

proceeding or to a deponent ("the producing party"), the Department and the party to whom it directed the request shall provide a copy of the request to the producing party. The producing party must file any objection to the request with the Court within thirty days of receiving the request; if the producing party does not file such an objection, the person to whom the Department directed its request shall provide the materials to the Department promptly;

(2) Any party to the proceeding may provide the Department with copies of any products of discovery produced in the proceeding. Any party who provides the Department with copies of any product of discovery shall inform the other parties to the proceeding within fifteen days of providing such materials to the Department. The producing party must file any objection to the production within fifteen days of receiving such notice; and

(3) The Department shall not disclose any products of discovery that it obtains under this order that have been designated as "confidential" in good faith or as otherwise protectable under Fed.R.Civ.P. 26(c)(7) to any third party without the consent of the producing party, except as provided in the Antitrust Civil Process Act, 15 U.S.C. § 1313(c)-(d), or as otherwise required by law.

X. Public Lists.

(A) Within 90 days of entry of this Second Amended Final Judgment, ASCAP shall, upon written request from any music user or prospective music user:

(1) Inform that person whether any work identified by title and writer is in the ASCAP repertory; or

(2) Make a good faith effort to do so if identifying information other than title and writer is provided.

(B) Within 90 days of entry of this Second Amended Final Judgment, ASCAP shall:

(1) Make the public list available for inspection at ASCAP's offices during regular business hours, maintain it thereafter, and update it annually; and

(2) Make the public electronic list available through on-line computer access (e.g., the Internet), update it weekly, make copies of it available in a machine-readable format (e.g., CD-ROM) for the cost of

U.S. v. American Society of Composers, Authors, Publishers, Not Reported in...

2001 WL 1589999, 2001-2 Trade Cases P 73,474, 2001 Copr.L.Dec. P 28,341

reproduction, and update the machine-readable copies semiannually.

**\*9** (C) Beginning 90 days after entry of this Second Amended Final Judgment, the first written offer of a license that ASCAP makes to a music user or prospective music user shall describe how to gain access to the public list and public electronic list and describe the variety of works in the ASCAP repertory, including, but not limited to, a list of writers, genres of music and works that illustrates that variety.

(D) After the date on which ASCAP makes the public electronic list available pursuant to Section X(B)(2) of this Second Amended Final Judgment, ASCAP shall not institute- or threaten to institute, maintain, continue, sponsor, fund (wholly or partially, directly or indirectly) or provide any legal services for, any suit or proceeding against any music user for copyright infringement relating to the right of nondramatic public performance of any work in the ASCAP repertory that is not, at the time of the alleged infringement, identified on the public electronic list; provided, however, that nothing in this Section X shall preclude ASCAP from pursuing its own *bona fide* independent interest in any such suit or proceeding. This Section X(D) shall not apply to any such suit or proceeding pending on the date of entry of this Second Amended Final Judgment.

XI. Membership.

A. ASCAP is hereby ordered and directed to admit to membership, non-participating or otherwise:

(1) Any writer who shall have had at least one work regularly published, whether or not performance of the work has been recorded in an ASCAP survey; or

(2) Any person actively engaged in the music publishing business, whose musical publications have been used or distributed on a commercial scale for at least one year, and who assumes the financial risk involved in the normal publication of musical works.

B. (1) ASCAP shall distribute to its members the monies received by licensing rights of public performance, less its costs, primarily on the basis of performances of its members' works (excluding those works licensed by the member directly) as indicated by objective surveys of performances periodically made by or for ASCAP, provided, however, that ASCAP may

make special awards of its distributable revenues to writers and publishers whose works have a unique prestige value, or which make a significant contribution to the ASCAP repertory. Distribution of ASCAP's distributable revenue based on such objective surveys shall reflect the value to ASCAP of performances in the various media, and the method or formula for such distribution shall be fully and clearly disclosed to all members. Upon written request of any member, ASCAP shall disclose information sufficient for that member to determine exactly how that member's payment was calculated by ASCAP.

(2) Where feasible, ASCAP shall conduct, or cause to have conducted, a census or a scientific, randomly selected sample of the performances of the works of its members. Such census or sample shall be designed to reflect accurately the number and identification of performances and the revenue attributable to those performances, made in accordance with a design made and periodically reviewed by an independent and qualified person.

**\*10** (3) ASCAP shall not restrict the right of any member to withdraw from membership in ASCAP at the end of any calendar year upon giving three months' advance written notice to ASCAP; provided, however, that any writer or publisher member who resigns from ASCAP and whose works continue to be licensed by ASCAP by reason of the continued membership of a co-writer, writer or publisher of any such works, may elect to continue receiving distribution for such works on the same basis and with the same elections as a member would have, so long as the resigning member does not license the works to any other performing rights licensing organization for performance in the United States. ASCAP may require a written acknowledgment from such resigning member that the works have not been so licensed.

(a) A resigning member shall receive distribution from ASCAP for performances occurring through the last day of the member's membership in ASCAP, regardless of the date the revenues are received.

(b) ASCAP shall not, in connection with any member's resignation, change the valuation of that member's works or the basis on which distribution is made to that member, unless such changes are part of similar changes

Case 1:22-cv-01599-LLS    Document 2    Filed 02/25/22    Page 167 of 169

U.S. v. American Society of Composers, Authors, Publishers, Not Reported in...

2001 WL 1589999, 2001-2 Trade Cases P 73,474, 2001 Copr.L.Dec. P 28,341

applicable to all members in the resigning member's classification.

(c) Notwithstanding the foregoing, for any member who resigns from ASCAP, ASCAP is enjoined and restrained from requiring that member to agree that the withdrawal of such works be subject to any rights or obligations existing between ASCAP and its licensees, provided, however, that ASCAP may make withdrawal of any works from the ASCAP repertory subject to any license agreement between ASCAP and any licensee that is in effect on the date that this provision becomes effective.

C. Each provision of Section XI(B) of this Second Amended Final Judgment shall only be effective upon entry of an order in *United States v. Broadcast Music, Inc.,* No. 64 Civ. 3787 (S.D.N.Y.), that contains a substantially identical provision. Until the provisions of Section XI(B)(3) of this Second Amended Final Judgment become effective, ASCAP shall not enter into any contract with a writer or publisher requiring such writer or publisher to grant to ASCAP performing rights for a period in excess of five years.

D. Notwithstanding the provisions of Section XI (B)(3) and (C) of this Second Amended Final Judgment, a member who requests and receives an advance from ASCAP shall remain a member of ASCAP and shall not be entitled to exercise any right to resign until the advance has been fully recouped or repaid.

XII. Plaintiff's Access.

(A) For the purposes of determining or securing compliance with this Second Amended Final Judgment or determining whether this Second Amended Final Judgment should be modified or terminated, and subject to any legally recognized privilege, authorized representatives of the Antitrust Division of the United States Department of Justice, shall upon written request of the Assistant Attorney General in charge of the Antitrust Division and on reasonable notice to ASCAP, be permitted:

**\*11** (1) Access during regular business hours to inspect and copy all records and documents in the possession, custody, or under the control of ASCAP, which may have counsel present, relating to any matters contained in this Second Amended Final Judgment;

(2) To interview ASCAP's members, officers, directors, employees, agents, and representatives, who may have counsel present, concerning such matters; and

(3) To obtain written reports from ASCAP, under oath if requested, relating to any matters contained in this Second Amended Final Judgment.

(B) ASCAP shall have the right to be represented by counsel in any process under this Section.

(C) No information or documents obtained by the means provided in this Section shall be divulged by the plaintiff to any person other than duly authorized representatives of the Executive Branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Second Amended Final Judgment, or as otherwise required by law.

(D) If, at the time information or documents are furnished by defendant to plaintiff, ASCAP represents and identifies, in writing, the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and ASCAP marks each pertinent page of such material, "subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then 10-days notice shall be given by plaintiff to ASCAP prior to divulging such material in any legal proceeding (other than a grand jury proceeding) to which ASCAP is not a party.

XIII. Dismissal of Individual Defendants. This action is dismissed with respect to Gene Buck, George Meyer and Gustave Schirmer and their estates.

XIV. Retention of Jurisdiction. Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this Second Amended Final Judgment to make application to the Court for such further orders and directions as may be necessary or appropriate in relation to the construction of or carrying out of this Second Amended Final Judgment, for the modification thereof, for the enforcement of compliance therewith and for the punishment of violations thereof. It is expressly understood, in addition to the foregoing, that:

(A) The plaintiff may at any time after entry of this Second Amended Final Judgment, upon reasonable notice, apply to the Court for the vacation of said Judgment, or its modification in any respect, including the dissolution of ASCAP; and

(B) If, at any time after the entry of this Second Amended Final Judgment, a stipulated amended final judgment is entered in *United States v. Broadcast Music, Inc.,* No. 64 Civ. 3787 (S.D.N.Y.), ASCAP may move the Court, and the Court shall grant such motion, to substitute the relevant terms of that stipulated amended final judgment for those of this Second Amended Final Judgment.

**\*12** XV. Effective Date. This Second Amended Final Judgment shall become effective three months from the date of entry hereof whereupon the Amended Final Judgment entered on March 14, 1950, all modifications or amendments thereto, the Order entered thereunder on January 7, 1960, and all modifications and amendments thereto (collectively the "Amended Final Judgment") and the Final Judgment in *United States v. The American Society of Composers, Authors and Publishers,* (formerly Civ. No. 42-245 (S.D.N.Y.)) entered on March 14, 1950 and all modifications and amendments thereto (the "Foreign Decree") shall be vacated. This Second Amended Final Judgment shall not be construed to make proper or lawful or sanction any acts which occurred prior to the date hereof which were enjoined, restrained or prohibited by the Amended Final Judgment or the Foreign Decree.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 1589999, 2001-2 Trade Cases P 73,474, 2001 Copr.L.Dec. P 28,341

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## PROOF OF SERVICE BY ELECTRONIC MAIL

I am over the age of 18. I am not a party to this action. My business address is 1180 S. Beverly Drive, Suite 610, Los Angeles, CA 90035-1158. My email address is GScottSobel@gmail.com. On the date indicated below, I served the indicated persons the following documents:

## PLAINTIFF'S VERIFIED FIRST AMENDED COMPLAINT
## EXHIBITS TO FIRST AMENDED COMPLAINT

I accomplished service by attaching PDF copies of the document(s) to an email sent to the recipients indicated below. The service list is as follows:

> Jackson Wagener
> Attorney for ASCAP
> jwagener@ascap.com

> AnnMarie Mori
> Attorney for BMI
> amori@troygould.com

> Date of service: March 25, 2021.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

March 25, 2021

G. Scott Sobel, Esq.

Attorney for Plaintiffs